Argued July 6, 1923, reargued June 5, modified July 29, rehearing denied September 30, petition for rehearing by Pacific Power and Light Co. dated October 7, decree modified and entered October 21, 1924.

# RE DETERMINATION OF WATER RIGHTS OF HOOD RIVER.

### (227 Pac. 1065.)

**Waters and Watercourses—Right of Appropriator not Impaired Because Headgate Washed Out and Location Changed.**

1. Fact that headgate was washed out and its location changed did not impair right of appropriator; no intervening rights having been affected, under Section 6535, L. O. L.

**Waters and Watercourses—Date of Posting Notice of Appropriation Fixes Priority.**

2. Under Section 6533, L. O. L., providing for posting of notice of appropriation, date of priority by doctrine of relation is fixed as of date of posting notice; appropriation being finally consummated with reasonable diligence.

---

1. See 27 R. C. L. 1279.
2. Doctrine of prior appropriation of water, see note in 41 L. R. A. 665. See, also, 27 R. C. L. 1266, 1269.

Waters and Watercourses—Reasonable Diligence Test of Appropriation and Priority.

3. Under Section 6533, L. O. L., regarding appropriation and priority, reasonable diligence is test, both in construction of necessary system and in application of water to beneficial purpose.

Waters and Watercourses—First in Time First in Right to Water.

4. Maxim, "First in time, first in right," is rule for determination of not only right to use of water, but also extent of such right.

Waters and Watercourses—Doctrine of Appropriation Applies to Corporation.

5. Appropriation of water by corporation follows same general rule of arid region doctrine as to priority of right as though appropriation was made by individuals.

Waters and Watercourses—Diligence Required in Construction of Works.

6. Diligence in construction of system of works after notice of appropriation of water, under Section 6533, L. O. L., does not involve unusual or extraordinary effort, but that which is usual and ordinary with men engaged in like enterprises, who desire to speedily effect their designs, is required; question being one of fact, to be determined from circumstances.

Waters and Watercourses—Reasonable Diligence in Constructing Works Held Exercised.

7. An irrigation district *held* to have exercised reasonable diligence in constructing ditch and works after notice of appropriation under Section 6533, L. O. L., indicating *bona fide* intent to complete same within reasonable time.

Waters and Watercourses—Appropriator Need not Construct Works for Entire Appropriation at Inception of Project.

8. Under Section 6533, L. O. L., it is not necessary for an appropriator to construct works necessary to make entire appropriation for all land intended to be irrigated at inception of project, when it is not in readiness to receive same, and there is no immediate purpose for which water can be used.

Waters and Watercourses—Rights of Appropriator Protected by Subsequent Statutes.

9. Rights of an appropriator of water, an irrigation district, initiated under act of 1891 (Section 6525 et seq., L. O. L.), are protected and confirmed by later statutes.

Waters and Watercourses—Doctrine of Relation Applied in State.

10. Doctrine of relation, by which priority date of appropriation relates back to date of diversion of water from stream, or to

3. What constitutes appropriation of water, see note in 60 Am. St. Rep. 799. See, also, 27 R. C. L. 1270.

6. See 27 R. C. L. 1271.

10. See 27 R. C. L. 1266.

date of posting notice of contemplated diversion, when reasonable discretion is thereafter exercised in actually diverting water and applying same in accordance with plan in actual existence at such date, is applied in state.

### Waters and Watercourses—Appropriation may be Made for Use of Another.

11. An appropriation may be made by one person for future use of another, and for future use on lands which appropriator does not then own, or which he does not contemplate owning, and which he never does own.

### Waters and Watercourses—Rule of Relation Based on Diligence.

12. Rule of relation has its basis on diligence.

### Waters and Watercourses—Recorded Notice of Appropriation Constructive Notice.

13. Notice of appropriation by an irrigation district, properly recorded, was constructive notice to all persons.

### Waters and Watercourses—Appropriation Made Under Statute.

14. Irrigation Law of 1891 (Section 6525 et seq., L. O. L.), is declaratory of law as it formerly existed, and when an appropriation for a certain area was made, and proposed system was completed with reasonable diligence, and water applied to a beneficial purpose within a reasonable time, right to use of water related back to date of posting of notice of appropriation.

### Waters and Watercourses—Enlargement of Irrigation Canal Held New Appropriation.

15. Enlargement in 1914 of canal of the East Fork Irrigation District, in the Hood River District, *held* to constitute a new appropriation, with a date of relative priority of May 1, 1915.

### Waters and Watercourses—Presumed Decree was Satisfactory to One not Appealing.

16. It will be presumed that decree confirming determination of water board as to award of water rights to one not appealing is satisfactory as to award of water right of itself, and award will not be reviewed, except as it may affect decision as to other water rights.

### Waters and Watercourses—Riparian Right cannot be Declared to be for Definite Quantity of Water.

17. A riparian right is not and cannot be declared in advance to be for a definite quantity of water, and a power company is not entitled to a decree to that effect.

---

11.   See 27 R. C. L. 1264, 1268.

17.   Nature of riparian rights and lands to which they attach, see notes in 9 Ann. Cas. 1235; Ann. Cas. 1913E, 709; Ann. Cas. 1915C, 1026.   See, also, 27 R. C. L. 1070.

**Common Law—Common Law Adopted Only So Far as Applicable to Conditions.**

18.   Principles of common law of England have been adopted only so far as they are applicable to conditions and in consonance with public policy, Constitution, and statutes of state.

**Waters and Watercourses—Riparian Owner at Common Law Entitled to Full Flow.**

19.   At common law, riparian owner was entitled to full flow of stream through his land, except as it might be affected by reasonable use made thereof by other riparian owners, and no one except a riparian owner could divert any water from stream.

**Navigable Waters—Waters and Watercourses—State's Power to Permit Appropriation Limited.**

20.   A state may change common-law rule as to every stream within its dominion, and permit appropriation of flowing water for such purposes as it deems wise, limited, in absence of consent of Congress, so that state cannot destroy right of United States to water necessary for beneficial use for government property, and by superior power of United States to prevent interference with navigable streams.

**Waters and Watercourses—Power Company Held not Entitled to Continuous Flow of Water as Riparian Owner.**

21.   A power company has no right to a continuous flow of water as riparian owner, where its land belonged to state at time of passage of Section 5715, Or. L., declaring all waters within state to belong to public, but is only entitled to water appropriated under statutes.

**Constitutional Law—Waters and Watercourses—Laws as to Appropriation of Waters Held Valid.**

22.   Sections 5715–5717, Or. L., defining vested rights of riparian owners, and permitting appropriation, is not invalid as impairing vested rights or taking property without due process.

**Common Law—Does not Consist of Fixed Rules, but is Best Product of Human Reason.**

23.   Common law does not consist of fixed rules, but is best product of human reason applied to premises of ordinary and extraordinary conditions of life, as from time to time they are brought before courts.

**Courts—Precedents must Yield to Reason of Different or Modified Conditions.**

24.   It is one of established principles of common law that precedents must yield to reason of different or modified conditions.

18.   See 27 R. C. L. 1072.
19.   See 27 R. C. L. 1079.
20.   See 27 R. C. L. 1071.
21.   See 27 R. C. L. 1073.
23.   See 5 R. C. L. 806.

Waters and Watercourses—Common-law Riparian Doctrine may be Changed by Statute.

25. Common-law rule as to "continuous flow" of a stream, or riparian doctrine, may be changed by statute, except as such change may affect some vested right.

Waters and Watercourses—Title to Land Obtained Subject to Laws Prevailing.

26. Those obtaining title to land take same subject to laws then prevailing relating to appropriation of water.

Waters and Watercourses—One has Only Simple Usufruct in Water.

27. No one has any property in water of a stream, but a simple usufruct.

Waters and Watercourses—Waste Prohibited.

28. Waste of water must be prohibited, and when amount awarded appropriator is not actually used for irrigation or domestic purposes, water must be shut off from ditches or laterals and allowed to flow in stream.

---

See 12 C. J. 179, 181, 960, 1217 (1925 Anno.); 15 C. J. 954; 29 Cyc. 294, 295, 334; 40 Cyc. 557, 560, 561, 563 (1925 Anno.), 565, 702, 703 (1925 Anno.), 705 (1925 Anno.), 711 (1925 Anno.), 712, 717 (1925 Anno.), 718, 721, 722, 737 (1925 Anno.).

From Hood River: Fred W. Wilson, Judge.

In Banc.

Hood River is a perennial, non-navigable stream. It rises in the Cascade Mountains in the southwesterly part of Hood River County and flows in a northeasterly and easterly direction through Hood River Valley and empties into the Columbia River. The land irrigated from Hood River and its tributaries is semi-arid and irrigation is necessary for the raising of profitable crops, which are adapted to that climate and country.

This adjudication had its inception in a suit in the Circuit Court for Hood River County, by the

---

25. See 27 R. C. L. 1260.
27. See 27 R. C. L. 1070, 1273.
28. Care necessary to avoid waste in diverting water from a stream under right of appropriation, see note in 15 L. R. A. (N. S.) 238. See, also, 27 R. C. L. 1275.

Oregon Lumber Company against the East Fork Irrigation District. From a decree of the Circuit Court in favor of the district, the Oregon Lumber Company appealed to this court. On May 23, 1916, the decree appealed from was reversed and the matter remanded to the Circuit Court, with directions to transfer the same to the water board for determination. See *Oregon Lumber Co.* v. *East Fork Irr. Dist.*, 80 Or. 568 (157 Pac. 963).

Contest No. 1—Oregon Lumber Company, a corporation, appellant v. East Fork Irrigation District, appellant and respondent. Pacific Power & Light Company, a corporation, appellant and respondent. Mt. Hood Water Company, a corporation, appellant and respondent. Glacier Irrigating Company, a corporation, et al., respondents.

This controversy, as far as the Oregon Lumber Company is concerned, is mainly with the claimants, East Fork Irrigation District, Mt. Hood Water Company, the Glacier Irrigation Company, their claims being the only ones which would materially interfere with the Oregon Lumber Company.

For convenience we will refer to the Oregon Lumber Company as the "Lumber Company," the East Fork Irrigation District as the "District"; the East Fork Irrigation Company, predecessor in interest of the East Fork Irrigation District, as the "Irrigation Company"; the Mount Hood Water Company as the "Mt. Hood Company," and the Glacier Irrigation Company as the "Glacier Company."

The Oregon Lumber Company claims by virtue of an appropriation and use made in April 1906, 340 second-feet of the water of the East Fork of Hood River for the purpose of generating electrical power for its lumber-mill and an additional 30 second-feet

as leakage and seepage, and for a fish-ladder. The Water Board found from the evidence, in substance, as follows: The Oregon Lumber Company, without the posting of any notices, went upon the East Fork of Hood River and commenced to construct a dam for the purpose of diverting the water for use as power, the Lumber Company began work upon the dam in September, 1905, and completed the same and applied the water to the purpose of developing power about the middle of the year 1906 and within a reasonable time; and fixed the date of relative priority of the Lumber Company as September, 1905, and awarded 322 second-feet of water for power purposes, and for leakage and fish-ladder 13 second-feet, making a total of 335 second-feet. The board also found, in substance, as follows:

The rights of the East Fork Irrigation District appear to have originated with certain notices of appropriation, one filed by the East Fork Irrigation Canal Company recorded on the fourth day of October, 1895, together with a map giving the outline of the ditch and calling for 5,000 miner's inches of water, the ditch to be 6 feet wide on the bottom, 12 feet wide at the top and 4 feet deep. A second notice was filed by the East Side Water Supply Company for 2,000 miner's inches of water recorded on October 15, 1895, the ditch to be 6 feet wide on the bottom, 10 feet wide at the top and 3 feet deep. A further notice was filed by the East Fork Irrigation Company for 7,000 miner's inches of water, and recorded about the twenty-fifth day of November, 1895, which notice calls for a ditch 12 feet wide on the bottom, 18 feet wide at the top and 4½ feet deep. The maps filed with these notices show that the ditches were all to take about

the same general course, and extend from the point of, diversion on the east fork of Hood River, in a northerly and slightly easterly direction to the Columbia River. The claim of the Irrigation District shows that there are about 11,380 acres of irrigable land, which can be irrigated from the ditch. Using the last notice as a basis for their water right, and dating their water right from November 25, 1895, and the size of the ditch as designated in that notice, and the grade of the ditch as shown by the testimony, constructed at $\frac{1}{8}$ inch per rod a short way, and then changed to a grade of 1/10 inch per rod with the depth of water at 4 feet, the board found the capacity of the district ditch to be 142 second-feet, or 5,680 miner's inches; and limited the amount of the water of the district to the capacity of the ditch as provided by the statute of 1891, and fixed the capacity of the ditch at the figures mentioned above.

With regard to the question whether or not due diligence in applying the water to a beneficial use had been maintained, on the part of the district, the board found in substance thus:

"At the inception of the right, the east side of Hood River was a rough, rolling, thickly wooded, undeveloped country. In order to improve any particular tract of land it was necessary to clear the land, prepare it for farming, construct the necessary laterals so as to put water upon the land, and place upon the land the necessary improvements which good husbandry requires for the operation of farming. Such work necessarily takes time. The law does not require an appropriator to do all of that work at one time, but if the work is done within a reasonable time, his appropriation relates back to the date of its initiation. The rules with regard to placing the water to beneficial use also apply to the building of a ditch to its capacity. Where the ap-

propriator intends to appropriate a certain amount
of water and ultimately to have his ditch of a cer-
tain size, he is not required to build that ditch to
that size immediately, but may do so within a reason-
able time after the appropriation is made.  He may,
therefore, build a small ditch and increase its capa-
city as his development requires, until he has his
ditch constructed at the full capacity intended at the
time of the initiation of the appropriation, provided
all this is done within a reasonable time.  The
history of the development of this Company shows
that the first appropriation was made by a company
organized under the act of 1891, and the members
of this company were the owners of the farm lands,
or a large portion of them along the course of the
ditch.  The farmers themselves were pioneers, were
limited in means, and performed most of the work
upon the ditch and upon their land in the prepara-
tion of it for irrigation, themselves.  After having
prepared a farm for the operation of farming, the
apple industry became one of the principal indus-
tries in the Hood River Valley.  The experience of
the apple raisers taught the various growers that the
best trees were produced in this particular climate
and country by not irrigating the trees until they
began to bear, and this condition of husbandry af-
fected, to some degree, the development of the
project initiated by the predecessors in interest of
the East Fork Irrigation District.  The East Fork
Irrigating Company early got into financial straits,
and arrangements were made with one C. R. Bone,
who was given financial control of the Company, to
do a large amount of work upon the ditch.  This was
in 1897.  And in 1901, water was delivered to water
users through the ditch.  Work had been performed
upon the ditch each and every summer, and from
that time on the water began to be used more and
more each year, until at the time of the filing of the
claim of the East Fork Irrigation District there
were irrigated about 7,600 acres of land.  There
was a general enlargement of the ditch in 1904, and

another one in 1908. But in addition to these enlargements, in the meantime, throughout the whole district where the irrigation was carried on, there was continuous construction work of laterals to supply lands which were newly developed each year. In 1912 the Irrigating Company found itself bankrupt, and the East Fork Irrigation District was formed, which district purchased the irrigating plant in the spring of 1913, for about $110,000, plus the debts of the Company, which were paid by the District. These debts and the new construction work performed by the District up to April 30, 1919, amount to $134,337.37, making a total of purchase and construction cost to date of $244,337.37. Since the District was formed many of the laterals have been enlarged, flumes replaced by new ones, and a large amount of pipe laid, putting a large amount of their lands under a pressure system of irrigation; that is, the water is conveyed to the land through pipes under high pressure. There is no evidence in the record of any cessation in the work. The project, being a large one, is impossible to develop in a short time. The State Water Board, therefore, finds that the East Fork Irrigation District and its predecessors in interest have been diligent, and an unreasonable time has not elapsed since the initiation of its water right; and that its appropriation is limited to 5,680 miner's inches, or 142 second feet of water. And inasmuch as the total irrigable area in said District has not been placed under irrigation, the state water board hereby fixes 5 years from the first day of January, 1920, as the time within which such irrigation district must complete its appropriation (or within such further time as may be granted by the State Water Board, upon proper showing) and that all of such appropriation when completed, or such appropriation as may be utilized at the expiration of the time fixed by said water board, shall relate back to and have the priority date for the purposes of the distribution of water, of November 25, 1895.

"That the rights of the First National Bank of Portland, Oregon, and of James H. Ganoe of Portland, Oregon, are included in the appropriation of the East Fork Irrigation District, and their rights are governed thereby."

## Mt. Hood Water Company.

The Water Board found that the Mt. Hood Water Company appropriated water out of the East Fork of Hood River in October, 1895, and built its ditches and began to use the water in June, 1898; that the first appropriation of water was made by the Mt. Hood Water Supply Company which deeded all of its rights to the Mt. Hood Water Company, and in the modified findings of fact and order of the determination the board awarded to the Mt. Hood Water Company water for 433 acres of land which had been irrigated under the Mt. Hood Water Company ditch and found that there were about 897 acres under said ditch which it intended to irrigate and allowed the company five years from the first of January, 1920, to complete the appropriation for the entire acreage and determined that such appropriation should relate back to, and for the priority date of, October, 1895.

The board found that the Glacier Irrigation Company filed a notice of appropriation on March 15, 1906, appropriating water from Fall Creek and Sand Creek. Thereafter the company began the construction of a ditch out of Sand Creek for the purpose of irrigating the land lying under the ditch, amounting to about 3,165 acres. The appropriation of water from Sand Creek, under the notice, was limited to 1,500 inches. The ditch was constructed and work carried on until the first irrigation was done in 1911. At the date of the State Engineer's survey of the

land there had been irrigated through the Glacier Irrigation Company's ditch 562 acres. That the lands to be irrigated are covered with timber and that the company and the water users under it have been using reasonable diligence to reduce the lands to cultivation. The board fixed five years from the first day of January, 1920, as the time within which such appropriation from Sand Creek shall be completed and the rights of the Glacier Irrigation Company shall relate and have the priority date of March 15, 1906, to the extent said appropriation shall have been completed within such time. That the appropriation out of Fall Creek or Cold Spring Creek is under a State Engineer's permit, and the company shall have the rights under such permit as are given by law.

The Oregon Lumber Company filed exceptions to the findings and determination of the Water Board and especially to that part of the findings of the Water Board that the amount of water required and appropriated by the Oregon Lumber Company is 322 second-feet and no more, for power purposes and in refusing to find that the amount of water appropriated by the Lumber Company is 340 second-feet for power purposes; for the reason the amount was appropriated and used for that purpose. The Lumber Company also excepts to the allowances of 13 second-feet and no more, for the fish-ladder and leakage, and claims the amount should be 30 second-feet for those purposes and that the total amount of water awarded to the Lumber Company should be 370 second-feet. The Lumber Company also excepts to the finding that the East Fork Irrigation Company ever appropriated as against the rights of the Lumber Company 5,680 miner's inches, or 142 second-

feet, or any amount of water in excess of the capacity of its ditch at the time the Lumber Company made its appropriation in September, 1905, to wit: 1,100 inches, for the reason the finding is not supported by the evidence and is contrary to the evidence and the law; and excepts to the award to the East Fork Irrigation District of 5,680 miner's inches or 142 second-feet of water or any amount greater than 1,100 inches, the capacity of the district ditch when completed June, 1901. The Lumber Company also excepts to the finding of the Water Board awarding water to the East Fork Irrigation District for 11,797, or any number of acres, or for any specified lands for the reason all the water diverted by the East Fork Irrigation Company, the predecessor in interest of the district, was appropriated for general rental, sale and distribution pursuant to the law of 1891.

The Lumber Company further excepts to the finding and determination of the Water Board in Contest No. 1 wherein the Water Board determined that the rights of appropriation confirmed by this determination are appurtenant to the lands described in the determination for irrigation purposes for the reason that the same could not become appurtenant to any land, the same having been appropriated for general rental, sale and distribution, and particularly excepted to most of the finding of fact and determination of the water board and prayed the court to modify the findings in accordance with the Lumber Company's claim. The decree of the Circuit Court affirmed the findings of fact and order of determination of the state Water Board save and except in the following respect material to the appellants, or some of them, and denied all of the exceptions,

except as against the Mt. Hood Water Company, which company the court allowed 433.5 acres with the priority date of October, 1895.

From this decree the Pacific Power and Light Company, the Oregon Lumber Company, the East Fork Irrigation District and Mt. Hood Water Company, appealed. The Glacier Irrigation Company et al. did not appeal as to the award made to it.

MODIFIED.

For appellant Pacific Light & Power Co., there was a brief and oral argument by *Mr. John A. Laing* and *Mr. Henry S. Gray.*

For appellant and respondent Oregon Lumber Co. there was a brief over the name of *Messrs. Huntington & Wilson,* with an oral argument by *Mr. B. S. Huntington.*

For appellant and respondent East Fork Irrigation District there was a brief and oral argument by *Mr. George R. Wilbur.*

For appellant and respondent Mt. Hood Water Co., and for respondents Hood River Irrigation District et al. there was a brief and oral argument by *Mr. James H. Hazlett.*

For respondents there was a brief and oral argument by *Mr. Ernest C. Smith.*

BEAN, J.—We will consider first the rights of the East Fork Irrigation District, which involves the condition of its predecessor, the East Fork Irrigation Company appropriation and the system of irrigation. The rights of the company, the District's

predecessor, were initiated under the legislative enactment of 1891, Section 6525 et seq., L. O. L. Several sections of the act of 1891 were amended and several repealed in 1913: Gen. Laws 1913, p. 138. The later enactment of 1909, known as the Water Code, preserves existing rights under former laws and provides that such rights shall be adjudicated under the law of 1909: Or. L., § 5715 et seq.

The act of 1891 provided, in so far as deemed necessary to note here, as follows (Section 6525, L. O. L.):

"The use of the water and the running streams of the State of Oregon, for general rental, sale or distribution, for purposes of irrigation, and supplying water for household and domestic consummation, and watering livestock upon dry land of the state, is a public use, * * *"

Section 6526, L. O. L., authorizes a corporation organized for the construction and maintenance of a ditch, or canal or flume for general irrigation purposes and other purposes, to appropriate and divert water from its natural bed or channel, and to store the same when not needed for immediate use. Section 6528, L. O. L., provided for the posting of a notice, giving the name, general course, size, width and depth of the ditch or canal; the proposed point of construction of the headgate, the name of the owner and the number of cubic inches of water by miner's measurement under a six-inch pressure intended to be appropriated. Section 6529, L. O. L., directs a similar notice to be filed with the county clerk. Section 6533, L. O. L., requires that within six months from the date of the posting of the notice, the corporation shall commence the actual construction of its proposed ditch or canal or flume

"and shall prosecute the same without intermission (except as resulting from the act of God, the elements, or unavoidable casualty), until the same be completed; and the actual capacity of said ditch or canal or flume, when completed, shall determine the extent of the appropriation, anything contained in the notice to the contrary notwithstanding. Upon a compliance with the provisions of this act, the right to the use of the water appropriated shall relate back to the date of posting said notice."

Section 6534 respects and upholds all then existing appropriations to the extent of the amount of water actually appropriated, and enacts that all controversies respecting rights of water under the provisions of this act shall be determined by the date of the appropriations, as respectively made thereunder by the parties. Section 6535 declares that in case of a change in the channel of a stream the head of the ditch may be extended a distance upon the stream so as to secure a sufficient flow of water. Section 6538 provides that natural depressions in the earth may be utilized to all intents and purposes as parts of the ditch. Section 6546, which is still in force, enacts that the right of the appropriator may be lost by abandonment for a period of one year; but the question shall be tried and determined as other questions of fact.

Some provisions of the act of 1909 are as follows: Section 5715, Or. L., reads, "All water within the state from all sources of water supply belong to the public."

Section 5716, Or. L., declares:

"That subject to existing rights all waters within the state may be appropriated for beneficial use, as herein provided, and not otherwise; but nothing herein contained shall be so construed as to take

away or impair the vested right of any person, firm or corporation or association,''

provided that the act does not apply to certain enumerated streams.

Section 5717, Or. L. (amended by Laws of 1923, p. 439), declares, in effect, that nothing in this act contained shall impair a vested right to the use of water. Subdivision 2 reads thus—

''Actual application of water to beneficial use prior to the passage of this act by or under authority of any riparian proprietor, or by or under authority of his or its predecessors in interest, shall be deemed to create in such riparian proprietor a vested right to the extent of the actual application to beneficial use; provided, such use has not been abandoned for a continuous period of two years.''

Subdivision 3 provides that where any riparian proprietor at the date of the act is engaged in good faith in the construction of works for the application of water the right to take and use such water shall be deemed vested in such riparian proprietor, provided such works shall be completed and the water devoted to a beneficial use within a reasonable time after the passage of the act, and empowers the State Engineer to determine the time for such application to a beneficial use. ''The right to water shall be limited to the quantity actually applied to a beneficial use within the time so fixed by the State Engineer.'' Subdivision 6 directs that in prescribing the time within which the full amount of water appropriated shall be applied to a beneficial use, the State Engineer shall grant a reasonable time after the construction of the works or canal or ditch, used for the diversion of the water, and in doing so shall take into consideration the cost of the appropriation

and application of such water to a beneficial purpose, the good faith of the appropriator, the market for water or power to be supplied, the present demands therefor, and the income or use that may be required to provide fair and reasonable returns upon the investment. For good cause shown the State Engineer may extend such time.

Subdivisions 7 and 8 read thus—

"(7) And where appropriations of water heretofore attempted have been undertaken in good faith, and the work of construction or improvement thereunder has been in good faith commenced and diligently prosecuted, such appropriations shall not be set aside or avoided, in proceedings under this act, because of any irregularity or insufficiency of the notice by law, or in the manner of posting, recording, or publication thereof.

"(8) All rights granted or declared by this act shall be adjudicated and determined in the manner and by the tribunals as provided in this act. This act shall not be held to bestow upon any person, association or corporation, any riparian rights where no such rights existed prior to the time this act takes effect."

1. There can be no question but that the company, the District's predecessor, obtained the right of appropriation of the waters of the East Fork of Hood River by posting and filing its notice of appropriation and otherwise complying with the law. The question is, what is the extent of the appropriation? The statute requires that the work of construction of such canal shall be commenced within six months from the date of the posting of the prescribed notice. The uncontroverted testimony shows a *bona fide* compliance with the law in this respect. The statute does not specify any certain amount of work to be

114 Or.—9

performed during the first six months. The fact that the first headgate was washed out and its location changed is a contingency contemplated by the act of 1891. No intervening rights having been affected, this does not impair the right of the appropriator. The same water was utilized at the new intake as was proposed to be used at the former: Section 6535, L. O. L.

In Long on Irrigation, Section 41, we read:

"The appropriator must exercise that degree of diligence which will indicate the constancy and steadiness of purpose and labor usual with men engaged in like enterprises, who desire a speedy accomplishment of their designs, and will manifest to the world a *bona fide* intention to complete the work without unnecessary delay."

Counsel for the Lumber Company contend that the appropriation made by the District's predecessor was made by a public service corporation under the statute of 1891, and that the doctrine of relation does not apply as claimed by the District.

2-6. Where an act provides for the posting of a notice of appropriation, and the appropriation is finally consummated with reasonable diligence, the date of priority, by the doctrine of relation, is fixed as of the date of posting the notice: Section 6533, L. O. L.; 2 Kinney on Irrigation, §§ 732, 778. Reasonable diligence is the test, both in the construction of the necessary system of works and in the application of the water to a beneficial purpose. In those states which require no notice of appropriation the date of the actual commencement of the work fixes the priority of appropriation. The maxim, "first in time, first in right," is the rule for the determination of not only the right to the use of the

water but also the extent of such right: 2 Kinney on Irrigation, § 779. The appropriation of water by a corporation follows the same general rule of the arid region doctrine as to the priority of right, as though the appropriation was made by individuals: 3 Kinney on Irrigation, § 1470. In the prosecution of the construction of a system of works necessary for the diversion and application of water, in an attempted appropriation of the same, the diligence required by the law does not involve unusual or extraordinary efforts. That which is usual and ordinary with men engaged in like enterprises who desire to speedily effect their designs is required. There must be such assiduity of work of construction of the system as will manifest to the world a *bona fide* intention to complete it within a reasonable time. The question is one of fact and must be determined from the circumstances surrounding each case: 2 Kinney, § 735; *Moss* v. *Rose,* 27 Or. 598 (41 Pac. 666, 50 Am. St. Rep. 743); *Hough* v. *Porter,* 51 Or. 318 (95 Pac. 732, 98 Pac. 1083, 102 Pac. 728); *Ison* v. *Sturgill,* 57 Or. 109 (109 Pac. 579, 110 Pac. 535); *Porter* v. *Pettengill,* 57 Or. 247, 110 Pac. 393); *Andrews* v. *Donnelly,* 59 Or. 138, 116 Pac. 569); *Longmire* v. *Smith,* 26 Wash. 439 (67 Pac. 246, 58 L. R. A. 308); *Hall* v. *Blackman,* 8 Idaho, 272 (68 Pac. 19); *In re Willow Creek,* 74 Or. 592, 144 Pac. 505, 146 Pac. 475); 1 Wiel on Water Rights, §§ 382, 394.

7. In the present case, as shown by the testimony, when the Lumber Company made its appropriation in the spring of 1906, the East Fork Irrigation Company, pursuant to its notice of appropriation, was diligently prosecuting the work of constructing its ditch which was then completed for about six miles from the headgate to Jake Lentz's place, from where

the laterals or branches were extended. The laterals or branches, and some rocky places in the ditch, were then in an incomplete state. The testimony indicates, and the record of the Irrigation Company shows, that the main ditch was completed somewhat over six miles from the headgate to "The Dalles road" prior to March 5, 1903.

The acts of the company indicated a *bona fide* intent to complete the same within a reasonable time. Each and every season labor and money had been continuously expended in furtherance of the enterprise. The Lumber Company and all others had constructive notice of the claim. There had been no abandonment nor sign of cessation in the work on the part of the company. It was an undertaking of considerable magnitude, one which under the conditions prevailing in that locality would necessarily take quite a long time. There were logs and brush and debris to be removed from the right of way, and the land was uneven with considerable fall in the grade, necessitating the construction of flumes and the laying of a great amount of pipe, 8,000 feet of 16 inch, and 3,200 feet of 14-inch pipe, much of which was necessarily high-pressure pipe, and considerable of smaller size. But little if any work could be done during the winter season. The most of the land to be served with water had to be cleared of timber before it could be cultivated and irrigated, making the demand for water increase slowly. The use of the water, however, was enlarged steadily. The present statute of our state recognizes the demand for water as a question for consideration in such case. The conditions differ from those which prevail where irrigation works have been constructed in eastern Oregon, principally upon

sagebrush prairies. We think this feature of the case should have an important bearing upon the question of time for the construction of the system: 2 Kinney, § 736, and cases there cited.

8. Under this state of facts the law pronounces that the appropriator has used "reasonable diligence" and that the additional application of water annually to meet the augmented demand causes the appropriation to relate back to its inception, as to the capacity of the ditch of the District constructed before the fall of 1914, thereby cutting off all intervening rights of adverse claimants to the use of the water. It would be vain and useless to require an appropriator to construct works necessary to make the entire appropriation of water for all the land intended to be irrigated at the inception of the project when it is not in readiness to receive the same and there is no immediate purpose for which the water can be used. The law does not require impossibilities nor compel settlers to cultivate all their land within a short time, or be deprived of the benefit of a large portion of the water right which has been properly initiated for the purpose of irrigating their irrigable lands: 2 Kinney on Irrigation, § 740.

Considerable space in the record and briefs is devoted to the classification of the East Fork Irrigation Company, defendant's predecessor. This question is not deemed controlling and will be noticed only in a general way. During the first years of the existence of the East Fork Irrigation Company the stockholders were principally farmers. Afterwards, not having the means to carry through the project, they transferred a majority of the shares of stock to Mr. Bone. Still later the system was conveyed

to the Irrigation District, the corporation remaining intact. Each organization was properly utilized as a means for the same end, namely—the reclamation and irrigation of the lands covered by the system. In *Seaward* v. *Pacific Livestock Co., supra,* cited and relied upon by the Lumber Co., five years elapsed during which no work was done to increase the appropriation claimed and the application of the water to the land. No such condition is shown to exist in the case of the District. The evidence shows that the appropriator did some work each and every year to the extent of its ability.

The policy of the State of Oregon in regard to the use of the waters of the state is further expressed in the Water Code enacted in 1909: See § 5715 et seq., Or. L. That act commands that all existing water rights shall be adjudicated as provided for in the act. It directs the Water Board (now State Engineer) where actual construction work has been commenced prior thereto, to prescribe the time within which the full amount of water appropriated shall be applied to a beneficial use; and in deciding such question the cost of the appropriation, the application of such water to a beneficial purpose, the good faith of the appropriator, the market for water or power to be supplied, the present demands therefor, and the income or use that may be required to provide fair and reasonable returns upon the investment is to be taken into consideration. The same provision is contained in the Act of 1909, Chap. 216, L. O. L., § 6595. Section 6668, L. O. L., and Section 5764, Or. L. declare ''all water used in this state for irrigation purposes shall remain appurtenant to the land upon which it is used * * '' and makes provision for a change of rights upon proper appli-

cation: Section 6669.   Section 6765 declares the willful waste of water to the detriment of another shall be a misdemeanor.

Between 1897 and 1905 they diligently kept constructing the ditch to practically its full size.   In some rocky places it was left narrower.   Water was put through the first six miles, or main canal, and on through the pass, through the "Joss Divide," and on beyond what is called the middle lateral and a little water was delivered in Willow Flat in the summer of 1901.   In 1902 the ditch was practically completed to The Dalles road.   In 1903 they went back and widened the main ditch in the rocky places and straightened it.   In 1909 they made a pipe-line extension of the ditch to the Dethman Ridge.   During the early part of the construction of the ditch contracts were awarded to the stockholders and the ditch was excavated in disconnected sections, and it was not of the same width in all places.   Afterward the sides were evened up and the ditch was made of a uniform width, as stated "by cleaning out a narrow place" and making it "uniform in width, grade and bank" along the upper six miles.   It is in evidence that most of the so-called enlargements of the ditch were below the main canal and that they were in reality an extension of the laterals.   The evidence shows that the first half-mile of the ditch which is above a certain toll road has not been changed or enlarged.

Mr. R. A. McClanathan, a civil engineer, testifies to the effect (Trans. Ev., Vol. 1, p. 241) that he commenced work for the Irrigation District about the 1st of September, 1914, and cross-sectioned the old ditch where it had not been enlarged that year and found that its size varied at places from 8½

feet on the bottom and 12 feet on the top, to 15 feet on the bottom and 18 feet on the top; that the upper end of the ditch, which was on a much steeper grade, was not enlarged, would carry as much water as the ditch below after it was enlarged, and that there were not over two or three places where it was of the minimum size mentioned. The measurements vary with the grade of the ditch. The engineer describes the main ditch as being from the headgate down to the falls on the Long place, and from there the ditches are designated as laterals.

9. It appears from where the ditch was extended for the service of what is called the "Lower Valley" it is separated into three laterals. In 1907 the East Fork Irrigation District was organized and the system was transferred to the District for about $110,000, which amount was afterward augmented until the indebtedness of the District for its water system was about $244,337.37. The District has bonds outstanding to the amount of $225,000. The rights of an appropriator, like the East Fork Irrigation District and its predecessors, initiated under the act of 1891, are protected and confirmed by all of the later statutes.

10–11. The doctrine of relation, by which the priority date of an appropriation relates back to the date of the diversion of water from the stream, or to the date of posting notice of the contemplated diversion when reasonable diligence is thereafter exercised in actually diverting the water and applying the same to the irrigation of lands in accordance with a plan in actual existence at such date, has been established and applied in Oregon: *Simmons* v. *Winters,* 21 Or. 35 (27 Pac. 7, 28 Am. St. Rep. 727); *Cole* v. *Logan,* 24 Or. 304 (33 Pac. 568); *Wimer* v. *Simmons,* 27

Or. 1 (39 Pac. 6, 50 Am. St. Rep. 685); *Nevada Ditch Co.* v. *Bennett,* 30 Or. 59 (45 Pac. 472, 60 Am. St. Rep. 777); *Hough* v. *Porter,* 51 Or. 318, 430 (98 Pac. 1083, 1106, 102 Pac. 728); *Nevada Ditch Co.* v. *Canyon Ditch Co.,* 58 Or. 517 (114 Pac. 86); *Smith* v. *Neal,* 31 Or. 105, 109 (49 Pac. 850); *Whited* v. *Cavin,* 55 Or. 98, 104 (105 Pac. 396); *Oviatt* v. *Big Four M. Co.,* 39 Or. 118 (65 Pac. 811). Such rule is universally applied throughout all the western arid states: *Amalgamated Sugar Co.* v. *Hempe et al.,* 226 Fed. 1012; *Opir Silver M. Co.* v. *Carpenter* (Nev.), 97 Am. Dec. 550; *Barnes* v. *Sabron,* 10 Nev. 217, 244; *Sowards* v. *Meagher,* 37 Utah, 212 (108 Pac. 1112); *Sand Point W. & L. Co.* v. *Panhandle Co.,* 11 Idaho, 405 (83 Pac. 347). Reasonable diligence is exercised in the diversion of the water, if such diversion keeps pace with the additional area of land brought under cultivation, and the latter in turn be done with reasonable diligence: *Seaweard* v. *Pacific L. S. Co.,* 49 Or. 157 (88 Pac. 963–965); Wiel, Water Rights (3 ed.), §§ 382–385, 483–485; Kinney on Irrigation (2 ed.), Chap. 39, §§ 734, 736, 738, 740, 741. It will avail nothing to an appropriator to divert a greater quantity of water than is presently required, even though he has a definite plan to use the excess in the future: *Hindman* v. *Rizor,* 21 Or. 112 (27 Pac. 13, 15); *Low* v. *Rizor,* 25 Or. 551 (37 Pac. 82, 84). An appropriation may be made by one person for the future use of another; and for future use upon lands which the appropriator does not then own, or which he does not contemplate owning, and which he never does own.

It is sufficient to make the appropriation valid, if the original intention contemplate that the water filed upon is for use upon certain lands then definitely

had in mind, and it be reasonably anticipated that when the diversion is ultimately completed and the water ready for application to that land, or other land or uses which have been substituted for the originally considered and intended land, such land will be then, or with reasonable diligence thereafter, ready to receive it: *Nevada Ditch Co.* v. *Bennett, supra.* It is a significant fact that what was intended by the promoters and movers of the Irrigation Company in the inception of the undertaking has been actually accomplished as conceived and planned. The land is now watered and it is the same land and watered from the same source the promoters had in mind. Owing to the topography of the country being mountainous the water had to be conducted from the bank of a mountain stream to a point 20 miles away, passing through and crossing over ravines and canyons, falling over a precipice at one place and many flumes, pipes and syphons were necessary. It was a stupendous task. The construction of the system kept pace with the requirements for water by the settlers. In order to prepare their land for cultivation and setting out fruit trees they were obliged to clear the land and grub out the stumps, as the most of the land was covered with a heavy growth of brush and timber. To clear and prepare for cultivation an acre of such land would entail many times the amount of labor and expense that would be required to cultivate and prepare to irrigate an acre of ordinary prairie land. Hood River Valley is situate between mountains. It is the great apple and fruit orchard country of the state.

The area the District planned to have covered was over 13,000 acres. The cost of the District above mentioned does not include all the cost of construc-

tion before the District acquired the system.   Much work was done by the farmer stockholders, a record of which was not preserved.   In the case of *Eldredge v. Hill Ditch Co.,* 90 Or. 590, 596 (177 Pac. 939), which involved a corporation organized under the general corporation laws, it appeared that it was not formed or operated for profit and that it did not sell water but merely carried it.   The language of Mr. Justice BENNETT, in the opinion of that case, is in part as follows:

"It seems to be pretty well settled in the states having water codes similar to that of our own state, even in cases of public service corporations organized for profit and selling water to the general public, that the water and ditch rights really belong to the individual appropriator and are appurtenant to the lands upon which the same are used, and that the corporation transmitting the same is in the nature of a holding company or agent for the true owners of the water rights."

See *De Pauw Univ.* v. *Oregon Public Ser. Com.,* 253 Fed. 848; citing *Del Mar Co.* v. *Eshelman,* 167 Cal. 666 (140 Pac. 593, 948); *Thayer* v. *California Dev. Co.,* 164 Cal. 117 (128 Pac. 21).   See, also, *Oregon Const. Co.* v. *Allen Ditch Co.,* 41 Or. 209 (69 Pac. 455, 457, 458, 93 Am. St. Rep. 701); *Caviness* v. *La Grande Irr. Co.,* 60 Or. 410, 425 (119 Pac. 731). The doctrine of relation was fully recognized by the decision of the case of *Simmons* v. *Winter,* 21 Or. 35, at page 42 (27 Pac. 7, 28 Am. St. Rep. 727).   Mr. Justice LORD, in writing the opinion, states thus:

"If the amount of water appropriated is within the given, beneficial purpose for which it was taken—no more than is necessary to irrigate the lands contemplated to be reduced to cultivation as soon as can be reasonably done—although more than can be bene-

ficially used for the present, it is nevertheless a valid appropriation. * * '' The settler "is not required, in order to make his appropriations valid, to beneficially use the first years of his settlement the full amount of water appropriated, when such amount is no more then is necessary to irrigate the lands he intends to subject to cultivation. His original appropriation may be made with reference to the amount of water that is needed to irrigate the lands he designs to put into cultivation."

See *Cole* v. *Logan*, 24 Or. 304, at p. 311 (33 Pac. 568), where Mr. Justice MOORE said:

"The defendant, as a prior appropriator, did not find it necessary to divert or appropriate in 1871 all the water he ultimately intended to use in the irrigation of his lands. As he adds to the area of his cultivated land he may increase the quantity necessary to properly irrigate the whole tract, and any subsequent appropriator diverts the water subject to such prior claim. To entitle the defendant, however, to the benefit of such appropriation, he should within a reasonable time apply the water to such beneficial use. As fast as he can reasonably put his homestead into cultivation, he is entitled to divert and use the water for that purpose."

In *Low* v. *Rizor*, 25 Or. 551 (37 Pac. 82), the syllabus reads as follows:

"A prior appropriator of water is entitled to a sufficient quantity to irrigate his land, and he may increase the appropriation to keep pace with the additional area brought under cultivation, if it is done with reasonable diligence. * * "

In *Wimer* v. *Simmons*, 27 Or. 1, at page 6 (39 Pac. 6), we find:

"It is the policy of the law that water of a stream shall be appropriated to the extent only that it is put to or so designed for some useful or beneficial

purpose.   This is the measure of the appropriation. The entire appropriation may not be utilized at once for the purpose designed.   In such case a reasonable time is allowable within which to make the application to such purposes, and the surroundings and circumstances of each particular case are elements for consideration in determining what is a reasonable time within which to complete and fix the extent of the appropriation.''

In *Nevada Ditch Co.* v. *Bennett, supra,* at page 98 we find the following language:

''Mallett, Adams and Lee contemplated a use, not only to be applied by themselves, but by such others as might come in under their ditch.   They had in mind some persons with whom they had arranged to join them in the new settlement, should they find a suitable locality; and they expected others to come, as they did subsequently, some of whom they brought in themselves.   Indeed, the very object of the scheme was to induce immigration and settlement which they expected to accomplish by diverting the water, and conducting it to such localities as would be convenient for use, with a purpose of developing the appropriation with the aid of such other settlers as would apply the use.   They had a reasonable expectation that there would be a demand for water as soon as they could convey it to a convenient place for the intended use, and in this respect the scheme could not be said to be merely speculative, impracticable or visionary.''

The latter case has often been cited and approved both in this state and elsewhere.   In *Hough* v. *Porter,* 51 Or. 318, at page 430 (95 Pac. 732, 98 Pac. 1083), Mr. Commissioner KING uses the following language:

''It is urged in respect to their (certain claimants') rights that only a part of the lands were entered or in cultivation when the ditch was first dug, and that the rights of each of the parties interested in this

ditch are limited to the time when the lands of each were acquired and the irrigation hereof commenced. Whatever may be the rule elsewhere, this question is set at rest in the very clear and able opinion by Mr. Justice WOLVERTON in *Nevada Ditch Co.* v. *Bennett,* 30 Or. 59 (45 Pac. 472, 60 Am. St. Rep. 777), where this feature was prominent among the many points relied upon. It was held that a *bona fide* intention to devote the water to a useful purpose, which is required of an appropriator, may comprehend the use to be made by or through other persons and upon lands and possessions other than those of the appropriator.''

See also to the same effect *Nevada Ditch Co.* v. *Canyon Co., supra; Smith* v. *Neal, supra.*

12. The question of diligence is closely related to the rule of relation; the two must be considered together for the rule has its basis upon diligence. The reason for the rule grew out of the necessity arising through conflicting claims of settlers in the arid districts of the great west. Except for its application the doctrine of appropriation would have resolved itself into a scrambling rush for the possession of the water right, and the question would always be decided in favor of the one who either had the most money or the one who had the least to do to effect a diversion of water: Wiel on Water Rights (3 ed.), § 382 et seq.; *Seweard* v. *Pacific Liv. Co.,* 49 Or. 157, 160, 161 (88 Pac. 963) ; *Whited* v. *Cavin,* 55 Or. 98, 109 (105 Pac. 396) ; *Ison* v. *Sturgil,* 57 Or. 109, 116, 117 (109 Pac. 579, 110 Pac. 535).

13. The notice of appropriation posted and filed by the predecessor of the District was intended by the statute, and by the promoters of the East Fork Irrigation System to apprise all subsequent appropriators of water from the East Fork of Hood River,

of the amount of water appropriated and claimed by the Irrigation Company and of a general description of the land proposed to be irrigated. Such notice was available to the officers and agents of the Lumber Company when they commenced the construction of their plant and made the Lumber Company's appropriation. It was constructive notice to them of such appropriation and to all persons. The managing officer of the Lumber Company states that he never saw the notice of the appropriation of the Irrigation Company, but that would not change the force of the record thereof made pursuant to statute. The Lumber Company would be presumed to take notice of the record of the notice of appropriation just the same as it would of the record of title to the land which it purchased for a mill site.

14. It is earnestly contended on behalf of the Lumber Company, in effect, that the appropriation of the East Fork Irrigation Company, under the act of 1891, could not be made and was not made for any particular lands.

It is plain that except for the land under the proposed ditch at the time of posting and filing the notice and making the appropriation, doubtless the appropriation would not have been made. The purpose of the irrigation law of 1891 seems to be to promote irrigation and to provide a manner for exercising organized effort in that direction. The statute, to quite an extent, is declaratory of the law as it formerly existed, the rules theretofore obtaining were not abrogated. When an appropriation for a certain area was made under the act, the statute provides that upon the completion of the proposed system with reasonable diligence, and the application of the water to a beneficial purpose within a reason-

able time, according to the provisions of the law, the right to the use of the water shall relate back to the date of the posting of the notice: Section 6533, L. O. L.

In *Re Waters of Umatilla River,* 88 Or. 376 (168 Pac. 922, 172 Pac. 97), the claims were made under the act of 1891 and the intent of the promoters of the Hinkle Ditch Company, the predecessor in interest of the Western Land and Irrigation Company, the appellant, was taken into consideration and discussed in the opinion, in connection with the notice of appropriation in determining the extent of the appropriation. Syllabus No. 3 reads thus:

"The notice and map which Section 6525, L. O. L., requires an appropriator of water for irrigation to file, mark the limit of the proposed enterprise; and activities beyond the scope thereof requires proceedings for a new appropriation."

At page 393 we find the language of Mr. Justice McCAMANT as follows:

"Mr. Hinkle and Mr. O. D. Teel were the promoters of the Hinkle Ditch Company and were more familiar than anyone else with its plans at the time when its appropriation of water was made. Mr. Hinkle testifies" (here follows testimony as to what they proposed to do).

On pages 397 and 398 we read the following:

"It remains to apply the law arising on the above facts. In 2 Kinney on Irrigation and Water Rights (2 ed.), page 1221, it is said:

" 'In connection with the claim set forth in the notice, the court may also examine all the other facts in any particular case which tend to prove the actual intent of the appropriator. Such facts may be such as the purpose indicated in the notice, the actual amount of water required for such purpose, the acts

of the appropriator in prosecuting the work neces-
sary, the size of the ditch and its capacity, the method
of diversion from the stream, the method of the
application of the water, and any other facts which
tend to show the true purpose of the appropriator.' "

Pomeroy on Riparian Rights (1 ed.), Section 47,
says:

"There must be some such actual, positive, benefi-
cial purpose, existing at the time, or contemplated in
the future, as the object for which the water is to be
utilized; otherwise no prior and exclusive right to
the water can be acquired."

In *Power* v. *Switzer*, 21 Mont. 523, 530 (55 Pac.
32), the Court says:

" 'The intention of the claimant is a most important
factor in determining the validity of an appropriation
of water.   When that is ascertained, limitation of
the quantity of water necessary to effectuate his in-
tent can be applied according to the acts, diligence
and needs of the appropriator.' "
"The formation of a new intention to irrigate
lands the irrigation of which was not at first con-
templated marks the beginning of a new appropria-
tion."

In *Andrews* v. *Donnely*, 59 Or. 138, 147, 148 (116
Pac. 569), Mr. Justice BURNETT says:

"The right of a prior appropriator is paramount,
but the right is limited to such an amount of water
as is reasonably necessary for such useful purpose
and project as may be fairly within contemplation
at the time the appropriation is made."

In the present case both the notice of appropriation
of the East Fork Irrigation Company, the prede-
cessor in interest of the Irrigation District, and the
testimony in the case, show that it was the original

intention of the Company and its promoters, and the farmers and land owners interested in the project, to appropriate water for, and to irrigate all the land for which water is claimed by the District. To this end they have diligently and continuously prosecuted the work of construction of the system and the application of the water to the irrigation of the land.

Two Circuit Court judges and the Water Board have passed upon the facts in relation to the appropriation of the Irrigation District and their findings of fact are entitled to great weight. The State Engineer made extended surveys of the lands and measurements of the waters in the various streams and ditches involved in this proceeding. The Water Board was in much better position after an examination of the premises to determine the questions of fact than this Court is from a mere reading of the record.

After mature deliberation we hold that the appropriation and use of the water made by the predecessors in interest of the East Fork Irrigation District, and the construction of the canal and system up to the year 1914, come within the general rule above referred to.

The enlargement of the ditch in 1914, sometimes referred to as the increase after 1913, raises a different question. R. A. McClanathan, a civil engineer, who testified as a witness for the District, November 21, 1914, to the effect that he had been employed by the District since September of that year; said that he prepared for the District plans for an enlargement of the canal and system and had charge of the work; that he examined the canal September, 1914, and cross-sectioned it; that the plans for the enlargement of the canal and the construction of the new

head works were contemplated to be completed by the spring of 1915. It was, however, enlarged about one-half a mile from the intake, cleaning out of the other one-half mile and cribbing the ditch so as to strengthen the banks, and moving stumps and rocks, according to the plan. The District contemplated the expenditure of $20,000 in the enlargement of the ditch and cleaning the same out and improving the system. The enlargement would necessitate an increase in the size of the laterals, particularly the west lateral.

15. We find from the records of the United States Geological Survey, which is in evidence, that the flow of water in the canal in the season of 1915 was increased over the flow therein in the season of 1914, before the enlargement to the amount of twenty-two second-feet, or approximately 880 miner's inches under a six-inch pressure.

From the record we think that the enlargement mentioned constituted a new appropriation to the extent of twenty-two second-feet of water, and that the award to the East Fork Irrigation District should be modified so that the same will be for 120 second-feet of water, with a date of relative priority of November 25, 1895, and for twenty-two second-feet or approximately 880 miner's inches of water with a date of relative priority of May 1, 1915.

OREGON LUMBER COMPANY.

A short distance below the junction of the East and Middle Forks of Hood River is the power plant and sawmill of the Oregon Lumber Company.

The main question as to the appropriation of the Oregon Lumber Company is as to the amount of water necessary to operate its plant. J. L. Stan-

nard, an hydraulic engineer, a witness for the Lumber Company, testified to the purport that after examining the plant in a general way; in his judgment 368 second-feet of water is necessary for the proper operation of the plant. At the hearing before the Water Board Mr. Stannard further testified that in May, 1919, he made four tests of the power plant to determine the amount of water required; the tests ranging from 20 actual horse-power to 540 actual horse-power which was not a full load for the machine. After detailing the tests he concluded therefrom that 850 theoretical horse-power would require 420 second-feet.

Under the direction of the former State Engineer, V. H. Reineking, an engineer of wide experience in the construction of power plants, on September 1, 1917, made and reported four tests of the Oregon Lumber Company's water, which are as follows:

## Test on Hydraulic Turbines, Oregon Lumber Company, Dee, Oregon.

| Test No. | Generator Output K. V. A. | Computed Turbine Output K. W. | Computed Turbine Output Horse Power | Head Feet | Discharge Sec. feet | Theoretical H. P. | Efficiency |
|---|---|---|---|---|---|---|---|
| 1. | 121.8 | 107 | 143.5 | 30.32 | 180 | 620 | 21.3% |
| 2. | 487.3 | 427 | 573 | 30.17 | 328.5 | 1125 | 50.9% |
| 3. | 368.2 | 323 | 433 | 30.11 | 300 | 1025 | 42.2% |
| 4. | 437.6 | 384 | 515 | 29.98 | 322.5 | 1098 | 46.8% |

It is seen from the above data that the effective head is slightly over 30 feet in three of the four tests. The last three tests were made when the full load of both the sawmill and planing mill was carried by the generator. In August, 1917, measurements were made to determine the quantity of water seeping through the dam, which, with the water level back of the dam at its maximum elevation, was found

to be 114.3 second-feet with 3.70 feet flowing through the fish-ladder. With the water surface drawn to 3.24 feet below the crest of the dam, the seepage water measured 93 second-feet, with no water flowing through the fish-ladder.

It appears from the State Engineer's report that the most economical use of the water would result if the average head were approximately 32 feet (which can be obtained by raising the flume) and the storage exhausted in a five-hour period, and the reservoir refilled during the noon hour. Under these conditions the power plant could be operated at its full capacity when the river carried approximately 246 second-feet, not taking into consideration the seepage through the dam.

The records of the Water Resource Branch of the United States Geological Survey, of the gauging of Hood River at Dee, about 400 feet below the Power Dam of the Oregon Lumber Company from May 21, 1913, to December 31, 1914, and also just above the back water of the dam and one-half mile below the junction of the Middle Fork and East Fork of Hood River between February 1, 1915, and to December 15, 1917, both of which places are below the intake of the ditch of the East Fork Irrigation District, show that during the critical period for the supply of water for irrigation and power purposes, namely, during the months of July and August, the mean discharge of the river in second-feet was as follows:

|        | 1913 | 1914 | 1915 | 1917 |
|--------|------|------|------|------|
| July   | 624  | 372  | 285  | 737  |
| August |      | 354  | 262  | 374  |

The record in this case indicates that the power of the Lumber Company's plant can be increased by diminishing the seepage through the dam, and this

can be accomplished at a minimum expense. Much of this seepage is probably due to the use of the flashboards on the dam.

It is believed that the amount of water awarded to the Oregon Lumber Company by the Water Board and by the decree of the Circuit Court, a total of 335 second-feet, is sufficient for the successful and convenient operation of its plant. Therefore, the decree of the trial court as to such award is affirmed.

## MT. HOOD WATER COMPANY.

After taking additional testimony before the Circuit Court and referring the same to the Water Board, by its modified findings the Water Board awarded the Mt. Hood Water Company water for 433.5 acres which had been irrigated under the Mt. Hood Water Company ditch, and also an inchoate right to water for 897 acres additional land under said ditch which is intended to be irrigated; and fixed five years from the first day of January, 1920 (or such further time as may be granted by the state Water Board on proper showing), as the time within which to utilize the appropriation; and that such appropriation as may be utilized at the expiration of the time fixed by the Water Board shall relate back to and for the priority date of October, 1895.

Upon exceptions being filed to the modified findings as to Mt. Hood Water Company by the Water Board the Circuit Court allowed the Mt. Hood Water Company water for 433.5 acres with a priority date of October, 1895, and denied all further claim by said company. An appeal has been taken from the decree of the Circuit Court in regard to the award to the Mt. Hood Water Company as to the date of priority.

## FINDINGS AS TO MT. HOOD WATER COMPANY.

It appears from the record and the Water Board found in substance that the Mt. Hood Water Supply Company posted and filed a notice of appropriation of 1,000 miner's inches of water out of the East Fork of Hood River in October or November, 1895, and thereafter built its ditches within a reasonable time and completed the main canal in 1898, and began the use of water in June of that year; and that said waters were appropriated for irrigation and domestic purposes; that 31 acres were irrigated in the year 1898, and the area was gradually increased so that in 1904, 186 acres were irrigated; and that thereafter and continuing down to the date of hearing the area irrigated has been gradually increased; that such increase has been made with due diligence considering the local conditions, the character of the lands to be reclaimed, and especially the heavy clearing encountered; that in the year 1905 the Mt. Hood Water Company succeeded to all the rights of the Mt. Hood Water Supply Company and attempted to make a second appropriation of 1,000 miner's inches for irrigation and domestic purposes; but that the first appropriation made in the year 1895 was made for the purpose of irrigating the lands described in the statement and proof of claimant filed by the Mt. Hood Water Company, and for use for domestic purposes on said land and the amount of water which the company attempted to appropriate by said first appropriation was more than sufficient to supply the needs for all purposes for which a right is claimed herein; that said attempted second appropriation made in the year 1905 was unnecessary, and that no

water has been put to a beneficial use by virtue
thereof.

That from the claim of the company, and the
evidence and testimony filed herein, it appears that
about 433.5 acres of land have been irrigated under
the Mt. Hood Water Company ditch and there are
about 897 acres additional land under said ditch
which it was intended at the time of making the ap-
propriation to irrigate; that inasmuch as the lands
to be irrigated are situated in the southern part of
Hood River Valley and are covered with timber and
are very hard to clear and hard to develop, and that
the company and the water users under it have been
using reasonable diligence in reducing the land to
cultivation and applying the water to a beneficial use,
the state Water Board fixed five years from the
first of January, 1920 (or such further time as may be
granted by the Water Board on proper showing), as
the time within which the appropriation shall be
utilized and the water applied to a beneficial use; and
that such appropriation as may be utilized at the
expiration of the time fixed by the state Water Board
shall relate back to and for the priority date of
October, 1895. The Water Board added a list of
the lands irrigated from the Mt. Hood Water Com-
pany ditch and date of relative priority October, 1895,
for 1,331.1 acres.

It also appears from the State Engineer's report
that during July, 1917, the maximum flow of the
water in the ditch of the Mt. Hood Water Company
was 20.5 second-feet or approximately 820 miner's
inches and the minimum flow 13.1 second-feet; the
average flow 16.6 second-feet, or 1,020 acre-feet, which
if applied uniformly to 545 acres, for the season the
depth per acre would be 1.87 feet. In addition to the

water used from their own ditch some water was
secured from the East Fork ditch during that season.
It therefore appears that the ditch is of sufficient
capacity to irrigate the 1,331.1 acres of land under
the same. The report of the engineer contains the
following:

"Owing to the fact that all unused water together
with the returned seepage from the irrigated lands
under this ditch finds its way back into the East Fork
of Hood River and is available for use by the Dee
Power Plant and other rights below, the diversion of
an excessive amount of water to the Mt. Hood Ditch
is of little consequence. However, the soil and the
topography of these lands are equally as favorable
for irrigation as most of the lands in the Hood River
Valley and they will not, therefore, require more
water for their irrigation than other lands in the
valley."

What we have heretofore said in regard to the
statute and the rules and regulations governing ap-
propriations of water applies to all appropriations
involved herein.

There is considerable controversy as to the date of
the posting of the notice of the appropriation by the
Mt. Hood Water Supply Company by virtue of which
the Mt. Hood Water Company claims a date of
priority as of October, 1895. This date is given in
the claim filed by the Mt. Hood Water Company.
This company excepted to the original findings of the
Water Board and asked that further testimony be
taken to establish their rights claiming *inter alia* that
it was entitled to sufficient water to irrigate 1,330
acres of land to the extent of 1,000 inches as of the
date of October, 1895. It developed upon cross-
examination of the witness Robert Leasure that the
notice of appropriation, filed in the county clerk's

office by the Mt. Hood Water Supply Company, was dated November 27, 1895, and filed for record January 6, 1896. The company's articles of incorporation were dated November 6, 1895. Therefore, the corporation was not in existence in October, 1895. The oral testimony indicates that the notice of appropriation was posted in October or November. The witnesses of necessity rely upon memory of what took place about 25 years before giving their testimony. We do not question their veracity but the written evidence is the safer guide.

It is contended on behalf of the Mt. Hood Water Company that the testimony as to the date of posting the notice was not within the issues raised by the exceptions at the time of taking the additional testimony. To this contention we cannot accede.

It is also urged as a further reason that at the time of taking the original testimony before the Water Board (Vol. 4, p. 189 of Trans.) it was stipulated that the date of posting the notice as set forth in the claim of the Mt. Hood Water Company should be accepted as the true date. The stipulation made between the company and the attorneys for one of the claimants is to the effect that the witnesses for the Mt. Hood Water Company would testify with reference to the notice, substantially as set forth in their claim. This stipulation would not cover any errors in the date of posting, the notice occurring on account of defective memory. Therefore, we make the following findings:

The Mt. Hood Water Company should be, and is awarded a date of relative priority of November 27, 1895, for sufficient water to irrigate 1,331.1 acres at the rate of 1/80 of a second-foot per acre or its equivalent in case of rotation and that the total

quantity diverted during the irrigation season shall not exceed three acre-feet per acre for each acre thereof to which water is applied within the time fixed by the Water Board or within the time that may hereafter be fixed as provided by law; such water to be measured in the company's ditch immediately above the lateral ditch which is nearest to the headgate.  And that the findings and determination of the Water Board, as to the award to the Mt. Hood Water Company, be modified as to such date of priority and approved as modified.

The decree of the Circuit Court will be modified accordingly.

### GLACIER IRRIGATION COMPANY.

16. The Glacier Irrigation Company, a corporation, appeals from that portion of the decree of the Circuit Court making the award to the Oregon Lumber Company of water from the East Fork of Hood River. The Glacier Company did not appeal from the decree confirming the determination of the Water Board as to the award of the water right of itself.  Therefore, it is presumed that the decree of the lower court making the award to the Glacier Company is satisfactory to it.  Except as the award to the Glacier Company may be affected by the decision on the appeals taken as to the other rights the award to this company cannot be reviewed.

### PACIFIC POWER & LIGHT COMPANY.

The Pacific Power & Light Company, a corporation, has a power plant at Tucker's Bridge on the main stream of Hood River below the confluence with the West Fork, and also has a plant some distance down the river at Powderdale.  The Power Company duly

filed its statement and proof of claim to the use of the waters of Hood River with the Water Board in two parts, designated respectively "Upper Development" and "Lower Development," setting forth in substance as follows.

The Pacific Power & Light Company is engaged as a public service corporation under the laws of the State of Oregon, in the generation and distribution of electrical energy for light and power purposes, and is the owner of certain specifically described real properties in Hood River County which form continuous tracts of land of more than four miles in length at the Upper Development or power property, and more than two miles in length at the Lower Development or power property.

The title to all the real property between the points of proposed diversion and return upon said Upper and Lower properties was derived from the United States, as to certain specific portions of said property upon the admission of the State of Oregon into the Union in 1859, and as to the remainder of said property under selections for internal improvements made by the State of Oregon on July 18, 1864; and that

"the title of claimant to said property passed from the United States to the State of Oregon and from the State of Oregon to the various grantees above named and from such grantees by *mesne* conveyance to claimant herein without condition, exception or reservation."

Title to Sections 16 and 36 passed from the United States to the State of Oregon by virtue of the act of Congress of August 14, 1848, for school purposes in 1859, when the state was admitted into the Union, and the other land by virtue of a selection made by the state for internal improvements on July 18, "1864

under the act of Congress of September 4," 1841, list
23, approved by the Department of the Interior of
the United States, August 12, 1868, when title passed.
The State of Oregon conveyed title to the "Upper
Development" tract, to the predecessors in interest
of the Power Company on different dates from 1882
to 1903.

The claimant, Pacific Power & Light Company, in
its statement and proof of claim as to its "Lower
Development," in addition to the usual statement
made before the Water Board, by an exhibit attached
thereto, states, among other things, as follows:

"The stream of Hood River is perennial, non-
navigable and unmeandered and has well-defined
banks and bed and the waters thereof, as they flow
over and across the said lands of the claimant are
a part and parcel of said lands.   Claimant, as the
owner of its said lands, owns and possesses the right
to have the waters of said stream flow on and across
said lands as they are and have been accustomed to
flow undiminished by the acts or appropriations of
others above its said lands other than by the reason-
able use thereof by upper riparian owners for water-
ing livestock and for domestic purposes, and by the
reasonable use by such riparian owners of the waters
of such stream for the irrigation of lands actually
riparian to said stream.

"Claimant and some of its immediate predecessors
in ownership of the greater portion of said property
have used the waters of said Hood River flowing over
and across such lands for the generation of electrical
energy for general distribution and sale, as follows:

"In 1901 the flume and power house known as the
'Power Flume' were constructed on the said property
of claimant.   The location of this power plant is
shown upon the map attached hereto and marked
Exhibit B.   At the same time an electric transmission
system was constructed in the City of Hood River and

vicinity and connected with said power plant. The water of the stream of Hood River, as the same flows over and across the said property of claimant, was used in the operation of this plant from the time of its construction to some time in the year 1911 in the generation of electricity for general sale and distribution in the City of Hood River and vicinity. This plant had a capacity of approximately 75 kilowatts.

"During the years 1904 and 1905 the Hood River Electric Light & Power Company, a corporation, predecessor in interest of claimant, constructed on the property described in subdivisions (b), (c), and (d) of paragraph II hereof a hydro-electric power plant, a dam in the river and a pipe-line from the dam to the power-house. This power plant connects with said electric transmission system above referred to, which system has been and is being developed and extended from time to time to meet the demands of the public for electric light and power service. Such system and plant have been in continuous operation since the year 1905 and claimant is now operating said hydro-electric plant and system and carrying on its said business. During all of said time the waters of the stream of Hood River, as the same flows over said property of claimant, was and is now being used in the operation of said plant in the generation of electricity for general sale and distribution. This power development has a head of approximately 46 feet and about 140 cubic feet per second of the water of said stream as it flows on said property is required in the operation of said plant.

"In the year 1913 claimant began the construction of a hydro-electric plant upon its said property to take the place of the power plant now in operation on said property."

The statement then proceeds to describe the proposed plant as consisting of a dam, a conduit, consisting of earth canal and pipe-lines having a capacity of 750 second-feet of water, which amount it conveys

to a power-house, where the water is passed through water-wheels coupled with electrical generators and returned to Hood River, all on lands of claimant. Of this proposed development the foundation of the power-house is completed, a bridge across Hood River for supporting the pipe-line has been built, concrete saddles for supporting the pipe-line are completed, and all heavy excavation work for the pipe-line has been finished. The foundations and a portion of the superstructure for the transformer station and construction camps have been built and considerable machinery and equipment have been assembled for completing this development. This power plant will be connected with the electric transmission system of claimant in Hood River Valley and in the City of Hood River and vicinity. The plant is designed to use and will use 750 cubic feet of water per second of the stream of Hood River and when the volume of water in the stream is less than 750 second-feet, the plant will require the entire flow of the stream undiminished by the acts or appropriations of others above said lands for the irrigation of land not riparian to the stream; that claimant requires and will use all of such energy so developed and generated as well as that generated by its proposed "upper development."

The exhibit attached to the statement and proof of claimant as to its "Upper Development" follows much the same line except as to descriptions. The notable differences are that at the upper plant the fall upon the properties is approximately 252 feet available for power purposes; that about the year 1883 diversion works consisting of a flume or ditch and a turbine-house were constructed on said lands by Logan & Crowell and the waters of the stream

were used for several years thereafter for the operation of a sawmill. Later, one Tucker reconstructed the mill.

During the years 1911 and 1912 and supplanting the above diversion works there were constructed by the Hydro Electric Company, a corporation, predecessor in interest of claimant, a dam in the river, a power plant and flume leading thereto from the dam on the property of claimant. This system and plant have been in continuous operation since the year 1912 and claimant is now operating the same. This development has a head of approximately 28 feet and about 640 cubic feet of the water of said stream as it flows in said property is required in the operation of such power plant.

Claimant proposes to supplant the present power development on said property by one consisting of a dam where the stream will be diverted and carried by means of a conduit consisting of earth canal, pipelines and flume, to a power-house located on said lands where the water would be returned to the stream.

17. The Power Company states as follows: The two proposed plants are designed to use and will require 750 cubic feet per second, and during certain seasons when the water is less than that amount, the entire flow of the stream "diminished by the acts or appropriations of others above said lands for the irrigation of lands not riparian to said stream."

The Power Company, in its statement of contest against the several irrigation districts and companies, alleges practically the same facts as contained in exhibits to its statement and proof. There can be no mistake as to the claim of this company to a definite quantity of water, namely—750 second-feet, when we

refer to the prayer made by this company in the Circuit Court in its exceptions to the findings of the Water Board. In the Circuit Court this company "prays for a decree of this court as follows:

"That said Findings of Fact and Order of Determination of said State Water Board be modified so that there shall be awarded to said Pacific Power & Light Company, for power purposes, a continuous flow of 750 second-feet of the waters of said stream of Hood River, and that the claims and appropriations of each of the other claimants to said waters herein be adjudged to be subsequent in time and inferior in right to this exceptor's said claim, excepting," certain enumerated rights acquired by prescription.

It is seen as stated that the Power Company in its statement and proof, and statement of contest before the Water Board, and its exception in the Circuit Court asked for a definite amount of water to be awarded to it without regard to the rights of others. The Power Company alleges in detail that it "diverted" and "used" water from Hood River in 1883 and again in 1901. The writer sees no distinction between "diversion" and "use" and "appropriation" and "use." Applying the law, as tersely stated by Mr. Justice BURNETT in the Caviness case, it is clear that the old riparian right rule does not apply, as the claimant Power Company asks, in effect, to be awarded a definite appropriation from Hood River. A riparian right is not and cannot be declared in advance, to be for a definite quantity of water. It would change as conditions change and as the requirements of other riparian proprietors would be demanded and utilized. At page 422, 60 Or. (119 Pac. 736) we read:

114 Or.—11

"Claiming then, as he does, from the month of June, 1865, the right to use a fixed quantity of water upon his land without regard to its duty to others, the plaintiff assumes the character of an appropriator in this litigation and must be held to have waived his rights as a riparian proprietor, at least for the pur-poses of this suit, although the river in its natural course washes his land."

The Caviness case was followed and applied in the case of *In re Willow Creek, supra.* By reason of the fact that the old riparian right doctrine does not provide for a fixed quantity of water to be appor-tioned to different persons or tracts of land, the rule is in conflict with the statute of 1891, referred to above, and cannot be worked out or applied under the Water Code of 1909 in the adjudication of the relative rights of the various claimants to the use of water of a stream system. The Water Code has been upheld by various decisions of this court, and also has the sanc-tion of the federal court as to the "due process clause": *Pacific Livestock Co.* v. *Oregon Water Board,* 241 U. S. 440 (60 L. Ed. 1084, 36 Sup. Ct. Rep. 637).

The granting of the contention of the Pacific Power and Light Company, and going back to the old rule of "continuous flow" of a stream, would take the heart out of the Water Code and render the act of 1891 a delusion. Under the provision of the last-named act the people of Hood River Valley, as well as many more in other parts of the state, have complied with the statute, which has been operated under for more than 30 years, and made their appropriations, and ex-pended vast sums of money in establishing homes and clearing their land and applying the water to a benefi-cial use, long before the Power Company or its predecessor formed any intention of utilizing the

water, or making any claim as an appropriator, or as a proprietor, except for the lesser quantity, which has been awarded that company.

The riparian right rule can be applied as to riparian owners involving the floating of logs and the like, such as the case of *Weiss* v. *Oregon Iron Co.,* 13 Or. 496 (11 Pac. 255); *Kamm* v. *Normand,* 50 Or. 9 (91 Pac. 448, 126 Am. St. Rep. 698, 11 L. R. A. (N. S.) 280; *Logan* v. *Spaulding Log. Co.,* 100 Or. 731 (190 Pac. 349).

The opinions rendered prior to the enactment of the statutes in question are of little assistance in construing the statutes. The same may be said of the cases in those states which adhere to the doctrine of riparian rights instead of adopting the system of appropriation, among which are listed California and Washington.

In 40 Cyc. 557 the law is declared there:

"Adoption or Abrogation of Common-law Doctrine. Although in a number of states the common-law rules as to riparian rights have been adopted as a part of the law and are still in force as such rights are *always subject to change and modification by statute;* and in many of the western states the common-law doctrine of riparian rights has been abrogated or curtailed by *constitutional or statutory provisions or the course of judicial decisions,* because entirely unsuited to the natural conditions of the country or inconsistent with the proper development of these industries or those beneficial uses of water which are deemed of paramount importance." (Italics ours.)

Within the states that are of a semi-arid nature and perhaps within some states that are wholly arid, it is said, the two doctrines of irrigation, one the rule of priority of appropriation and the other the common-law theory of riparian ownership, may both

exist at the same time, the former doctrine of appropriation applying to public lands and waters, or to unappropriated waters made public by Constitution or statutory enactments, the latter, or common-law rule being limited in its application to vested rights: 15 R. C. L. 445, § 3. In Oregon we have a statutory enactment that all waters within the state belong to the public: Or. L., § 5716.

The record shows as follows: The Power Company plant at Tucker's Bridge, or Upper Development, is located in the NE. ¼ of the SE. ¼ of Sec. 15, T. 2 N., R. 10 E., W. M., being about five miles above the junction of Hood River with the Columbia River below all of the principal tributaries of Hood River excepting Neal, Whiskey and Indian Creeks, the flow of which is relatively small. The report of the State Engineer shows that on October 27, 1917, the measurement of water used at the Tucker's Bridge plant, or "Upper Development," with the wheel-gates open, so as to use the maximum quantity, was 273 second-feet with a 27.5 feet head, and theoretical horse-power 353. The report of the State Engineer also shows that the Power Company plant at Powderdale, or Lower Development, is located in NE. ¼, NE. ¼, Section 36, T. 3 N., R. 10 E., W. M., being about one and one-half miles above the mouth of Hood River and below all tributaries with the exception of Indian Creek.

The report shows that on October 13, 1917, a quantity of water used at the Powderdale plant, or Lower Development, with the gates open so as to take the maximum quantity of water with an effective head of 54.4 feet, was determined to be 92 second-feet.

The flow of Hood River at Powderdale for the year

from October, 1913, to September, 1914, in second-feet was as follows:

| Maximum | Minimum | Mean |
|---------|---------|------|
| 4890 | 375 | 1080 |

The mean flow for August, 1914, was 560 second-feet, and for September of that year 560 second-feet. At Tucker's Bridge for the year from October, 1896, to September, 1899, the measurements of the river were—

| Maximum | Minimum | Mean |
|---------|---------|------|
| 9150 | 452 | 804 |

In 1914 the measurements showed:

|  | Maximum | Minimum | Mean |
|--|---------|---------|------|
| June | 785 | 625 | 715 |
| July | 700 | 495 | 574 |

The report also shows as follows:

"Work was started some time back upon a power plant at Powderdale, which was very much more extensive than the one now in operation. After the completion of the concrete saddles, which are to carry the pipe-line, the work was stopped and had not been resumed up to the end of 1917."

The Water Board and the Circuit Court awarded the Power Company a priority as of 1901 for a continuous flow of 140 second-feet of water at the company's Powderdale plant and a continuous flow of 640 second-feet for its Tucker's Bridge plant, with a priority for the year 1911.

The Power Company contends that both lower tribunals erred in treating its voluntary limitation of its claim to the use of but 750 second-feet of such water as a claim of appropriation of that quantity

of water and asserts that the record discloses that the Power Company has at all times relied solely upon its riparian rights and never upon appropriation as such.

18. The main question for determination as to the Pacific Power & Light Company upon this appeal is as to its claim for water-power as a riparian proprietor, that is, what is the nature and extent of the Power Company's right?

The principles of the common law of England have been adopted in the State of Oregon only so far as the same are applicable to our conditions and in consonance with the public policy, Constitution and statutes of the state. The common-law rule, as to riparian rights to water, has been greatly modified in Oregon; *Carson* v. *Gentner,* 33 Or. 512, 515 (52 Pac. 506, 43 L. R. A. 130); 7 Wiel, § 118, p. 141; *Caviness* v. *La Grande Irr.* Co., 60 Or. 410 (119 Pac. 731); *Hough* v. *Porter,* 51 Or. 407 (95 Pac. 722, 98 Pac. 1083, 102 Pac. 728); *In re Willow Creek,* 74 Or. 592, 623 (144 Pac. 505, 146 Pac. 475).

The territorial law of Oregon, passed June 27, 1844, contained this provision: "The Common Law of England and principles of equity, not modified by the statutes of Iowa or of this government, not incompatible with its principles, shall constitute a part of the law of this land." Laws of Oregon 1843–49, p. 100.

Article XVIII, Section 7, of the Constitution of Oregon provides "That all laws in force in the territory of Oregon when this constitution takes effect, and consistent therewith, shall continue in force until altered or repealed." See *Perry* v. *Fletcher,* 93 Or. 43, 52 (182 Pac. 143); *Wright* v. *Wimberly,* 94 Or. 1, 37 (184 Pac. 740).

19. At common law the riparian owner was entitled to the full flow of the stream through his land, except as the flow might be affected by a reasonable use made thereof by other riparian owners. No one except the riparian owner had the right to divert any of the water from such stream. Our statutes referred to above make no distinction between the riparian owner and the owner of other land capable of being irrigated, although not crossed by or adjoining the stream. Many of the provisions of our statutes are equally repugnant to the common-law doctrine of riparian rights taken as a whole: *Boquillas etc. Co.* v. *St. David etc. Assn.,* 11 Ariz. 128, 135 (89 Pac. 504).

It was stated by the Supreme Court of Utah in *Stowell* v. *Johnson,* 7 Utah, 215 (26 Pac. 290), thus:

"At common law the riparian proprietor is entitled to have the water flowing, in quantity and quality, past his land as it was wont to do when he acquired title thereto, and this right is utterly irreconcilable with the use of water for irrigation."

In the celebrated case of *Lux* v. *Haggin,* 69 Cal. 255 (10 Pac. 675), the Court said: "The doctrine of appropriation, so called, is not the doctrine of the common law."

The statutes of Nevada adopted the common law of England in the following words:

"The common law of England, so far as it is not repugnant to, or in conflict with, the Constitution and laws of the United States, or the Constitution and laws of this state, shall be the rule of decision in all the courts of this state."

The Supreme Court of that state in *Reno Smelting etc. Co.* v. *Stevenson,* 20 Nev. 269 (21 Pac. 317, 19

Am. St. Rep. 364, 4 L. R. A. 60) construing this statute in its application to riparian rights, said:

"The statute is silent upon the subject of the applicability of the common law, and we think the term 'common law of England' was implied in the sense in which it is generally understood in this country, and that the intention of the legislature was to adopt only so much of it as was applicable to our condition. An examination of the authorities will render this apparent."

In *Boquillas etc. Co.* v. *St. David etc. Assn., supra,* the Supreme Court of Ariz., page 136, of the report said:

"Whether or not the applicability of the common law to the physical conditions which prevail in the territory should enter into the construction to be given the statute, and whether or not the subsequent legislation can be construed as a recognition that the common law as to riparian rights was adopted by statutes of 1864 adopting the common law, we think a reading of the latter makes it clear that any right granted by the statute was not intended to become property in such a sense that it might not be abrogated by future legislation. The limitation expressed in the act cannot be construed as referring solely to the laws of the United States or of the territory in force at the time of the adoption of the statute. * *

"If the legislature of the territory may confer riparian rights by statute, it seems to us clear that it may do so upon the condition that such rights thus conferred may subsequently be modified or abrogated. Where the legislature has, subject to future legislation, conferred riparian rights to the use of water from flowing streams upon riparian owners, the latter cannot be said to be vested in such a sense as that they may not be subsequently abrogated by statute, at any rate when the riparian owner has made no use of the water permitted him at common law."

The latter case was affirmed by the Supreme Court of the United States *sub nom. Boquillas Land & Cattle Co.* v. *Curtis,* 213 U. S. 339 (53 L. Ed. 822, 29 Sup. Ct. Rep. 493, see, also, Rose's U. S. Notes). The court said:

"By the statutory bill of rights, Art. 22, all streams capable of being used for the purposes of irrigation are declared to be public property and no one shall have the right to appropriate them exclusively, except under such equitable regulations as the legislature shall provide * *

"The right to use water is not confined to riparian proprietors. *Gutierres* v. *Albuquerque Land & Irrig. Co.,* 188 U. S. 545, 556 (47 L. Ed. 588, 23 Sup. Ct. Rep. 338); *Coffin* v. *Left Hand Ditch Co.,* 6 Colo. 443, 449, 450; *Wiley* v. *Decker,* 11 Wyo. 496 (73 Pac. 210, 220, 100 Am. St. Rep. 939). Such a limitation would substitute accident for a rule based upon economic considerations, and an effort, adequate or not, to get the greatest use from all available land. Whether there are any limits of distance is a question not arising in this case."

In *Gutierres* v. *Albuquerque Land etc. Co.,* 188 U. S. 545 (47 L. Ed. 588, 23 Sup. Ct. Rep. 338), it is said at pp. 553, 556:

"That the purpose of Congress was to recognize as well the legislation of a territory as of a state with respect to the regulation of the use of public waters is evidenced by the act of March 3, 1891, c. 561, 26 Stat. 1095. By the eighteenth section of the act of 1891 it was provided as follows: * *

"It is conceded on behalf of appellant that, by the laws of Mexico in force when the territory of New Mexico was ceded to the United States, the use of the waters of both navigable and unnavigable streams was not limited to riparian lands, but extended as well to lands which did not lie upon the banks of the

rivers, and that such use was subject to be regulated and controlled by the public authorities."

In *Fallbrook Irr. Dist* v. *Bradley,* 164 U. S. 112, at page 166 (41 L. Ed. 369, 17 Sup. Ct. Rep. 56, 66), we read:

"The general power of the legislature over the subject of providing for the irrigation of certain kinds of lands must be admitted and assumed. The further questions of limitation, as above propounded, are somewhat legislative in their nature, although subject to the scrutiny and judgment of the courts to the extent that it must appear that the use intended is a public use as that expression has been defined relatively to this kind of legislation."

In *Peoples* v. *Appraiser,* 33 N. Y. 461, it is said, as quoted by Mr. Justice Nave in the Boquillas case, *supra:*

"No doctrine is better settled than that such portions of the law of England as are not adapted to our condition form no part of the law of this state. This exception includes, not only such laws as are inconsistent with the spirit of our institutions, but such as were framed with special reference to the physical condition of a country differing widely from our own. It is contrary to the spirit of the common law itself to apply a rule founded on a particular reason to a case where that reason utterly fails."

In *Hill* v. *American Land & Livestock Co.,* 82 Or. 202 (161 Pac. 403) the Pacific Livestock Company, one of the defendants, among other things in its answer, averred as follows:

"That Trout Creek flows, and from time immemorial has flowed, through, over and upon these said lands, and which said lands are riparian thereto, and riparian rights attached thereto, and the said defendant is entitled to have the water of said creek flow by, through, over and upon the said lands, and to

make such use of said water as a riparian owner is entitled to make thereof."

Mr. Justice BURNETT, speaking for this court, at page 207 of the Report, makes use of the following language:

"Thus it is made plain that riparian rights are not the same in essential particulars as the common-law privilege thus designated. In the arid and semi-arid regions of the west the principal thing is the beneficial use of water as contrasted with its mere presence under the old common-law doctrine that a person whose lands abutted upon a stream was entitled to have it flow past his premises as it was naturally wont to do undiminished in quantity except for domestic purposes and unimpaired in quality. The rule had its rise in England, where irrigation was at the time practically unknown. The modification embodied in the act of Congress referred to and in the general legislation of the semi-arid western states is founded upon the necessity of the situation and the principle of making the water do the greatest good to the greatest number."

Again, on page 210, of the Report, it is said:

"At the outset, under the very nature of things, no one can tell what particular drop of water is his own. It is the use of an aliquot part of this amount which is in question; and no adequate determination of the same can be had without the presence of all who are interested in the entire flowage of the stream."

In *Williams* v. *Altnow,* 51 Or. 275 (95 Pac. 200, 97 Pac. 539), the defendant claimed the right to water for irrigation as a riparian proprietor. Former Mr. Justice R. S. BEAN, in dealing with the question at page 297, records these words:

"There are several reasons why this position cannot be sustained. In the first place, in the opinion of the writer, it is doubtful whether the owner of land

through which a non-navigable stream flows can claim the right as riparian proprietor to use the waters thereof for irrigation as against subsequent appropriators on the stream below him. * *   Every riparian proprietor is entitled, as against other riparian proprietors, to a reasonable use of the waters of a non-navigable stream flowing through his land, and after the natural wants of all have been supplied he may make a reasonable use of the surplus for irrigation purposes, when he can do so without infringing upon the corresponding rights of the other proprietors: *Jones* v. *Conn,* 39 Or. 30 (64 Pac. 855, 65 Pac. 1068, 87 Am. St. Rep. 634, 54 L. R. A. 630). * *

"A riparian proprietor has no title to the water flowing over his land, but only the right to use it while it is passing his place, and this right is subordinate to a corresponding right in all the other proprietors.   One proprietor cannot unreasonably detain or give the water another direction, or use it in any way to the injury of the others."

20. The case of *United States* v. *Rio Grande Irr. Co.,* 174 U. S. 690, 702 (43 L. Ed. 1136, 19 Sup. Ct. Rep. 770), is authority for the statement that it is undoubtedly true that a state may change its common-law rule as to every stream within its dominion and permit the appropriation of the flowing water for such purposes as it deems wise.   This authority is limited, in the absence of the consent of Congress, so that the state cannot destroy the right of the United States to water necessary for beneficial use for government property and by the superior power of the government of the United States to prevent interference with the navigation of navigable streams.

In *United States* v. *Rio Grande Irr. Co., supra,* it was said, as found at page 704 of the Report:

"Notwithstanding the unquestioned rule of the common law in reference to the right of a lower riparian proprietor to insist upon the continuous flow of the stream as it was, and although there has been in all the western states an adoption or recognition of the common law, it was early developed in their history that the mining industry in certain states, the reclamation of arid lands in others, compelled a departure from the common-law rule, and justified an appropriation of flowing waters both for mining purposes and for the reclamation of · arid lands, and there has come to be recognized in those states, by custom and by state legislation, a different rule—a rule which permits, under certain circumstances, the appropriation of the waters of a flowing stream for other than domestic purposes. * *

The court there quotes from the opinion of *Broder* v. *Water Co.,* 101 U. S. 274, 276 (25 L. Ed. 790, see, also, Rose's U. S. Notes), as follows:

"It is the established doctrine of this court that rights of miners, who had taken possession of mines and worked and developed them, and the rights of persons who had constructed canals and ditches to be used in mining operations and for purposes of agricultural irrigation, in the region where such artificial use of the water was an absolute necessity, are rights which the government had, by its conduct, recognized and encouraged and was bound to protect, before the passage of the act of 1866. We are of opinion that the section of the act which we have quoted was rather a voluntary recognition of a pre-existing right of possession, constituting a valid claim to its continued use, than the establishment of a new one."

The act of 1891 from which we have quoted above makes reference to riparian rights, and thereby recognizes whatever riparian rights a landed proprietor may have, but this act does not attempt to

define a riparian right nor in any manner to establish any rule respecting such interests: *Hough* v. *Porter, supra*. The different statutes recognize and protect vested rights. By the act of 1909, Section 5717, Or. L. (Amended Law of 1923, p. 439), the legislature, in its wisdom, saw fit to define what shall be deemed to constitute a vested right in a riparian proprietor. Subdivision 2 of that section declares that the actual application of water to beneficial use prior to the passage of the act by a riparian proprietor shall be deemed to create in such riparian proprietor a vested right to the extent of the actual application to beneficial use. Subdivision 3 makes provisions where a riparian proprietor has initiated a right by the commencement of the construction of works for the application of water to a beneficial use. There can be no doubt as to the intent of the legislature in this respect.

Section 5721 et seq., Or. L., provides for the procedure in the application of water for a beneficial use after the passage of the act of 1909, and requires an application to the State Engineer for a permit to make such appropriation and for the issuance thereof, the nature of such application, the condition of the permit, and for a record of such proceedings. Section 5729, Or. L. declares thus:

"The right acquired by such appropriation shall date from the filing of the application in the office of the state engineer."

Chapter V of Title XXXIII, Section 5731 et seq., under which the present proceedings were had, provides for the determination of water rights.

21, 22. The legislative enactment having defined and regulated the riparian right of the claimant, Power Company, the question arises whether such

authority resides in the legislative branch of our state government. This inquiry involves, to a certain extent, the nature of the right obtained by the Power Company to the waters of the river upon which its lands are located. It is not a new question.

In the case of *Caviness* v. *La Grande Irr. Co.*, 60 Or. 410, at pp. 421 and 423, Mr. Justice Burnett records the following language:

"In the very nature of things, a court cannot fix in advance by its decree what quantity of water will be reasonable in the future for the use of a riparian proprietor claiming the duty of water in that character. This conclusion is a necessary corollary to the case of *Jones* v. *Conn*, 39 Or. 30 (64 Pac. 855, 65 Pac. 1068, 87 Am. St. Rep. 634, 54 L. R. A. 630).

"Primarily, any use of the water of a natural stream for a beneficial purpose is free to him who has an opportunity to take it without infringing upon the property rights of another. At least on the Pacific slope, the exigencies of mining and agriculture have established this principle since the earliest times. The general government acquiesced in its application since the first settlements under the American régime, and by the Act of Congress of July 26, 1866, c. 262, 14 Stat. 253 (U. S. Comp. St. 1901, p. 1437), and in the Act of March 3, 1877, c. 108, 19 Stat. 377 commonly known as the 'desert land act,' has enunciated the doctrine in statutory form."

In *Re Willow Creek*, 74 Or. 592, 623, 625 (144 Pac. 505, 146 Pac. 475), this court held in effect that the common-law rule as to a riparian owner prevails in this state only to a limited extent; the old rule of "continuous flow" has been changed by custom and crystallized into express law by statute; that a riparian proprietor cannot lay claim to the undiminished flow of a stream without actual use, simply because it adds beauty to outlook, citing 4 Kinney,

Irr., § 1975; and that a riparian owner's right to water for irrigation is limited to the amount of water needed and used.

In the case of *In re Willow Creek, supra,* the Eastern Oregon Land Company claimed a riparian right to the use of water for 7,000 acres through which Willow Creek passes. That company also claimed appropriations through three ditches constructed respectively in 1882, 1883 and 1887, for tracts of land separate and distinct from the other land of the company. That company also claimed the right to have irrigated by natural overflow certain tracts of land aggregating 370 acres. At page 621 of the Report it was stated in effect that the overflow of these lands was analogous to a crude manner of irrigation much the same as the method adopted by other irrigators on the same stream at an early date when they cut ditches and allowed the water to flow into the sloughs and low places and subirrigate the land. It was there stated:

"It is unimportant how difficult or with what ease water can be appropriated for irrigation. It is tantamount to a beneficial use and is a valuable right which should not be ignored."

At page 622 the claim of the company for the remainder of the 7,000 acres is shown in the following words:

"In support of its claim the company contends that the law of riparian rights recognized in this state at the time the appellants' land passed out of the government should govern their rights, and cannot be affected by appropriations made subsequent to that time except as such appropriation rights have become vested by consent, purchase or adverse user."

The land company was awarded appropriations as claimed through its three ditches and as an appropriation for 3.65 second-feet for its overflowed lands, and requiring the installation of measuring devices. As shown on page 627 et seq. the company was denied the claim as a riparian proprietor and was allowed "no additional use of water" by reason thereof, by virtue of authority of subdivision 2, Section 6595, L. O. L. (now Section 5717, Or. L.).

In *Cookingham* v. *Lewis*, 58 Or. 484 (114 Pac. 88, 115 Pac. 342), Mr. Chief Justice EAKIN had under consideration the statute of 1909, known as the "Water Code." At page 497 of the Report, in referring to the report of the Oregon Conservation Commission, he notes:

"In the report of the commission to the Governor, of date November, 1908, as to the conditions and possibilities under consideration, which is exhaustive on that subject, the defects of the former methods of acquiring water rights are set forth and the undertaking contemplated by the commission outlined, namely—to conserve the surplus waters, as well as to settle and make definite water rights already existing as the only means of reclaiming arid lands of the state under the Carey act * *

"The whole purpose of the present system of water laws has been developed with a view to state control to reduce legislation to a system that shall accomplish this reclamation, together with the other uses of public water as a great public enterprise, carried out by an administrative system that will also accomplish a speedy adjustment of relative rights through these boards, not only of the individual cases, but of the stream system."

In *Coquille Mill & Mercantile Co.* v. *Johnson*, 52 Or. 547 (98 Pac. 132, 132 Am. St. Rep. 716), at page

551, Mr. Commissioner SLATER records the following language:

"But 'riparian owners upon navigable fresh rivers and lakes may construct, in the shoal water in front of their land, wharves, piers, landings, and booms, in aid of and not obstructing navigation. This is a riparian right, being dependent upon title to the bank, and not upon title to the bed of the river. *Its exercise may be regulated or prohibited by the state;* but, so long as not prohibited, it is a private right, derived from a passive or implied license by the public.' " (Italics ours.)

In *Parkersville Dist.* v. *Wattier,* 48 Or. 332 (86 Pac. 775, 777), cited in Mr. Justice McCOURT's opinion, Mr. Justice MOORE, at page 339 of the Report, records the following language:

"In *Carson* v. *Gantner,* 33 Or. 512 (52 Pac. 506, 43 L. R. A. 130), the plaintiff maintained a ditch across certain lands owned by the State of Oregon which it thereafter conveyed to the defendants without reserving any accrued or vested water rights from the operation of the deed. The defendants having intermeddled with the ditch, is was held, in a suit to enjoin such interference, that the plaintiff had the right to enter upon their premises to repair the conduit. In referring to what is now incorporated in B. & C. Comp. as Section 3338, and alluding to the policy of the State of Oregon in enacting the clause herein before quoted, it was said: 'This statute was a legislative sanction, confirmatory of the customs of miners, and, like the act of Congress of July 26, 1866, was the recognition of a pre-existing right, rather than the granting of a new easement in its real property.'

"The doctrine, once declared, that the rights of a riparian proprietor who had secured from the United States a patent for land before the passage of the act of Congress of July 26, 1866, thereby defeated the claims of a prior appropriator of the water of a

stream flowing through such lands (*Van Sickle* v. *Haines,* 7 Nev. 29), has been expressly overruled: *Jones* v. *Adams,* 19 Nev. 78 (6 Pac. 442, 3 Am. St. Rep. 788).''

The recognition by law of the right of an appropriation is of necessity an infringement or curtailment of the common-law rule as to a riparian owner. To illustrate: If ten persons are tenants in common of a tract of land, and a definite one tenth of the area is taken away from them, or away from the tract, the right of each of the owners is affected. Hence, when an appropriation of a definite quantity of water from a stream is permitted and made, "thus," as said in the *Caviness* v. *La Grande* case, "destroying one of the essential characteristics of riparian user considered as a tenancy in common," all the "tenants in common" in such water, or riparian proprietor, are affected. When the State of Oregon recognized the right of appropriation of the waters of the streams of the state, the old riparian doctrine of "continuous flow" was materially changed.

In early days when there was little or no government, the miners of the west adopted the custom of diverting water from the stream and using it in their placer digging and small power plants. This custom came to be recognized as an established rule. The first taker from the stream had the first right to the water taken and used. No head was given to the "continuous flow" doctrine. This custom led to similar diversions for gardens and fields. When government in these regions was established, the courts found these customs fixed and ingrafted to such an extent that they were at once recognized and enforced. These customs date practically from the

time of first settlement. By an act of the legislature of Oregon in 1864 it was enacted that—

"Miners shall be empowered to make local laws in relation to the possession of water rights, the possession and working of placer claims, and the survey and sale of town lots in mining camps, subject to the laws of the United States." Deady & Land's Code, 687; Hill's Code, § 3832.

Two years later Congress gave formal, official recognition to such customs in the following language:

"Whenever, by priority of possession, rights to the use of water for mining, agriculture, manufacturing, or other purposes, have vested and accrued, and the same are recognized and acknowledged by the local customs, laws, and the decisions of courts, the possessors and owners of such vested rights shall be maintained and protected in the same; and the right of way for the construction of ditches and canals for the purposes herein specified is acknowledged and confirmed. * * Act of July 26, 1866, c. 262, § 9; 14 Stat. 253; 5 Comp. St. (1916) 4647; U. S. Rev. St., § 2339."

23, 24. The very essence of the common law is flexibility and adaptability. It does not consist of fixed rules but is the best product of human reason applied to the premises of the ordinary and extraordinary conditions of life, as from time to time they are brought before the courts. Although the common law is homogeneous, yet it finds widely different expression in different jurisdictions. If the common law should become so crystallized that its expression must take on the same form wherever the common-law system prevails irrespective of physical, social or other conditions peculiar to the locality, it would cease to be the common law of history, and would be an inelastic and arbitrary Code. It is one of the

established principles of the common law which has been carried along with its growth, that precedents must yield to the reason of different or modified conditions.

25. The common law having been partially adopted by statute, it is plain that the common-law rule as to the "continuous flow" of a stream, or riparian doctrine, may be changed by statute, except as such change may affect some vested right.

26, 27. Therefore, it will be seen that the State of Oregon recognized and adopted the rule conferring the right of appropriation of water long before the state conveyed the land of the Power Company to its predecessors. Such right of appropriation was recognized and adopted in principle when the statute of 1864 was passed.  The Power Company recognized the rule that those obtaining title to land take the same subject to the laws then prevailing: *In re Willow Creek*, 74 Or. 627 (144 Pac. 505, 146 Pac. 475).  When the state conveyed the lands to the Power Company's predecessors, the law prevailing in this state authorized an appropriator subject to rights existing at the time of his appropriation, to take water from the streams of the state for a beneficial use, and convey the same to nonriparian land; provided he could legally obtain access to the stream. No one has any property in the water itself but a simple usufruct.

It was within the province of the legislature, by the act of 1909, to define a vested right of a riparian owner, or to establish a rule as to when and under what condition and to what extent a vested right should be deemed to be created in a riparian proprietor: *Kansas* v. *Colorado,* 206 U. S. 46, 94 (51 L. Ed. 956, 973, 27 Sup. Ct. Rep. 655, see, also, Rose's

U. S. Notes); *Sternberger* v. *Seaton,* 45 Colo. 401, 403 (102 Pac. 168); *Clark* v. *Nash,* 198 U. S. 361 (4 Ann. Cas. 1171, 1174, 49 L. Ed. 1085, 25 Sup. Ct. Rep. 676); *Atchison* v. *Peterson,* 87 U. S. 508 (22 L. Ed. 414); *Boquillas L. & C. Co.* v. *Curtis,* 213 U. S. 339 (53 L. Ed. 822, 29 Sup. Ct. Rep. 493); *Van Dyke* v. *Midnight Sun M. & D. Co.,* 177 Fed. 85 (100 C. C. A. 503); *United States* v. *Rio Grande Irr. Co.,* 174 U. S. 690, 703 (43 L. Ed. 1136, 19 Sup. Ct. Rep. 770, see, also, Rose's U. S. Notes).

The statute of this state plainly declares that all waters within the state from all sources of water supply belong to the public: Section 5715, Or. L. This is, of course, subject to the further provision of the act. As we have noted the courts of this state and other states and of the United States have upheld the legislative enactments of this state and other similar statutes. Rights to public waters can be acquired as provided by the several statutes of this state: *Cookingham* v. *Lewis,* 58 Or. 484, 490 (114 Pac. 88, 115 Pac. 342); *Caviness* v. *La Grande Irr. Co., supra.*

Under our present statute, defining what shall constitute a vested right of a riparian proprietor, the claim of the Pacific Power & Light Company as a riparian owner of land on Hood River to a continuous flow of the specified quantity of water over its land cannot be maintained.

As already noted, the Water Board and the Circuit Court awarded the Power Company rights as an appropriator. While its claims are not asserted to be in form as claiming an appropriation, it is suggested on behalf of the Power Company that considering its right from that standpoint, the award to the Power Company is incorrect.

In the Power Company's statement and proof of claimant regarding its "Upper Development" or "Tucker's Bridge plant," the following questions and answers appear:

"Q. When was water first used for irrigation, or other beneficial purposes?

"A. In 1883 the water was first used for power purposes.

"Q. State the means of utilizing such water, giving the name by which the ditch is most commonly known, if a ditch is used.

"A. The first diversion made by Logan & Crowell. Later enlarged by diversion works, flume and ditch and turbine house known as the 'Old Tucker Mill Ditch,' later reconstructed and known as 'Tucker's Bridge Plant.'"

The Power Company's allegations as to the early use of these waters by its predecessor in interest is not denied. The difficulty, however, arises from the fact it is not shown how much water was used by the first diversion made by Logan and Crowell, nor the quantity diverted when the diversion works were later enlarged and the flume and ditch and turbine house known as the "Old Tucker Mill Ditch" were constructed.

It would seem to be an easy matter to compute the amount of water that would be used if the size and grade of the flume and ditch, or the size of the wheel and the head available were given. It does not appear to have been the intention of the early appropriators, about in 1883, to use any more water than was actually diverted at that time.

It would seem from this testimony that the Power Company is entitled to a right of a certain quantity of water as of the date of about 1883, or later, and under all the circumstances the Power Company

should be permitted to apply to the trial court to submit additional proof and data as to such quantity of water diverted at the times mentioned. No abandonment of such early right appears in the record.

Section 5803, Or. L., provides as follows:

"Every person, firm, or corporation or association hereinafter called 'claimant,' claiming the right to the use of water for power development, shall on or before the first day of January, 1916, and on or before the first day of January of each year thereafter, pay to the state of Oregon in advance an annual license fee based upon the theoretical water horse-power claimed under each and every separate claim to water, graduated as follows, to wit: Ten cents for each and every theoretical water horse-power up to one hundred, inclusive; five cents for each and every theoretical water horse-power in excess of one hundred and up to and including one thousand; and one cent for each and every theoretical water horse-power in excess of one thousand; provided, however, upon filing the statement as hereinafter provided, the United States, or the state, or any municipal corporation, claiming the right to the use of water to any extent for the generation of power, or any other claimant to the right to use water for the generation of twenty-five theoretical water horse-power, or less shall be exempted from the payment of all fees herein provided.   (L. 1911, c. 236, § 1; L. 1915, c. 213, § 1.)"

Section 5804, Or. L., requires a written statement to accompany the fees paid setting forth the name and address of the claimant, name of the stream from which the water is appropriated, or claimed for power development, a description of the 40 acres, or smallest legal subdivision in which the point of diversion and point of return are located; the date of the right as claimed; the maximum amount of water

claimed expressed in cubic feet per second of time; the total average flow utilized; the manner of developing power and the use to which the power is applied and other data.

The first enactment of Section 5803, Chap. 236, p. 418, Gen. L. of 1911, required claimants claiming the right to the use of water for power purposes where water was applied to the development or generation of power, and the power generated thereby prior to the twenty-second day of May, 1909, to pay such license fee. By Chap. 213, Gen. Laws of Or. 1915, the section was amended so as to read as above quoted, eliminating the clause containing the date of May 22, 1909.

It is shown on behalf of the Pacific Power and Light Company that in compliance with the act of 1911 the Power Company filed its statement with the State Engineer in December, 1911, and paid the license fee and annually thereafter filed certain statements of ·its water-power claim with the State Engineer and paid license fees thereon pursuant to the statute, each year up to December, 1914, inclusive, claiming 1,500 second-feet of water for power purposes, the annual license fee being $121.70. During each of those four years the company also filed a statement of a claim to the use of 100 second-feet of water at what was called the Old Evans plant, that being a small 75-kilowatt plant, which had its intake on what was formerly the N. C. Evan's property situated just above Powderdale, and paid the license fee therefor of $33.40 annually.

In December, 1915, the Power Company filed its statement and paid its license fees on the claim as to the Lower Development, for 750 second-feet of

water. In the same month it also filed the claim as to its Upper Development, claiming 1,000 second-feet of water and paid a license fee therefor of $163.18. The same claims were filed for the Upper and Lower Development in December, 1916, and 1917. In December, 1918, the Power Company, in filing its claim and paying its license fees for the year 1919, reduced its claim to the use of water at the Tucker's ridge plant, or Upper Development, from 1,000 second-feet to 750 second-feet, and paid the license fee accordingly. It also filed its claim for 750 second-feet as before on the Lower Development and paid the license fee.

Commencing in 1913 the Power Company expended something in the neighborhood of $200,000 in substantial development of its plants. The financial conditions prevailing during the World War and since, rendered it inexpedient to proceed with the development. It is not definitely determined by the Power Company, as we understand the record, whether it intends to develop its plant in one unit or two.

By Section 5789, Or. L., the use of the waters of the state for the purpose of furnishing electrical power for all purposes is declared to be beneficial use and a public necessity and confers the right to divert unappropriated waters for such beneficial use.

It is significant that the water law of 1891 provided for appropriations for irrigation, domestic uses and watering livestock on dry land. While the Water Code of 1909, § 5715, Or. L., et seq., provides for the appropriation of water for a beneficial use, Section 5721 provides for making application to the State Engineer for a permit to use water for beneficial use. While

it is not shown that the Power Company applied for such a permit, it made substantially the same kind of an application under the statute of 1911 and 1915: Or. L., § 5803.   Under the circumstances, the Pacific Power and Light Company should be awarded an inchoate right to 110 second-feet of water in addition to the 640 second-feet awarded by the Water Board and Circuit Court, to be diverted at its Upper Development, or Tucker's Bridge plant, and allowed until January 1, 1929, or within such further time as may be allowed by the State Engineer, as provided by law, to make an application thereof to a beneficial use, when so made to have a date of relative priority of 1911.

## General Provisions.

For the purpose of permitting the Pacific Power and Light Company to submit proof as to the amount of water used about the year of 1883 at its Lower Development, this portion of the cause will be remanded to the Circuit Court.

There is considerable testimony in the record regarding the duty of water which is always an important subject in such cases.   There is testimony of an expert to the effect that 28/100 of a miner's inch per acre would be sufficient for the needs of the irrigators in the Hood River system.   The Water Board allowed 1/80th of a second-foot per acre not exceeding three acre-feet per acre during the irrigation season. While it might be possible to use a less amount than allowed by the Water Board, it is not believed that it is practicable with the facilities available for the irrigators to use less than that amount.   The lands involved are of little or no value without water for

irrigation. It appears that the use of the water from these streams is wasteful to a certain extent.

28. The duty of water, as fixed by the Water Board, should not be changed provided that waste of water must be prohibited and when the amount awarded is not actually used for irrigation or domestic purposes the water must be shut off from the ditches and laterals and allowed to flow in the streams. The various irrigators and users of water for domestic purposes and watering livestock from Hood River and its tributaries are hereby required on or before March 1, 1925, to put the ditches, canals, flumes, gates, pipes and laterals in good serviceable condition by repairing and puddling the ditches, canals and laterals, repairing and tightening the flumes, repairing the pipes, all in a good and husband-like manner, so as to prevent waste in the use of water.

Commencing with the irrigating season of 1925, any waste in the use of water in conveying the same or irrigating the land, or using the same for domestic purposes, by any water user from Hood River, or its tributaries, is hereby enjoined and inhibited.

With the modifications and exceptions above noticed, the decree of the lower court is affirmed; each party to pay his, her or its own costs in this court.

AFFIRMED AS MODIFIED.

McBRIDE, C. J., and RAND and COSHOW, JJ., concur in special opinions.

BURNETT, BROWN and McCOURT, JJ., dissent in special opinions.

McBRIDE, C. J., Specially Concurring.—I concur in the opinion of Mr. Justice BEAN. In my opinion

the whole case turns upon the constitutionality of Sections 5715, 5716 and 5717, Or. L.

In the first section above quoted it is provided that all waters in the state, from all sources of supply, belong to the public. By the second section it is provided that, subject to existing rights as therein provided, waters may be appropriated for beneficial use, but that the section shall not be construed to take away or impair the vested right of any person, firm, corporation or association to any water. Subdivision 2 of Section 5717 defines, it seems to me, what is meant by a vested right. It is as follows:

"Actual application of water to beneficial use prior to the passage of this act by or under authority of any riparian proprietor, or by or under authority of his or its predecessors in interest, shall be deemed to create in such riparian proprietor a vested right to the extent of the actual application to beneficial use, * * "

It seems to me that this definition makes the test of a vested right the beneficial use of the water by a riparian proprietor, and, if this act is constitutional, then the appropriators in this case are entitled to a decree.

It is difficult exactly to define in what a vested right in the use of water consists. Practically, there is no such a thing as property in the water of a flowing stream. The riparian proprietor may own the banks, and even the bed of a non-navigable stream, but he no more owns the water than he owns the air. His only right is the right of using it. In this country we have ceased, to a great extent, to apply, in its original severity, the common-law doctrine, "Water runs, and it ought to run as it is accustomed to run." This maxim, while very con-

venient in expression, was never in fact practically applied in common law to its full extent.

The riparian rights to water, or to the use of water, may be divided into two classes—natural uses, and other uses which may be deemed extraordinary. Natural uses, which I deem to be those that vest in a riparian proprietor at the very moment that he obtains title to land bordering on a natural stream, include the use of water for domestic purposes of his home or farm, such as drinking, washing or cooking, or for his stock. These might well be construed to extend to all culinary and household purposes, even to the watering of a garden and things of that character, and, so far as irrigation is concerned, the watering of a small garden is about the extent of use to which any kind of irrigation was put at the time of the common law. All other uses are extraordinary, and may be classed rather as privileges than as rights, and, as to such, I do not believe the theories of the common law should be applied.

All confess that the common-law theory of riparian rights has been modified in this country in many respects, either by legislation or by holdings of the courts declaring it inapplicable in some particulars to conditions in this country, and the fact that such modifications have been upheld by the courts strongly indicates that, except as to the natural uses before mentioned, no constitutional right to the enjoyment of the flow of a stream exists, but that the use in these extraordinary respects is in the nature of a mere privilege, over which the legislature has jurisdiction.

As to manufacturing and the use of water by dams, it does not seem to me that it ever arose in this country above the dignity of a mere privilege, over

which the legislature had complete control. This is especially true of mills. Very many of the decisions, in referring to a mill site, speak of it as a "mill privilege." In *Hutchinson* v. *Chase,* 39 Me. 508 (65 Am. Dec. 645), it was substantially decided that a "mill privilege" is the right to the use of a water-power in its existing state. It was only another term for a mill site, with the privilege of using the water by placing a dam. Mill sites, and the use of water thereon, are termed "mill privileges" in the following cases, which do not at all exhaust the list: *Whitney* v. *Wheeler Cotton Mills,* 151 Mass. 396 (7 L. R. A. 613); *Pettee* v. *Hawes,* 13 Pick. (Mass.) 323; *Knapp* v. *Douglas Axe Co.,* 95 Mass. 1; *Moore* v. *Fletcher,* 16 Mo. 63 (33 Am. Dec. 633); *Gould* v. *Boston Duck Co.,* 79 Mass. 442; *Farrar* v. *Cooper,* 34 Mo. 394. The use of this term, as contradistinguished from the term "right," or "vested right," is significant, and indicates that there has long been in this country, although not always plainly expressed, a distinction between those natural rights of access to and use of water for ordinary purposes, and those privileges which are exercised by the building of dams and the use of the head of water thereby obtained for the purposes of manufacturing.

It seems to me that we are at the parting of the ways with the old common-law doctrine of the use of water. In this case a small sawmill, and thereafter an electric light plant, were put in use upon the stream and there was no indication that those uses would be extended when the irrigators who are parties here filed their notices and began to take out water to supply the wants of a large community. If the Power Company is entitled, by reason of its riparian situation, to the use of any portion of what has been

so diverted or is now being diverted, it is entitled to every drop, and to take it at such time as it may choose; and this would apply not only to the large community of water users on Hood River, whose investments had been made on the faith of their right to use this water for the purpose of irrigation and who would be impoverished to a great extent by a decree in favor of the Power Company in this case, but it would apply to many other streams in Eastern Oregon, with an ultimate consequence which would be more serious and injurious to the people of that semi-arid section than the recent decline in the price of wheat, and wool and beef, injurious as these consequences have been.

I do not believe that we should attempt to apply the common law, which had its origin in a country where the natural humidity was such as to render the problem of getting rid of surplus water much more important than the conservation of water for the purpose of irrigation, to which latter purpose it was seldom applied. With no right in nonriparian users to a continuance of their use beyond the time when the riparian owner may see fit to put the water to some practical use in operating machinery, it will practically put an end to irrigation in the arid section of this country, because no sane man will invest in what would be a precarious title, which would, in fact, make him a tenant at will of a riparian owner.

I am aware there has been some expression of our court, especially as to the rights of flotation upon non-navigable streams, which would indicate a different view, but these are to a great extent *dicta,* as applied to a condition like the present. It may be said that property rights have grown up as a result of the *dicta* in these decisions and that, therefore, they should be

adhered to, notwithstanding the present condition; but such property rights as have grown up are infinitesimal compared to the property rights which would be destroyed by adhering to technical, unsuitable and worn-out common-law doctrine.

RAND, J., concurs in the foregoing opinion.

COSHOW, J., Concurring.—The following opinion applies to the relative rights of the Pacific Power & Light Company. There is no difference of opinion among the members of the court regarding the relative rights of the other litigants. The determination of the relative rights of the Pacific Power & Light Company hinges upon the validity of the act of 1909, known as the Water Code and designated as Chapter III, Title XXXIII of Oregon Laws. The pertinent portions of that Chapter are as follows:

Section 5715: "All water within the state from all sources of water supply belong to the public."

Section 5716: "Subject to existing rights, all waters within the state may be appropriated for beneficial use, as herein provided, and not otherwise; but nothing herein contained shall be so construed as to take away or impair the vested right of any person, firm, corporation, or association to any water; * * ."

Section 5717, as amended in the General Laws of 1923, Chapter 283, reads as follows:

"1. Nothing in this act contained shall impair the vested right of any person, association or corporation to use the water.

"2. Actual application of water to beneficial use prior to the passage of this act by or under authority of any riparian proprietor or by or under authority of his or its predecessors in interest, shall be deemed to create in such riparian proprietor a vested right to the extent of the actual application to beneficial

114 Or.—13

use; provided such use has not been abandoned for a continuous period of two years.

"3. And where any riparian proprietor, or under authority of any riparian proprietor or his or its predecessor in interest, any person or corporation shall, at the time this act is filed in the office of the secretary of state, be engaged in good faith in the construction of works for the application of water to a beneficial use, the right to take and use such water shall be deemed vested in such riparian proprietor; provided, such works shall be completed and said water devoted to a beneficial use within a reasonable time after the passage of this act. The state engineer, in the matter hereinafter provided, shall have power and authority to determine the time within which such water shall be devoted to a beneficial use. The right to water shall be limited to the quantity actually applied to a beneficial use within the time so fixed by the state engineer." General Laws of 1923, pp. 439, 440.

The other provisions of said Chapter provide for determining the relative rights, either initiated or vested. The legislature intended by this act to confine vested riparian rights to the use of water, either already applied to a beneficial use, or in the process of being so applied, when that act took effect. The legislature intended to modify the doctrine of riparian rights as theretofore announced and prescribed both by the prior statutes of this state and the judicial utterances of this court. If the legislature had the power to so define, limit and prescribe the use of water, then the common-law doctrine of riparian rights as to continuous flow has been abolished.

The able and exhaustive opinion of Mr. Justice McCourt is accepted by the writer as the correct statement of the doctrine of riparian rights as the same existed in the state prior to 1909 when the

Water Code was adopted.  The able opinion of Mr.
Justice LORD in *Weiss* v. *Oregon Iron & Steel Co.,*
13 Or. 496, 498 (11 Pac. 255), defines the doctrine of
riparian rights, as commonly and generally under-
stood by the members of the bar, as well as the courts
at that time, as clearly and lucidly as can be found
anywhere.  He defines riparian rights in that case
as follows:

"The general doctrine relating to watercourses is,
that every proprietor is entitled to the use of the
flow of the water in its natural channel, and to the
momentum of its fall on his own land.  The owner
has no property in the water itself, but a simple
usufruct.  He may use it as it passes along, *but he
must send down to his neighbor below as much as he
received from his neighbor above.* (Angell on
Watercourses, §§ 90, 94.)  'As a general proposition,
every riparian proprietor has a natural and equal
right to the use of the water in the stream adjacent
to his land, without *diminution or alteration.'*
(Washburn on Easements, 319.)  'Riparian pro-
prietors are entitled, in the absence of grant, license,
or prescription limiting their rights, to have the
stream which washes their lands flow as it is wont by
nature, without material diminution or alteration.'
(Gould on Waters, § 204.)  Chancellor KENT says:
'Though he may use the water while it runs over
his land, he cannot unreasonably detain it, or give it
another direction, and he must return it to its
ordinary channel, when it leaves his estate.  Without
the consent of the adjoining proprietors, he cannot
divert or *diminish the quantity of water* which would
otherwise descend to the proprietors below.'  (3)
Kent's Com., § 439.) * * The right to a watercourse
begins *ex jure naturae,* and having taken a certain
course naturally, it cannot be diverted to the depriva-
tion of the rights of the riparian owners below.  This
is the language of all the common-law text-books,
and the decision. (Angell on Watercourses, § 93.)

'It is an ancient and well-established principle,' said WESTON, J., 'that water cannot be lawfully diverted, unless it is returned again to its accustomed channel, before it passes the land of the proprietor below. *Running water is not susceptible of an appropriation which will justify the diversion or unreasonable detention of it.*' (*Blanchard* v. *Baker,* 9 Greenl. 266.) 'The general rule of law is, that every man has a right to have the advantage of a flow of water in his own land, without diminution or alteration.' (Lord ELLENBOROUGH in *Healy* v. *Shaw,* 6 East, 208, 214.)

"By settled principles of both the civil and common law, the riparian owner has a usufruct in the stream as it passes over his land, of which he cannot be deprived by mere diversion." (*Pope* v. *Kinman,* 54 Cal. 3.)

This decision as so ably pointed out by Mr. Justice McCOURT has been repeatedly cited and followed and may be said not only to state the law of riparian rights in this state clearly, but may also be considered the leading case in this state upon that doctrine. Further citation of authorities would be unnecessary repetition without contributing anything of value to the reasons for the conclusions of the writer. The doctrine of riparian rights as thus laid down has been held to be a vested property right: *Brown* v. *Baker,* 39 Or. 66 (65 Pac. 799, 66 Pac. 193); *Oregon Construction Co.* v. *Allen Ditch Co.,* 41 Or. 209 (69 Pac. 455, 93 Am. St. Rep. 701); *Anaheim U. W. Co.* v. *Fuller,* 150 Cal. 327 (86 Pac. 978, 11 L. R. A. (N. S.) 1062, and other cases cited in the same paragraph in the opinion of Mr. Justice McCOURT.

"This right of the riparian proprietor to the flow of the water is inseparably annexed to the soil, and passes with it not as a mere easement or appurtenant, but as a part and parcel of it. Use does not create,

and disuse cannot destroy or suspend it. It is a private property right in the proprietor within the protection of the constitutional provision that private property shall be forever held inviolate, *subject to the public welfare,* and shall not be taken for public use without compensation being first made. The property consists, not in the water itself, but in the added value which the stream gives to the land through which it flows. This is made up of the power which may be obtained from the flow of the stream, from the increased fertility of the adjoining fields because of the presence of the water, and of the value of the water for the uses to which it may be put. The right to the continued existence of these conditions is property, to protect which the owner may resort to any or all of the instrumentalities which may be employed for the protection of private property rights." 27 R. C. L. 1092, 1093, § 30, and cases cited in note 6, page 1092, and in note 7, page 1093; 1 Kinney on Irrigation and Water Rights (2 ed.), §§ 450–551; § 588, p. 1012; *Clark* v. *Allaman,* 71 Kan. 206 (80 Pac. 571, 70 L. R. A. 971, 985).

If this court should adhere to the doctrine of riparian rights as thus expounded, no water could be diverted from our streams against the will of a riparian owner unless the right to so divert it has been acquired by condemnation, grant, license or prescription. Not only did the courts enforce common riparian rights because the common law obtained in this state, except as modified by state statute, but the legislature of the state jealously guarded and protected the same rights, as is very thoroughly pointed out by Mr. Justice McCOURT in his dissenting opinion.

Climatic, meteorological and topographical conditions have caused a departure from the riparian doctrine of the common law in all of the Rocky

Mountain and western states. In some of these states, namely, Arizona, Colorado, Idaho, Montana, Nevada, Utah and Wyoming, the common-law doctrine has been abrogated either by the Constitution or legislative enactment. In some of these states the courts have refused to apply the common-law doctrine of riparian rights because that doctrine was inapplicable to the physical conditions. In other states an attempt has been made to do the impossible and reconcile the two opposing doctrines concerning the right to and use of the waters of the state. These two systems are so inconsistent with each other that they cannot be reconciled. The doctrine of appropriation is directly opposed in practice and principle to the common-law doctrine of riparian rights. The most that can be said with reference to the two systems in those states, which have not abrogated the doctrine of the common law, is that they stand side by side. The fact, however, that some of the states have altogether abrogated the common-law doctrine of riparian rights is convincing to the mind of the writer that the common-law doctrine of riparian rights is not such a vested property right as is protected by the constitutional guaranty. It must be borne in mind, in this connection, that all of these western states adopted the common law as their system of jurisprudence. Having done that, some of the early decisions held the common-law doctrine of riparian rights obtained and the appropriation of the water was not permitted. The doctrine of appropriation was held in *Bear River Water Co.* v. *New York M. Co.*, 8 Cal. 327 (68 Am. Dec. 325, 4 Morr. Min. Rep. 526), to be "without judicial or legislative precedent, either in our own country or in that from which we have borrowed our jurisprudence."

"In the early history of the doctrine, however, attempts were made in some of the California decisions to reconcile the doctrine of appropriation with the common law. But, for the reason that the very fundamental principles of the two doctrines are opposed to each other, this attempt at reconciliation did not get very far.

"About the most that can be said of the two doctrines is that they may both exist in the same state at the same time; but even then they are continually clashing." 1 Kinney on Irrigation and Water Rights (2 ed.), 1010, 1011.

"In 1861, while Nevada was still a territory, the common law of England was adopted by the legislature, in the following language: 'The common law of England so far as it is not repugnant to or inconsistent with the constitution or laws of the United States, or the laws of the territory of Nevada, shall be the rule of decision in all courts of this territory.' And when Nevada became a state the above enactment was adopted in the constitution by the following clause: 'All laws of the territory of Nevada in force at the time of the admission of this state, not repugnant to this constitution, shall remain in force until they expire by their own limitations or be altered or repealed by the legislature.' It will be noticed that the section is entirely silent upon the subject as to the applicability or nonapplicability of the common law, or any portion thereof, to the conditions or necessities of the state of Nevada. And, when the question was first considered by the supreme court of the state in the case of *Vansickle* v. *Haines* [7 Nev. 249, 15 Morr. Minn. Rep. 201], the court in upholding the common law rule of riparian rights according to the strict construction thereof, after quoting the section of the statute above, said: 'Hence, although the common law might, in the opinion of judges, be inapplicable, still, if not in conflict with the constitutional laws of the United States or the constitution or laws of

Nevada it must nevertheless be enforced.' Later the same court in the cases of *Jones* v. *Adams* [19 Nev. 78, 6 Pac. 442, 3 Am. St. 788, 4 L. R. A. 60], without any further enactment upon the part of the legislature of that state, overruled the case of *Vansickle* v. *Haines* upon the only ground that the common law of riparian rights was unsuited to the physical conditions of that state, and they were thereby entirely abrogated, and the arid region doctrine of appropriation of waters for beneficial uses was adopted in lieu thereof. These decisions upon the part of the court in the later cases have been called by an eastern writer upon the subject, in a somewhat hysterical manner, 'one of the most flagrant examples of judicial legislation that was ever perpetrated.' But in view of the authorities cited in the previous sections, the court had this power; and owing to the fact that Nevada is one of our most arid states, the physical conditions of which are such that the common law of riparian rights is entirely inapplicable, as it was construed in the Vansickle case, it will have to be admitted, by all who are at all familiar with the subject, that it was better for the court to reverse its holding, than to persist in adhering to a wrong rule. * *

"Again, this doctrine was reaffirmed in the case of *Reno Smelting, Milling & Reduction Works* v. *Stevenson* [20 Nev. 269, 21 Pac. 317, 19 Am. St. Rep. 364, 4 L. R. A. 60], wherein it was said: 'It is contrary to the spirit of the common law itself to apply a rule founded on a particular reason to a law, when that reason utterly fails—*Cessante ratione legis, cessat ipsa lex*. In states where the common law has not been adopted by legislative enactment, courts have proceeded upon the hypothesis of its adoption, *subject always to its applicability to the locality.* From these authorities we assume that the applicability of the common law rule to the physical characteristics of the state should be considered. Its inapplicability to the Pacific States, as shown in

*Atchison* v. *Peterson* [1 Mont. 561; Id., 87 U. S. 20 Wall. 22 L. Ed. 414, 1 Morr. Min. Rep. 582] applies forcibly to the state of Nevada. Here the soil is arid and unfit for cultivation, unless irrigated by the waters of running streams. The general surface of the state is table land, traversed by parallel mountain ranges. The great plains of the state afford natural advantages for conducting water, and lands other- wise waste and valueless become productive by arti- ficial irrigation. The condition of the country and the necessities of the situation impelled settlers upon the public lands to resort to the diversion and use of waters. This fact of itself is a striking illustration and conclusive evidence of the inapplicability of the common-law rule.' "   1 Kinney on Irrigation and Water Rights (2 ed.), 1020–1023.

To a large degree the State of California has abrogated the common-law doctrine of riparian rights. Mr. Justice SHAW, whose learning and long experi- ence upon the supreme bench of the State of Cali- fornia entitles his opinion to especial respect in regard to water rights, in *Katz* v. *Walkinshaw,* 141 Cal. 116 (70 Pac. 663, 74 Pac. 766, 99 Am. St. Rep. 35, 64 L. R. A. 236), said:

"Whenever it is found that, owing to the physical features and character of this state, and the peculiari- ties of its climate, soil, and productions, the applica- tion of a given common law rule by our courts tends constantly to cause injustice and wrong, rather than the administration of justice and right, then the fundamental principles of right and justice on which the law is founded, and which its administration is intended to promote, require that a different rule should be adopted—one which is calculated to secure persons in their property and possessions, and to preserve for them the fruits of their labors and expenditures. The question whether or not the rule contended for is a part of the common law applicable

to this state depends on whether it is suitable to our conditions under the rule just stated.''

In a recent decision of the Supreme Court of California, that court modified its former views as to the flow of surface streams and held that a riparian owner must show some damage in order to restrain an upper owner from the beneficial use of the water and said:

''Even if at common law or under the civil law it was a part of the usufructuary right of the riparian owner to have the water flow by for no purpose other than to afford him pleasure in its prospect, such is not the rule of decision in this state. The lower claimant must show damage to justify a court of equity in restraining an upper claimant from his beneficial use of the water. The fair apportionment and economic use of the waters of this state are of the utmost importance to its development and well-being. The problems presented never came within the purview of the common law. They have been a necessity, therefore, and must continue to be solved by this court as cases of first impression, and, as in the past, or in the future if a rule of decision at common law shall be found unfitted to the radically changed conditions existing in this state so that its application will work wrong and hardship rather than betterment and good, this court will refuse to approve and follow the doctrine.'' *San Joaquin etc. Co.* v. *Fresno etc. Co.*, 158 Cal. 626 (112 Pac. 182, 35 L. R. A. (N. S.) 832).

There can be no question that the excerpt last quoted is in direct conflict with the principle announced in *Weiss* v. *Oregon Iron & Steel Co.*, 13 Or. 496 (11 Pac. 255), and in direct conflict with the common-law doctrine of riparian rights. California has adhered tenaciously to that doctrine as a general rule and yet its Supreme Court exercises the right to modify that doctrine. This it could not do

if the common-law riparian rights were vested property. The Constitution of the western states could not abrogate riparian rights if they were vested property. Legislative enactment could not abrogate riparian rights if they were vested property. It must be remembered that if riparian rights as known to the common law and defined in *Weiss* v. *Oregon Iron & Steel Co.*, 13 Or. 496 (11 Pac. 255), were vested property, to abrogate them would be to violate the federal Constitution protecting vested property. The people can no more violate the federal Constitution by their Constitutions than their representatives can by legislative enactment.

The state courts cannot violate the federal Constitution. It cannot be doubted that numerous persons had settled upon the streams of the western states, and thereby acquired riparian rights prior to the decisions of the courts referred to above, prior to the adoption of the Constitutions of the several western states, and prior to the legislative enactments referred to. It cannot be doubted that where riparian owners had exercised their rights to apply the water to a beneficial use they thereby secured a vested property right, which was protected in all these states. But the decisions referred to, as well as the constitutional provisions and legislative enactments, also conclusively show that riparian rights, not utilized by a beneficial application of the water, were not vested rights. If the doctrine of riparian rights, under the common law, vested a valuable property in the riparian owner, grantees of the United States would be protected in the enjoyment of that right, under the constitutional guaranty, against the impairment of contracts. Every riparian owner, to a certain extent, has a vested property right. By being

the owner of the bank, he has access to the water and to its use for any lawful purpose. To the extent he has used it, that use of it is a vested property. To that extent, it may be said he has applied the water to a beneficial use. It may be truthfully said, to that extent, he has appropriated the water. The use of water, therefore, has become a vested, fixed and valuable property right. The doctrine of the *Dartmouth College Case,* 17 U. S. (4 Wheat.) 518 (4 L. Ed. 629, see, also, Rose's U. S. Notes), protects such property against the invasion by the state either acting through its Constitution, legislative enactments, or judicial decisions. The right to have the water flow by and through his premises, undiminished in quantity and unimpaired in quality, in the opinion of the writer, is not such a vested property.

The case of *Pearsall* v. *Great Northern R. Co.,* 161 U. S. 664 (40 L. Ed. 838, 16 Sup. Ct. Rep. 705), is analogous in principle. In this case the Great Northern Railway Company was authorized by its charter to connect with or adopt as its own any other railroad running in the same general direction and to consolidate the latter in proportion to its capital stock with the capital stock of the Great Northern Railway Company. Under this authority it arranged for the purchase, through its stockholders, of one half of the stock of the Northern Pacific Railroad Company. A suit was instituted to enjoin the Great Northern Railway Company from entering into and carrying out that agreement. The Great Northern Railway Company justified its attempt to enter into that agreement on the ground that the authority given it, by its charter, was a vested right which could not be abrogated by the

legislature.   The injunction was sought on the ground
that the agreement violated a law of Minnesota,
which provides that no railroad corporation shall con-
solidate the stock, property or franchises of such cor-
poration with, or lease or purchase the works or
franchises of, or in any way control any other rail-
road corporation owning or having under its control
a parallel or competing line.   The Great Northern
Railway Company undertook to justify the act of
entering into the agreement by authority of the
Dartmouth College case.   Mr. Justice BROWN in the
opinion in *Pearsall* v. *Great Northern R. Co.*, 40 L.
Ed., in page 847, column 2 (161 U. S. 673, 16 Sup. Ct.
Rep. 713), said:

"A vested right is defined by Fearne, in his work
upon Contingent Remainders, as 'an immediate fixed
right of present or future enjoyment'; and by Chan-
cellor Kent as an 'immediate right of present enjoy-
ment, or a present fixed right of future enjoyment.'
4 Kent. Com. 202.   It is said by Mr. Justice COOLEY
that 'rights are vested, in contradistinction to being
expectant or contingent.   They are vested when the
right to enjoyment, present or prospective, has be-
come the property of some particular person or per-
sons as a present interest.   They are expectant when
they depend upon the continued existence of the
present condition of things until the happening of
some future event.   They are contingent when they
are only to come into existence on an event or condi-
tion which may not happen or be performed until
some other event may prevent their vesting.'   Cooley
Const. L., 332.

"As applied to railroad corporations, it may reason-
ably be contended that the term extends to all rights
of property acquired by executed contracts, as well
as to all such rights as are necessary to the full and
complete enjoyment of the original grant, or of prop-
erty legally acquired subsequent to such grant.   If,

for example, the legislature should authorize the construction of a certain railroad, and by a subsequent act should take away the power to raise funds for the construction of the road in the usual manner by a mortgage, or the power to purchase rolling stock or equipments, such acts might perhaps be treated as so far destructive of the original grant as to render it valueless, although there might in neither case be an express repeal of any of its provisions. *Sala* v. *New Orleans,* 2 Woods, 188.

"But where the charter authorizes the company in sweeping terms to do certain things which are necessary to the main object of the grant, and not directly and immediately within the contemplation of the parties thereto, the power so conferred, *so long as it is unexecuted, is within the control of the legislature and may be treated as a license, and may be revoked if a possible exercise of such power is found to conflict with the interests of the public.*"

The common-law doctrine of riparian rights is a system or a general law established by general custom and judicial decisions from the time whereof the memory of man runneth not the contrary. It was established, however, in a country where irrigation was not known or needed. So long as the right is not used, or water appropriated under it, it is a usufruct and is not vested property. For this reason, the California courts, although adhering to the doctrine of riparian rights, have held that a lower riparian owner cannot enjoin the diversion of water above his riparian lands without showing damages. This should not be the case if the doctrine of riparian rights, as known to the common law, was in full force and effect: *Weiss* v. *Oregon Iron & Steel Co.,* 13 Or. 496 (11 Pac. 255). It is not the law as announced in *Crawford Co.* v. *Hathaway (Hall),* 67 Neb. 325 (93 N. W. 781, 108 Am. St. Rep. 647), and cited in

Section 816, 2 Kinney on Irrigation and Water Rights.

"In the determination of causes, the courts of this state have, *in the absence of statute,* always followed and applied the general rules of the common law *in so far as those rules were found to be applicable to existing conditions and suitable to the needs and necessities of the people."   United States F. & G. Co.* v. *Bramwell,* 108 Or. 261, 264, 268 (217 Pac. 332, 32 A. L. R. 829).

Probably three fourths of the area of this state is not suited to the common-law riparian doctrine. It is a well-established rule in this state that it is not the amount of the actual damage done which entitles one to the extraordinary remedy of injunction, but it is the nature of the injury, or in other words, if the injury is not reasonably measurable in damages, then a writ of injunction should issue: *Phipps* v. *Rogue River Valley Canal Co.,* 80 Or. 175, 180 (156 Pac. 794); *Bernard* v. *Willamette B. & L. Co.,* 64 Or. 223 (129 Pac. 1039); 3 Kinney on Irrigation and Water Rights, § 1606, pp. 2922 and 2923, and the long list of authorities cited under note 5.

The decisions of this court have to a large degree, if not entirely, abrogated the common-law doctrine of the right of a riparian owner to the continuous flow of a stream. The owner of a bank of a flowing stream has certain well-defined rights in the stream. The beneficial use of the water, however, is the measure of his vested right and not the continuous flow of the stream as defined by the common law.

Mr. Justice H. J. BEAN in *In re Willow Creek,* 74 Or. 592, 623 (144 Pac. 505, 146 Pac. 475) said:

"The rule of 'continuous flow' has been changed by custom and crystallized into express law by statute. It is stated in effect in *United States v. Rio Grande Irr. Co.*, 174 U. S. 690, 702 (43 L. Ed. 1136, 19 Sup. Ct. Rep. 770), that this rule obtains in those states in the United States which have simply adopted the common law. *It is also true undoubtedly that a state may change its common-law rule as to every stream within its dominion and permit the appropriation of the flowing waters for such purposes as it deems wise.*"

This opinion rendered in bank October 20, 1914, expressed the unanimous views of the court and has never been modified. To the same purport is the opinion of Mr. Justice R. S. Bean in *Eastern Oregon L. Co. v. Willow River L. & Irr. Co.*, 187 Fed. 466, 468, where he says:

"The riparian proprietor is entitled to the ordinary and usual flow of a stream *as long as it is of any beneficial use to him,* and this may, under some circumstances, include flood or overflow waters reasonably to be anticipated during ordinary seasons. *Miller & Lux v. Madera Canal & Irr. Co.*, 155 Cal. 59 (99 Pac. 502, 22 L. R. A. (N. S.) 391); *Miller v. Bay Cities Water Co.*, 157 Cal. 256 (107 Pac. 115, 27 L. R. A. (N. S.) 772). But in my judgment a lower riparian proprietor who is not injured by the diversion of the flood waters above his land cannot invoke the aid of a court of equity to restrain such diversion although by a nonriparian proprietor. Such is the holding of the supreme court of California. *Fifield v. Spring Valley Waterworks*, 130 Cal. 552 (62 Pac. 1054). I am not advised that the direct question has ever been passed upon by the supreme court of this state, but I think the tendency of the later decisions is to that effect. Indeed, in my judgment, no other rule can be adopted which will serve to develop the arid section of the state and be in harmony with the state legislation concerning water, its ap-

propriation, and use. The modern tendency is to make the beneficial use of water the test of the right, and, unless it is put to a beneficial use by a riparian proprietor or is of some substantial benefit to him, he ought not be allowed to prevent its use by others." *Brown et al.* v. *Chase,* 125 Wash. 542 (217 Pac. 23).

What, then, has become of the doctrine of continuous flow?

One of the material, if not essential, elements of the doctrine of riparian rights according to the common law was the right to have the stream flow continuously without diminution or deterioration regardless as to whether it was applied to a beneficial use or not. Again, Mr. Justice BURNETT in *Caviness* v. *La Grande Irr. Co.,* 60 Or. 410, 423 (119 Pac. 731), said:

"Concerning the mere diversion and use of water there is no difference between a nonriparian appropriator and a riparian user, provided the former has a lawful right of access for that purpose to the stream from which the diversion is made. The essential condition of appropriation in the first place on public lands was the consent or acquiescence of the then riparian owner, the general government. The reason of the rule is not changed by the fact that the riparian owner is a private person provided the appropriator has his consent, or, what is equivalent, that the appropriator and the riparian owner are one and the same person. The deduction then is that if any one can lawfully gain access for that purpose to a nonnavigable stream, and water is there not subject to use by another, such a one may appropriate it for his own use."

But this is not the common-law doctrine. Waters could not be diverted from riparian lands for irrigation against the objection of a riparian owner.

114 Or.—14

"The plaintiff's right to an injunction does not depend upon the amount of injury which he has received. Being a riparian owner, *he has a right to the flow of the entire stream, as against any diminution thereof by one who is not a riparian owner,* and the claim of the defendants that they have a right to divert a portion of its flow authorizes him to invoke the aid of equity in order that this claim may not ripen into a right." *Gould* v. *Eaton,* 117 Cal. 539 (49 Pac. 577, 578, 38 L. R. A. 161, 183); *Weiss* v. *Oregon Iron & Steel Co.,* 13 Or. 496 (11 Pac. 255).

In *Title Ins. & Trust Co.* v. *Miller & Lux,* 183 Cal. 71 (190 Pac. 433, 437), Mr. Justice SHAW used this language:

"Many persons supposed that such right extended to all the lands owned by a single person, although obtained by separate conveyances, some of which did not convey any land abutting upon the stream, providing all the parcels were contiguous. * * It is not improbable that the parties to that agreement understood that they would have riparian rights in the stream for all of their lands if it was all contiguous to land which did abut upon the stream. When the contract of 1888 was made, however, the opinion in *Lux* v. *Haggin* had definitely declared that only those tracts which were acquired by a single conveyance from the state and which abutted upon the stream were entitled to riparian rights. 69 Cal. 424, 425 (4 Pac. 919, 10 Pac. 674)."

It is needless to cite other authorities. It is impossible to reconcile the conflicting authorities upon the right and title to water. The courts of the western states, in attempting to adjust the rights of conflicting interests, maintaining and supporting the common-law doctrine of riparian rights with the doctrine of appropriation, have made "confusion

worse confounded.'' The doctrine of appropriation
and riparian rights are diametrically opposed to each
other and cannot be reconciled.   Different interpreta-
tions of the common law of riparian rights have
been made by courts of the different states as is
shown herein above.

It is true that the rights of the Power Company
could have been condemned by the appropriators of
the water under the act of 1891.   It is also true
that the Power Company could have exercised its
right to appropriate all the water of Hood River
for power purposes.   Under the Water Code adopted
in 1909, the Power Company could have protected
its claim to all the waters of Hood River by being
engaged in the work of applying the water to benefi-
cial uses at the time the Water Code became the
law of this state.   Neither party is to be penalized
because they did not utilize all the rights they
might have exercised . under the law.   The law of
waters in this state has developed with the develop-
ment of the state.   In the early history of the state
the settlement·was principally in the Willamette Val-
ley.   The climatic and physical conditions of that
valley are quite similar to the climate and physical
conditions in England where the common law had its
origin and development. · The common law having been
adopted, it was but natural that the common-law doc-
trine of riparian rights should have been applied.   In
the early days, irrigation was not of sufficient im-
portance or magnitude to have directed the attention
of either the legislature or the courts to the impor-
tance of the doctrine of appropriation.   The history
of legislation, as well as of the adjudications by
the courts, disclose a gradual departure from the
inapplicable elements of the strict common-law doc-

trine of riparian rights. Apparently, the legislature of the state has been as zealous in. guarding and protecting riparian rights as have the courts. With the increase of population in the arid and semi-arid regions of the state the growing importance of irrigation to the development and settlement of the state has forced itself upon the attention of both the legislature and the courts. The result has been the modification by the courts of the common-law doctrine of riparian rights and resulted in the enactment of the Water Code by the state legislature. The very able and comprehensive opinion of Mr. Justice BEAN, and the collection of authorities in that opinion, justifies the writer in refraining from giving further citation of authorities. For the reasons given in this opinion, the writer believes that the legislature had the power to enact the Water Code and to define vested rights in the waters of the state as therein defined.

Conflict over water rights and privileges caused the separation of Abraham from his nephew Lot. Abraham, with greater generosity than is often displayed where such interests are conflicting, gave Lot the preference of locations. Lot, beholding the well-watered plains of Sodom and Gomorrah, pitched his tent there. Ever since that date, we know not how long prior thereto, water has been a fruitful source of contention and litigation. More litigation has been caused by conflicting claims to the use of water than any other subject matter. Many others, besides Mr. Tulliver, proprietor of the Mill on the Floss, have expended their substance litigating over the right to the use of water. By adopting the Water Code of this state, the legislature has attempted to fix a standard by which the conflicting

claims may be equitably and justly defined and fixed. Its basic principle is the beneficial use of the water for the good of all the people of the state. In the early and leading case of *Weiss* v. *Oregon Iron & Steel Co.*, 13 Or. 496 (11 Pac. 255), "the owner has no property in the water itself, but a simple usufruct." The Water Code declares the waters of the state to be public property. The courts, therefore, should liberally construe the Water Code according to the intent and spirit of the legislature, and to the end that it be actually administered to the necessities of the inhabitants of the state as nature intended it should.

This is not taking the property of one and giving it to another. It is making the use of public property, water, the measure of the property of the individual therein. The right to water is a usufruct. That right becomes vested when it is applied to a beneficial use, and not before.

For these reasons, the writer concurs with the opinion of Mr. Justice BEAN.

McCOURT, J., Dissenting.—I dissent from the conclusions reached in the opinion of Mr. Justice BEAN, that the rights of the Pacific Power and Light Company to the use of the waters of Hood River upon its riparian lands for the purpose of developing power for generating electricity for sale and distribution are subordinate and inferior to the claims asserted herein to the use of the waters of the stream for irrigating nonriparian lands, by claimants whose rights are based upon appropriations, followed by diversion of the waters of the stream for less than the period necessary to gain

title by prescription, such claims having been initiated long after the riparian rights of the Power Company and its predecessors had vested, and long after all the lands bordering along the stream, except a few tracts immaterial to the determination of the controverted claims herein, had passed into private ownership.

It is well settled that the title to land or water having once passed from the United States, can be acquired or lost only in the manner prescribed by the law of the state where such land or water is situated: Kinney on Irrigation and Water Rights (2 ed.), § 449.

All the lands for which riparian rights are claimed by the Power Company in this case were granted by the United States to the state—part of them as school lands in 1859, and the remainder in 1868 by virtue of a selection made by the state for internal improvements under the act of Congress of September 4, 1841. Hood River flows through those lands. None of the claims asserted to the use of the water of Hood River, and based upon appropriation, attached to the lands or the water before the land was granted to the state or while the state held title to the same. The United States granted the lands to the state without any reservation of water or other rights, and the state in turn conveyed the lands to the predecessors of the Power Company without reservation or exception, all before any statute was adopted in this state authorizing the appropriation of surplus water from streams flowing through the lands of individuals for use upon nonriparian lands.

In the case of *Eastern Or. Land Co. v. Willow River L. & Irr. Co.,* 187 Fed. 466, United States District Judge BEAN, long a distinguished member of

this court and the writer of many of its decisions relating to the use of waters, said:

"The general doctrine of riparian rights is too firmly established in this state to be shaken now by judicial decision. It is useless to cite authorities. The riparian proprietor is entitled to the ordinary and usual flow of a stream as long as it is of any beneficial use to him * * ."

Notwithstanding the above authoritative statement of the law, the Water Board and the lower court held in the instant case that a riparian owner cannot successfully assert his riparian rights upon a non-navigable stream, as against a subsequent appropriator of water from that stream for the irrigation of nonriparian lands, even where the title to the riparian lands passed from the United States before 1877, when the riparian proprietor has not, prior to notice of such appropriation, applied the water of the stream flowing over or through his lands to some beneficial use upon those lands.

The question is one of great importance, particularly in the eastern portion of the state, where the supply of water for irrigation is limited and where there are wide areas of semi-arid land that are unproductive without artificial irrigation, but which, when reclaimed by irrigation, will yield a variety of large and valuable crops. In many places in that region the entire flow of the available streams is insufficient to completely irrigate all the lands susceptible of irrigation in a given locality, and those promoting irrigation projects therein, which contemplate the diversion of the waters of a particular stream, look with impatience upon, and are disposed to give scant consideration to claims asserted by lower riparian owners upon such stream to the un-

diminished flow thereof, especially where the riparian owner is not presently utilizing the waters of the stream for generating power or for irrigating his riparian lands: Wiel on Water Rights in the Western States (3 ed.), § 743. Where, however, the riparian proprietor owns a vested right to the use of the waters of the stream flowing through or over his land, which right was recognized by the statutes of the state or the decisions of this court at the time title to the land passed into private ownership, neither the public interest nor the urgent needs of those desiring to use the water can be permitted to divest such riparian proprietor of that right, except in conformity to well-known constitutional requirements: *Weiss* v. *Oregon Iron Co.*, 13 Or. 496 (11 Pac. 255); *Kamm* v. *Normand*, 50 Or. 9, 22 (91 Pac. 448, 126 Am. St. Rep. 698, 11 L. R. A. (N. S.) 290); *In re Willow Creek*, 74 Or. 592, 627 (144 Pac. 505, 146 Pac. 475); *Lux* v. *Haggin*, 69 Cal. 255 (4 Pac. 919, 10 Pac. 674, 697); *San Bernardino* v. *Riverside*, 186 Cal. 7 (198 Pac. 784, 794); *Miller & Lux* v. *Madera Land Co.*, 155 Cal. 59 (99 Pac. 502, 512, 22 L. R. A. (N. S.) 391); *Clark* v. *Cambridge Irr Co.*, 45 Neb. 798 (64 N. W. 239); *St. Germain Irr. Co.* v. *Hawthorn Ditch Co.*, 32 S. D. 260 (143 N. W. 124, 126); *Humphreys-Mexia Oil Co.* v. *Arsenaux* (Tex. Civ. App.), 244 S. W. 280; *Smith* v. *Nechanicky*, 123 Wash. 8 (211 Pac. 880); *City of New Whatcom* v. *Fair Haven Land Co.*, 24 Wash. 493 (64 Pac. 735, 739, 54 L. R. A. 190).

Comparatively early in the judicial history of the state, this court by its decisions enforced and applied the common-law doctrine of riparian rights, as defined and established by the American and English cases and by eminent text-writers: *Oregon Iron Co.*

v. *Trullinger* (1876), 3 Or. 1; *Taylor* v. *Welch* (1876), 6 Or. 198; *Hayden* v. *Long* (1880), 8 Or. 244; *Coffman* v. *Robbins* (1880), 8 Or. 278; *Shively* v. *Hume* (1881), 10 Or. 76; *Shook* v. *Colohan* (1885), 12 Or. 239 (6 Pac. 503); *Weiss* v. *Oregon Iron Co.* (1886), 13 Or. 496 (11 Pac. 255).

The case last cited was a suit by a riparian proprietor to enjoin the defendant, an upper riparian proprietor, from diverting the water of Tualatin River into Snake Lake for manufacturing purposes. Plaintiff had not made, and so far as the record shows did not propose to make in the immediate future, any beneficial use upon his lands of the waters flowing in the river. Defendant urged that plaintiff was not entitled to relief, for the reason that he was not applying the water to a beneficial use and therefore should not be permitted to obstruct or prevent defendant's manufacturing enterprise. The evidence showed that the defendant had diverted one-fifth, or perhaps more, of the water of the stream from its natural course and turned it away from the other riparian owners, without restoring the unused surplus to its natural channel. Mr. Justice LORD, who delivered the opinion of the court, said:

"The general doctrine relating to watercourses is that every proprietor is entitled to the use of the flow of the water in its natural course, and to the momentum of its fall on his own land. The owner has no property in the water itself, but a simple usufruct. He may use it as it passes along, but he must send down to his neighbor below as much as he receives from his neighbor above. (Angell on Watercourses, §§ 90, 94.)"

Mr. Justice LORD carefully examined all the leading American and English cases and the text-books

defining the common-law doctrine of riparian rights, and supported his opinion by pertinent references thereto and extended quotations therefrom. He said:

"As a result of the American and English cases, the common-law doctrine is thus summed up in the editorial note to *Heath* v. *Williams,* 25 Me. 209 s. c. 43 Am. Dec. 275: 'The general principle is, that every owner of land through which a natural stream of water flows has a usufruct in the stream as it passes along, and has an equal right with those above and below him to the natural flow of the water in its accustomed channel, without unreasonable detention or substantial diminution in quantity or quality, and none can make any use of it prejudicial to the other owners, unless he has acquired a right to do so *by license, grant, or prescription.*'" (Italics ours.)

Referring to the nature of the right of a riparian proprietor to the use and flow of the waters of a stream flowing along or over his land, the cases and texts cited by Mr. Justice LORD declare that the right is an inherent incident to the ownership of the riparian land, like the right to enjoy the soil itself; that it is an absolute and fixed right annexed to the soil, not as an appurtenance, but as part and parcel of the land itself and belongs to the riparian proprietor by virtue of his mere ownership of the land; and that as part and parcel of the land, it passes with the land upon a conveyance thereof, and immediately vests in the grantee, although not especially mentioned in the deed. Those authorities declare further that the rights of the riparian proprietor do not depend upon the exercise of it, but he may begin to exercise his rights as to the water whenever he pleases. "Use does not create the right and disuse cannot destroy or suspend it," is the language of

the courts and text-writers mentioned. Indeed, the
authorities are in entire accord concerning the fore-
going statement of the nature of riparian rights:
Angell on Watercourses (6 ed.), §§ 5, 92, 92a; Gould
on Waters (3 ed.), § 204; Washburne on Easements
and Servitudes (4 ed.), p. 317; 2 Farnham on Waters
and Water Rights, p. 1569; Black's Pomeroy on
Water Rights § 9; Long on Irrigation (2 ed.), § 34;
Wiel on Water Rights in the Western States (3 ed.),
§ 861; Kinney on Irrigation and Water Rights,
(2 ed.), § 453.

After explaining the application of the foregoing
principles to the facts of that case Mr. Justice Lord
concluded the opinion in *Weiss* v. *Oregon Iron Co.,*
as follows:

"We do not think the contention of counsel for the
defendant can be maintained upon principle or
authority.

"Nor do we think the objection to the exercise of
the jurisdiction well taken. Mr. High says: 'A
riparian proprietor owning to the center of a stream
is entitled to the aid of equity to prevent a diversion
of the waters from their natural channel. Nor does
the neglect of complainants to use or appropriate
the water-power, or the fact that they have as yet
sustained but small pecuniary damage, or that de-
fendants would be subjected to heavy expense if com-
pelled to restore the water to its original channel,
present such objections as would warrant a court of
equity in refusing the relief.' (High on Injunctions,
§ 795, and authorities cited.)"

The foregoing decisions of this court recognized
the right of a riparian proprietor to divert water for
the reasonable irrigation of riparian lands where the
stream carried a surplus of water, after supplying the
natural wants of those owning lands bordering upon

the stream, holding that each riparian proprietor had an equal right to the use of water for that purpose: *Coffman* v. *Robbins, supra; Shook* v. *Colohan, supra.*

While holding that rights relating to watercourses flowing through lands held in private ownership were governed by the rules of the common law, this court at the same time recognized and enforced the rule prevailing then and now in the western states, which entitles one to go upon the public lands of the United States and appropriate, divert and use water from a stream thereon for beneficial uses, thereby securing a right to the use of the water so appropriated, diverted and used, subject to vested and accrued rights, but superior and prior to the right of a subsequent appropriator or a subsequent grantee of the lands from the United States: *Lewis* v. *McClure,* 8 Or. 273; *Kaler* v. *Campbell,* 13 Or. 596 (11 Pac. 301); *Tolman* v. *Casey,* 15 Or. 83, 88 (13 Pac. 669); *Speake* v. *Hamilton,* 21 Or. 3 (26 Pac. 855); *Simmons* v. *Winters,* 21 Or. 35 (27 Pac. 7); *Hindman* v. *Rizor,* 21 Or. 112 (27 Pac. 13).

It was held, however, that the rule last mentioned had no application to the lands of individual owners, and as against them could confer no right to divert the waters of streams flowing through their lands: *Curtis* v. *La Grande Hydraulic Water Co.,* 20 Or. 34 (23 Pac. 808, 25 Pac. 378, 10 L. R. A. 484).

*Kaler* v. *Campbell, supra,* was decided within two weeks after the decision in *Weiss* v. *Or. Iron Co., supra.* Mr. Justice Lord delivered the opinion of the court in both cases. *Kaler* v. *Campbell* was a suit in equity to restrain the defendant from diverting the waters of a small non-navigable stream running partly through the lands of the defendant. The court said:

"It seems that when plaintiff settled his claim there was no other person above him upon the stream running° through his land, nor any appropriation of its water. For the purpose of irrigating his soil, and for domestic and stock uses, he went above his land, and upon government land, and diverted the waters of Clover Creek. This he had a right to do, under the act of Congress; and to the extent he had actually appropriated and used, he had a vested right as to that amount or quantity of water, and whoever afterwards purchased above or below him took subject to such right of prior appropriation actually made by him. When, afterwards, the defendant acquired the title to the adjoining land, his right to appropriate the water of the creek to irrigate his land was subject to the prior appropriation of the plaintiff, and necessarily limited to whatever surplus remained."

It is important at this point to recall that the doctrine of riparian rights, as explained and defined by the decisions above referred to, prevailed in this state at the time the title to the riparian lands owned by the Power Company, and embraced in its power sites, was conveyed by the United States to the state, and by the state to the predecessors of the Power Company, and that the riparian rights incident to the land vested in the state when the United States parted with its title, and no adverse claim by appropriation or otherwise having attached while the state held the title, those riparian rights were conveyed by the state to the predecessors of the Power Company: *Faull* v. *Cooke,* 19 Or. 455 (26 Pac. 662, 20 Am. St. Rep. 836); *Cole* v. *Logan,* 24 Or. 304 (33 Pac. 568); *Brown* v. *Baker,* 39 Or. 66 (65 Pac. 799, 66 Pac. 193); *Morgan* v. *Shaw,* 47 Or. 333, 337 (83 Pac. 534); Kinney, Irrigation and Water Rights (2 ed.), § 449.

The law as stated and established by the decisions above cited, so far as the same is material to the question under consideration, was followed and applied in the following cases: *Low* v. *Schaffer*. 24 Or. 239 (33 Pac. 678); *Carson* v. *Gentner,* 33 Or. 512 (52 Pac. 506, 43 L. R. A. 130); *North Powder Milling Co.* v. *Coughanour,* 34 Or. 9 (54 Pac. 223); *Jones* v. *Conn,* 39 Or. 30 (64 Pac. 855, 65 Pac. 1068, 87 Am. St. Rep. 634, 54 L. R. A. 630); *Cox* v. *Bernard,* 39 Or. 53, 60 (64 Pac. 860); *Brown* v. *Baker,* 39 Or. 66 (65 Pac. 799, 66 Pac. 193); *Mace* v. *Mace,* 40 Or. 586, 589 (67 Pac. 660, 68 Pac. 737); *Oregon Construction Co.* v. *Allen Ditch Co.,* 41 Or. 209, 215 (69 Pac. 455, 93 Am. St. Rep. 701); *Salem Flouring Mills Co.* v. *Lord,* 42 Or. 82 (69 Pac. 1033, 70 Pac. 832); *Brown* v. *Gold Coin Min. Co.,* 48 Or. 277 (86 Pac. 361), *Parkersville Dist.* v. *Wattier,* 48 Or. 332 (86 Pac. 775).

*Jones* v. *Conn,* decided in 1901, was a controversy between riparian proprietors upon a natural watercourse. Defendant was an upper riparian owner, and asserted the right to divert water from the stream for the purpose of irrigating his upland and to furnish better power to a grist-mill owned and operated by him. The plaintiffs had not been substantially injured or damaged on account of the use of water by defendant up to the commencement of the suit, but they insisted, nevertheless, that they were entitled to an injunction against the defendant, for the reason, as claimed by them that he proposed to use the water upon nonriparian lands. Mr. Chief Justice BEAN now United States District Judge, delivered the opinion of the court, saying:

"It is often said that a riparian proprietor has a right, inseparably annexed to the soil, to have the water of a stream flow down to his land as it is wont

to run, undiminished in quantity and unimpaired in quality; and that, if an upper proprietor takes it from the stream, he must return substantially the same quantity again before it leaves his premises. This rule, however, is subject to the limitation now well established that each proprietor is entitled to a reasonable use of the water for domestic, agricultural, and manufacturing purposes, and such use is not to be denied him on account of the loss necessarily consequent upon its proper enjoyment."

The above quotation from the opinion is followed by citation and reference to numerous cases supporting the principle that a riparian proprietor has a right to the enjoyment and use of a stream of running water and to derive every benefit he can therefrom by its use upon his land, including the generation of power, or diversion for reasonable irrigation, provided he does not thereby work any actual material and substantial damage to the rights of other proprietors either above or below him, and that such right is incident and appurtenant to the ownership of the land itself. After reviewing at length the authorities defining a riparian proprietor and his rights as such as against other riparian owners upon the stream, the court said:

"There is some conflict in the authorities as to whether a riparian proprietor can enjoin the use of water for the irrigation of nonriparian lands without showing damage (*Modoc Livestock Co.* v. *Booth,* 102 Cal. 151 (36 Pac. 431); *Gould* v. *Eaton,* 117 Cal. 539 (49 Pac. 577, 38 L. R. A. 181); *Fifield* v. *Spring Valley Waterworks,* 130 Cal. 552 (62 Pac. 1054); but it is clear that a court of equity will not restrain the use of water by a riparian proprietor to irrigate his lands unless it is shown that such use will injure the other riparian proprietors. * * But, as the defendant has set up in his answer, and attempted to

maintain by his testimony, the absolute right to sufficient water to irrigate his land, regardless of the effect it may have upon the other proprietors, the plaintiffs are entitled to such a decree as will prevent his use from ripening into an adverse title * *.''

*Cox* v. *Bernard,* decided in 1901, was a suit brought by a riparian proprietor upon a stream to enjoin the defendants, who had no riparian rights, from diverting water from the stream. The trial court entered a decree in favor of the defendants. The Supreme Court, in its opinion reversing the decree of the lower court, quoted with approval from Long on Irrigation, Section 9, as follows:

" 'Every proprietor of lands on the banks of a natural stream has an equal right to have the water of the stream to continue to flow in its natural course as it was wont to run, without diminution in quantity or deterioration in quality, except so far as either of these conditions may result from the reasonable use of the water for irrigation or other lawful purposes by upper proprietors.' "

*Brown* v. *Baker,* decided in 1901, was a suit to enjoin interference with the flow of water in the channel of a non-navigable stream to the head of plaintiffs' irrigating ditches. Plaintiffs diverted the water of the stream at points upon their own premises and it was objected by the defendant, that in order to secure priority in the appropriation of water, the stream or lake from which it is taken must be tapped at some point on the public domain. The court, discussing the right of an appropriator of water as against a riparian owner who has settled upon or acquired title to the riparian land from the United States prior to the inception of the claim to the waters by appropriation, said:

"The water of a non-navigable stream is an incident to the soil through which it flows, and, as the United States is the primary proprietor of public lands, its grant of the waters thereof, in the Pacific Coast States, to the person having the priority of its possession (14 Stat. U. S. 253, c. 262), *in the absence of a constitutional provision or statute declaring water to be public property, necessarily cuts off the right of a subsequent settler to divert the water under a claim of prior appropriation.* Title by relation gives to the first settler upon the public land the priority of possession of the water flowing through the same (*Faull* v. *Cooke,* 19 Or. 455 (26 Pac. 662, 20 Am. St. Rep. 836); *Larsen* v. *Oregon Ry. & Nav. Co.,* 19 Or. 240 (23 Pac. 974); *Johnson* v. *Bridal Veil L. Co.,* 24 Or. 182 (33 Pac. 528); *Cole* v. *Logan,* 24 Or. 304 (33 Pac. 568), *though he may never appropriate the water to a beneficial use.* If a lower riparian proprietor had acquired a right to the waters of Willow Creek prior to plaintiffs' diversion, such right would necessarily defeat their appropriation of the water, because the stream at the time of the diversion was not flowing through public lands. The right of prior appropriation is limited to the use of water by the pioneer settler before any adverse claims of riparian proprietors attach to the stream from which the water is taken, and not to the points of diversion, which may be either within or beyond the boundaries of the tract selected by such settler." (Italics ours.)

*Oregon Construction Co.* v. *Allen Ditch Co.,* decided in 1902, was a suit by plaintiff, the owner of 1,520 acres of land through which the Umatilla River, a non-navigable stream, flows, to restrain the defendant from diverting any of the water for the irrigation of nonriparian land in disregard of plaintiff's riparian rights. The plaintiff had not used any of the water upon its lands. The defendant was a corpora-

114 Or.—15

tion, organized by water users to facilitate the distribution of water diverted among the members of the corporation. By the use of that water, many acres of land had been reduced from its wild and arid condition to a high state of cultivation. Orchards, shrubbery and ornamental trees had been planted, and the use of the water was absolutely essential to the maintenance of the then condition. The facts of that case render it very much in point here. Mr. Justice WOLVERTON, after reciting the facts, said:

"But, notwithstanding all this, if the plaintiff has a better right, under the law, to have it flow down the channel of the river, through and beyond its lands, by reason of its riparian ownership, than the farmers have to use it by virtue of a prescriptive right, the injunction should be maintained; otherwise not.

"The plaintiff's riparian right to have the water flow in the stream undiminished in quantity, except by the reasonable use thereof by riparian proprietors, is appurtenant to the land, running with it as a corporeal hereditament. Adverse possession to realty may have its inception in trespass, and naked possession under a claim of right actual, hostile, open and notorious, exclusive, and continuous for a period of ten years will, in this state ripen into a perfect title * *. In analogy to this principle the acquirement of a prescriptive right has come to be measured by the statute of limitations for the recovery of real property, and such is the rule in this state: Kinney, Irr., § 295: *Dodge* v. *Marden,* 7 Or. 456."

*Brown* v. *Gold Coin Min. Co.,* decided in 1906, was a suit by a riparian proprietor to enjoin the pollution of a stream and the interference of the flow thereof by mining operations conducted by the defendant. The court said:

"The plaintiff, being a riparian proprietor on Rith Creek, was entitled to have that stream flow through his premises undiminished in quantity, except as to the reasonable use thereof by other like proprietors, and unimpaired in quality, and because he might possibly secure water for his family and for his stock at other places on his land than the streams mentioned, does not impose on him the duty of resorting thereto to supply his needs, in order that a quartz mill may be operated."

Speaking of the conflicting claims between the parties—one claiming water for mining purposes, the other for agriculture—the court said:

"These and other like employments requiring the use of water from nonnavigable streams should be simultaneously conducted if possible. Where, however, a priority exists in the use of water, the party who makes a subsequent appropriation for any purpose inconsistent therewith must yield to the party possessing the superior right."

In *Carson* v. *Gentner* the court construed the legislative act of February 24, 1885, which granted to any individual or corporation a right of way over all lands belonging to the state, for the construction of water ditches to be used for irrigation, manufacturing or mining purposes, and provided that all patents issued by the state for any of its school, university, tide, swamp or overflowed lands, should be subject to any vested rights of the owners of such water ditches.

In connection with the above-mentioned statute, the court considered the legislative act of October 24, 1864. (Deady's Code, p. 812; Deady & Lane's Code, p. 686; Hill's Code, §§ 3827–3836), relating to mining claims and water rights and empowering miners to make local laws in relation to the possession

of water rights and the possession and working of placer mining claims subject to the laws of the United States. It was held that a prior appropriator of water from a natural stream flowing through state lands, obtains a vested right to the use of the water and to the ditch in which it flows also constructed on said lands, superior to the rights of one who, with notice of the diversion and existence of the ditch, obtains from the state a deed for the premises without reservation of any water right. The court, referring to the act of 1885, said:

"This statute was a legislative sanction, confirmatory of the customs of miners, and, like the act of Congress of July 26, 1866, was the recognition of a pre-existing right, rather than the granting of a new easement in its real property."

In the case of *Parkersville Dist.* v. *Wattier,* the legislative act (Laws 1868, pp. 21, 22), authorizing the drainage of land, was considered, Section 9 of which contained the following provision:

"This chapter shall not be construed so as to interfere with the rights of companies or individuals for mining, manufacturing, or watering towns or cities."

The court also referred to the act of February 24, 1885 (Laws 1885, p. 73), construed in *Carson* v. *Gentner,* and to the act (Laws 1899, p. 172), providing that all existing appropriations of water for beneficial purposes should be respected and upheld. The court, adopting the language used in *Carson* v. *Gentner* above quoted, held that the legislative provisions mentioned had the effect of recognizing the rights of settlers to divert and use the water flowing through the lands owned by the State of Oregon, with the same legal effect as like appropriations and

diversions made upon the public domain of the United States.

In the instant case the State Engineer contends that the several legislative acts referred to in the case of *Carson* v. *Gentner* and *Parkersville Dist.* v. *Wattier* constituted a dedication of the waters in the running streams flowing through state lands to the public, and separated the title to such waters from the land, and that thereafter no grants of state lands to private individuals conveyed or transferred a right to the waters flowing over or through the same—this in analogy to the act of March 3, 1877, known as the Desert Land Act (Chap. 107, 19 Stat. at L. 377, U. S. Comp. Stats. 1901, p. 1548), as construed by this court in the case of *Hough* v. *Porter,* 51 Or. 318 (95 Pac. 732, 98 Pac. 1083, 102 Pac. 728).   There is no similarity between the state statutes mentioned and the Desert Land Act, and those legislative acts do not contain any language susceptible of the construction claimed for them by the State Engineer.   Under those statutes, and in the absence of a statute declaring water to be public property, neither the public, nor any member of it, acquired any right to the waters flowing across state lands, without diverting the same and applying it to a beneficial use, and then to the extent only of such beneficial use, and if prior to any such diversion and application to beneficial use, the state conveyed the land to a private individual without reservation, the right to make such appropriation and diversion, as against the rights of the grantee of the state, was lost: *Brown* v. *Baker, supra.*

In the instant case, all the lands involved passed from the state into private ownership before any attempt was made to appropriate the waters of the stream flowing over and through the same, conse-

quently those statutes have no bearing upon the decision of the question under discussion.

Laws of 1891, page 52, was the first legislative enactment in this state authorizing the appropriation of water in this state from streams flowing through or over lands owned by private individuals, and the diversion thereof at points upon such land. That act declared the use of the waters of the lakes and running streams of the State of Oregon for general sale, rental or distribution for purposes of irrigation and supplying water for household and domestic consumption and watering livestock upon the dry lands of the state, to be a public use, and authorized any corporation organized for the construction of works to supply water for those purposes, to appropriate and divert water from its natural bed or channel and condemn right of way for its ditch, canal or flume and also to condemn *the rights of riparian proprietors upon the lake or stream from which such appropriation is made, upon complying with the terms of the act.* Section 8 of the act provided as follows:

"Such corporation may also maintain an action for the condemnation and apropriation of the right to the flow of the water in any stream from which it proposes to divert water below the point of diversion vested in the owners of lands lying continguous to such stream by virtue of their location * * . But no person owning lands lying contiguous to any stream shall, without his consent, be deprived of water for household or domestic use, or for the purpose of watering his stock, or of water necessary to irrigate crops growing upon such lands, and actually used therefor."

All the appropriations involved in this proceeding were made under the authority of the last-mentioned act, but no action or proceeding, by condemnation or

otherwise, was taken by any appropriator to acquire any of the riparian rights of the Power Company.

The above-quoted section of the acts was amended (Laws 1901, p. 136), in respect to the procedure to be followed in the condemnation of riparian rights, but all the matter above quoted was retained in the section as amended.

An act of the legislative assembly, approved February 20, 1895 (Laws 1895, p. 13), provided for the organization of irrigation districts, and authorized such districts, when organized, to acquire water rights and irrigation works by appropriate legal means. The concluding section of the act contained the following provisions:

"Nothing herein contained shall be deemed to authorize any person or persons to divert the waters of any river, creek, stream, canal or ditch from its channel, to the detriment of any person or persons having any interest in such river, creek, stream, canal or ditch or the waters therein, unless previous compensation be ascertained and paid therefor, under the laws of this state, authorizing the taking of private property for public uses."

In 1899 the legislature enacted a statute further authorizing the appropriation of surplus water from streams flowing over and through private lands, and the diversion of the water so appropriated at points upon such private lands: Laws 1899, p. 172. Section 1 of that act provided:

"That the use of the water of the lakes and running streams of the State of Oregon for the purpose of developing the mineral resources of the state and to furnish electrical power for all purposes is declared to be a public and beneficial use and a public necessity, and the right to divert unappropriated

waters of any such lakes or streams for such public and beneficial use is hereby granted.''

Section 3 of the act, after authorizing persons, or companies and corporations organized for the purposes named in Section 1 of the act, to appropriate and divert waters from any lake or running stream within the state and to condemn right of way for ditches, canals, flumes and pipe-lines for the carrying of the same, contained the following clause:

'' * * and may condemn the rights of riparian proprietors upon the lake or stream from which such appropriation is made, upon complying with the terms of this act.''

It was provided in Section 9 of the act—

''Such persons, companies and corporations may also maintain an action for the condemnation and appropriation of the right to the flow of water in any stream from which it proposes to divert water below the point of diversion vested in the owners of lands lying contiguous to such stream by virtue of their location.''

The statutes above referred to are the only legislative enactments adopted prior to 1909 which in any way affect the rights of riparian proprietors then and previously existing, and as above noted, all those acts expressly preserve such rights and require a resort to the power of eminent domain for their divestiture without the owner's consent. None of the legislative provisions mentioned attempt to define the character or extent of riparian rights, but obviously the protection of the statutes extended to and included all those rights recognized in the decisions of this court as belonging to riparian proprietors.

Clearly, then, the statutes above referred to and the cases decided by this court up to and including 1908, and which have been examined in the preceding pages, confirm the statement of Mr. Justice BEAN in *Eastern Or. Land Co.* v. *Willow River L. & Irr. Co., supra,* that "the general doctrine of riparian rights is too firmly established in this state to be shaken now by judicial decision."

Leaving out of consideration the statute adopted by the legislature in 1909, known as the "Water Code" (Laws 1909, Chap. 216), and the statute passed at the same session declaring waters in the lakes and running streams of the state to be public property (Laws 1909, Chap. 221), hereinafter discussed, the unavoidable conclusion to be deduced from those decisions is that, as against a subsequent appropriator claiming the right to water for irrigation of nonriparian lands, a riparian proprietor, in the absence of grant, license or prescription limiting his rights, is entitled to the ordinary and usual flow of a stream to the extent that the water thereof may be applied presently or prospectively to beneficial uses upon the riparian lands, and that such rights of the riparian owner are part and parcel of the land and are not lost by nonuser nor by use adverse thereto short of the prescriptive period. That is the rule established by the courts of last resort of California and Washington, where the conditions are similar to those which obtain in this state, and where the history and development of the law relating to water rights and the use of water has been almost identical with the like history and development of that law in this state: *Anaheim U. W. Co.* v. *Fuller,* 150 Cal. 327 (88 Pac. 978, 11

L. R. A. (N. S.) 1062); *Duckworth* v. *Watsonville W. & L. Co.*, 150 Cal. 520 (89 Pac. 338); *Miller & Lux* v. *Madera Canal & Irr. Co.*, 155 Cal. 59 (99 Pac. 502, 22 L. R. A. (N. S.) 391); *Mentone Irr. Co.* v. *Redlands E. L. & P. Co.*, 155 Cal. 323 (100 Pac. 1082, 17 Ann. Cas. 1222, 22 L. R. A. (N. S.) 382); *Rigney* v. *Tacoma L. & W. Co.*, 9 Wash. 576 (38 Pac. 147, 26 L. R. A. 425); *Benton* v. *Johncox*, 17 Wash. 277 (49 Pac. 495, 61 Am. St. Rep. 912, 39 L. R. A. 107); *City of New Whatcom* v. *Fair Haven Land Co.*, 24 Wash. 493 (64 Pac. 735, 54 L. R. A. 190); *Bernot* v. *Morrison*, 81 Wash. 538 (143 Pac. 104, Ann. Cas. 1916D, 290); *Brown* v. *Chase*, 125 Wash. 542 (217 Pac. 23), in which the earlier cases decided by that court are collected; Kinney on Irrigation & Water Rights (2 ed.), § 853; Wiel on Water Rights in the Western States (3 ed.), §§ 743, 744, 815.

The riparian lands of the Power Company constitute two power sites upon Hood River, both located several miles below the several points of diversion of the claimants to water by appropriations made subsequent to the time that the riparian rights incident to the lands of the Power Company accrued and became vested. Hood River runs through one of the power sites (the lower) owned by the company for a distance of more than two and one-half miles and has a fall thereon of more than twenty-eight feet; the situation of the land and the fall of the water thereon renders it practicable to utilize 750 cubic feet per second of the flow of the river for the advantageous development of power upon the riparian lands. Hood River runs through the lands embraced in the upper power site owned by the Power Company for a distance of between four and five miles, and has a fall thereon of 252 feet

rendering it practicable to utilize, for the development of power, 750 cubic feet per second of the flow of the river—a quantity equal to or exceeding the volume of water in the river in August and part of July and September of each year.

The right to use the water of Hood River to develop the power mentioned was incident to the land, and part and parcel thereof (Wiel on Water Rights in the Western States (3 ed), § 815; Kinney on Irrigation & Water Rights (2 ed.), § 853), and the proprietor of the land could not be deprived of that right except by grant, license, condemnation or prescription.

Such was the situation of fact and law existing and well known in 1895 and thereafter, at the time notice of intention to appropriate the waters of Hood River for the irrigation of nonriparian lands was given by each of the claimants whose claims the power company is contesting in this proceeding.

The appropriators relied upon the legislative act (Laws 1891, p. 52), as their authority for making the appropriations claimed by them respectively. That act expressly excluded from such appropriation waters, the title and right to the use of which was vested in riparian proprietors, but authorized any qualified corporate appropriators desiring to acquire such riparian rights, without the consent of the owner to condemn the same. None of the appropriation claimants in this proceeding at any time attempted to condemn the riparian rights incident to the lands of the Power Company or to acquire the same, or any interest therein, by negotiation and conveyance, and no estoppel or license is claimed.

No appropriator, party to this appeal, actually diverted water from Hood River and thereby invaded

the rights of the Power Company prior to 1901, and such diversions made prior to 1905 did not amount to any considerable quantity—the Power Company says 1,100 miner's inches diverted by the East Fork Irrigation District and its predecessors.

To initiate title to the use of water by adverse user, as against a riparian owner, there must be a hostile invasion of the rights of the latter to use the water, asserted in such a way that the owner may know of the claim, and adverse title can only arise where such adverse use has been exclusive, continuous and uninterrupted under a claim of right for ten years: *Bowman* v. *Bowman,* 35 Or. 279, 283 (57 Pac. 546); *Carson* v. *Hayes,* 39 Or. 97 ( 65 Pac. 814); *Oregon Construction Co.* v. *Allen Ditch Co.,* 41 Or. 209, 216 (69 Pac. 455, 93 Am. St. Rep. 701); *Britt* v. *Reed,* 42 Or. 76, 83 (70 Pac. 1029, 1030); *Davis* v. *Chamberlain,* 51 Or. 304 (98 Pac. 154); *Ison* v. *Sturgill,* 57 Or. 109, 118 (109 Pac. 579, 110 Pac. 535); *Cantrall* v. *Sterling Min. Co.,* 61 Or. 516, 524 (122 Pac. 42).

Neither mere notice of intention to appropriate water, the right to use which is vested in a riparian proprietor, nor preparation to divert the water claimed will initiate a right thereto by adverse use. Nothing short of an actual diversion that constitutes an invasion of the riparian owner's rights will operate to start the statute running: *Turner* v. *East Side Canal & Irr. Co.,* 169 Cal. 652 (147 Pac. 579); *Pabst* v. *Fimond,* 190 Cal. 124 (211 Pac. 11).

In *Turner* v. *East Side Canal & Irr. Co.,* the court said:

"A mere claim cannot establish a prescription. * * Such owner (riparian). has a present vested right before the appropriation begins, and his right

cannot be divested by the mere assertion of an intention to claim the water, nor by posting notices of appropriation or beginning work in pursuance thereof, nor even by the actual diversion for less than five years, with a view to a future public use, if the water is in the meantime wasted, or not applied to public or beneficial use.''

The statutory period of prescription in California is five years.

This litigation was instituted on the twenty-fifth day of May, 1915, as to the East Fork Irrigation District, and on September 29, 1916, as to the other claimants herein. Therefore no claim herein to the use of water by prescription can be sustained which was not initiated by an invasion of the rights of the Power Company more than ten years prior to the date that this litigation was instituted as to those asserting such adverse claims.

No support can be found in the decisions of this or any other state wherein the so-called modified doctrine of riparian rights is recognized, for the contention that vested and accrued riparian rights to the use of water for power purposes are lost by mere nonuser: Kinney on Irrigation & Water Rights (2 ed.), §§ 743, 744, 815.

''Riparian rights cannot be lost by abandonment, wherein they differ in an essential element from appropriations. The latter depend on continued beneficial use; but in the riparian right, future possible use stands as high as actual present use. Riparian rights remain both against other riparian owners and against nonriparian owners, though the water is put to no use at all.'' Wiel on Water Rights in the Western States (3 ed.), § 861.

In some jurisdictions in which common-law riparian rights upon non-navigable streams are recognized,

legislation and judicial decision disclose a tendency to limit those rights as follows: 1. The right of the riparian owner to the undiminished flow of the stream includes the quantity of water which presently or prospectively might be beneficially utilized without waste upon the riparian lands and no more, the excess, if any, being subject to appropriation; and 2. The riparian owner who has never made any beneficial use of the water to which he is entitled cannot maintain an action for damages for a diversion that invades his rights, and unless he proposes and is prepared to put his water to a beneficial use in the immediate future, he will not be granted an injunction in such a case, relief in both instances being denied because of the absence of actual damage: Kinney on Irrigation & Water Rights (2 ed.), §§ 816, 820.

The limitations mentioned fall far short of denying or destroying the vested rights of the riparian owner; they operate merely to withhold the power of the court to stay the running of the statute of limitations and to prevent title by prescription in such cases.

In the instant case there was not a total want of user of the rights incident to the riparian lands. Power had been developed upon the lands of the upper site owned by the Power Company even prior to any notice of appropriation, and the Power Company at the time of the first diversion by any of the appropriation claimants was applying 140 cubic feet per second of the water of the stream to the development of power upon the lands of its lower power site, and was planning further extensive and expensive power development upon both power sites.

The statutes under which notices of intention to appropriate were given, as well as numerous decisions of this court, expressly notified those contemplating the diversion of water from the river that the right to the flow of the water of the stream was vested in the owners of lands lying below the proposed points of diversion and contiguous to such stream by virtue of their location, and that the waters to which such right attached were not subject to appropriation, and pointed out to such intending appropriators, that if they desired to appropriate any waters embraced in such rights, they must condemn the right thereto: Laws 1891, § 8, pp. 52, 54. That right of condemnation has existed in favor of the appropriators continuously since notice of appropriation was given, but advantage has not been taken thereof. It is probable that the riparian rights mentioned had but small value prior to the time that the Power Company had expended large sums thereon in the development of power and might have been acquired by condemnation at a comparatively small cost. Having seen fit to reject the course pointed out by the statute and to ignore vested property rights mentioned therein which might conflict with their proposed use of the waters of the stream, the appropriators are not now in a favorable position to complain when those rights have arisen to plague them.

In *Miller & Lux* v. *Madera Canal & Irr. Co., supra,* the court, speaking of the obligation of an appropriator to condemn riparian rights in a situation analogous to the one under discussion, said:

"As against an appropriator who seeks to divert water to nonriparian lands, the riparian owner is entitled to restrain any diversion which will deprive

him of the customary flow of water which is or may be beneficial to his land. * *

"It is argued that, unless appropriators are permitted to divert and store for future use water which would otherwise run into the sea and be wasted, there will be a failure to make the most beneficial use of the natural resources of the state, and that riparian owners should not be permitted to obstruct the development of these resources. * * But the riparian owners have a right to have the stream flow past their land in its usual course, and this right, so far as it is of regular occurrence and beneficial to their land, is, as we have frequently said, a right of property, 'a parcel of the land itself.' Neither a court nor the legislature has the right to say that because such water may be more beneficially used by others it may be freely taken by them. Public policy is at best a vague and uncertain guide, and no consideration of police can justify the taking of private property without compensation. * * The argument that these waters are of great value for the purposes of storage by appropriators and of small value to the lower riparian owners defeats itself. If the right sought to be taken be of small worth, the burden of paying for it will not be great. If, on the other hand, great benefits are conferred upon the riparian lands by the flow, there is all the more reason why these advantages should not, without compensation, be taken from the owners of these lands and transferred to others."

In *Weiss* v. *Oregon Iron Co., supra,* the argument alluded to in the above quotation was rejected by this court in terms equally as emphatic and convincing as those used by the California court (page 501 of the opinion); and again in *Kamm* v. *Normand, supra,* answering the same argument, Mr. Chief Justice Bean, speaking for the court, said:

"It is often the case that the public good would be subserved by taking one man's property for the

benefit of the community; but as already quoted from Judge Cooley, 'it neither should be nor can be done under any circumstances without observing the only condition on which it can be permitted in constitutional government, namely, that the private proprietor be compensated for the value which he surrenders to the public.' "

This brings us to a consideration of the Water Code (Chap. 216, Laws 1909, and Chap. 221, Laws 1909; Or. L., §§ 5685–5717). The adoption of those statutes was influenced by the officials of the United States Reclamation Service, and was designed to abolish riparian rights in this state in so far as constitutional inhibitions would permit, and to substitute therefor the rules governing water and water rights in Wyoming, Colorado and other states which early rejected the common-law doctrine of riparian rights: Wiel on Water Rights in the Western States (3 ed.), § 124. The provisions of those statutes material to the question under discussion are:

"All water within the state from all sources of water supply belong to the public." Or. L., § 5715.

"Nothing in this act contained shall impair the vested right of any person, association or corporation to the use of water." Subd. 1, § 5717.

"Actual application of water to beneficial use prior to the passage of this act by * * any riparian proprietor, or by or under authority of his or its predecessors in interest, shall be deemed to create in such riparian proprietor a vested right to the extent of the actual application to beneficial use." Subd. 2, § 5717.

"And where any riparian proprietor, * * shall, at the time this act is filed in the office of the secretary of state, be engaged in good faith in the construction of works for the application of water to a beneficial use, the right to take and use such water shall be

114 Or.—16

deemed vested in such riparian proprietor; provided, such works shall be completed and said water devoted to a beneficial use within a reasonable time after the passage of this act.'' Subd. 3, § 5717.

''This act shall not be held to bestow upon any person, association or corporation, any riparian rights where no such rights existed prior to the time this act takes effect.'' Subd. 8, § 5717.

It will be noticed that the foregoing provisions, while expressly prohibiting a construction of the act that would impair any vested right to the use of water, at the same time attempted to limit the vested rights of riparian proprietors to those cases where at the time of the passage of the act, the riparian proprietor had, (1) applied water to a beneficial use, and to the extent of such application, or (2) was engaged in good faith in the construction of works for such application.

If it were permissible to give full effect to the above-mentioned limitations of the statute, the Power Company is entitled to priority over the appropriators to the extent of 140 second-feet that it was applying to beneficial use at the time the Water Code was adopted, and possibly to the extent of 640 second-feet, as the record indicates that the predecessor of the Power Company was then engaged in good faith in the construction of works for the use of the last-named quantity of water for the development of power. But, upon well-settled principles, it was beyond the power of the legislature to abridge or abrogate riparian rights that had accrued and become vested prior to the passage of the act.

In his valuable work on Irrigation and Water Rights (2 ed.), Mr. Kinney, who frankly expresses a preference for the Colorado rule, states the result of his examination of the cases as follows:

"§ 816. Many of the states and territories of the West, upon the theory that the common law rule was inapplicable to their condition, by constitutional provisions, statute, or by court decisions, entirely abrogated riparian rights, as they had the power to do, and in lieu thereof adopted the Arid Region Doctrine of appropriation. The adoption of the new rule could not and did not have the effect of abolishing riparian rights which had already accrued and vested, but only prevented the acquisition of such rights in the future. The substitution of the law of appropriation, instead of the common law rule of riparian ownership, is applicable only to those waters in the state which are unappropriated; or, in other words, which have not become the property of riparian proprietors."

In an earlier section the author says:

"§ 389. It is generally conceded, however, that the adoption of a constitutional or legislative provision making all the flowing streams and other waters forever the property of the public, or State, will not be held. to have destroyed riparian rights, which had vested prior to the passage of such provision. As was held in the case of *Crawford Co.* v. *Hall,* the legislative enactment to this effect did not have the result of abolishing vested rights of riparian proprietors, but affected only such rights as might have been acquired in the future under the law as theretofore existing. To hold otherwise would be to hold that one could be deprived of his property without due process of law, which would be in direct conflict with the Federal Constitution, that great safeguard of the rights of property, as against legislative encroachment."

In support of the foregoing text the author cite; the following cases: *Biglow* v. *Draper,* 6 N. D. 152 (69 N. W. 570) ; *McGhee Irr. D. Co.* v. *Hudson,* 8ª Tex. 587 (22 S. W. 398); *Barrett* v. *Metcalf,* 12 Tex.

Civ. App. 247 (33 S. W. 758); *Crawford Co.* v. *Hathaway,* 67 Neb. 325 (93 N. W. 781, 108 Am. St. Rep. 647, 60 L. R. A. 889); *Meeng* v. *Coffey,* 67 Neb. 500 (93 N. W. 713, 108 Am. St. Rep. 697, 60 L. R. A. 910); *Lux* v. *Haggin,* 69 Cal. 255 (4 Pac. 919, 10 Pac. 674); *Rossmiller* v. *State,* 114 Wis. 169 (89 N. W. 839, 91 Am. St. Rep. 910, 58 L. R. A. 93); *Nielson* v. *Sponer,* 46 Wash. 14 (89 Pac. 155, 123 Am. St. Rep. 910); *Nesalhous* v. *Walker,* 45 Wash. 621 (88 Pac. 1032); *Colorado Mill & El. Co.* v. *Larimer,* 26 Colo. 47 (56 Pac. 185); *Armstrong* v. *Larimer County D. Co.,* 1 Colo. App. 49 (27 Pac. 235); *Farm Invest. Co.* v. *Carpenter,* 9 Wyo. 110 (61 Pac. 258, 87 Am. St. Rep. 918, 50 L. R. A. 747).

The expressions of this court are to the same effect: *Pringle Falls* v. *Patterson,* 5 Or. 474 (128 Pac. 820, 132 Pac. 527); *In re Willow Creek,* 74 Or. 592, 616 (144 Pac. 505, 146 Pac. 475).

In the latter case, Mr. Justice BEAN, referring to the Water Code, said:

"The first section of the act declares that nothing therein contained shall be so construed as to take away or impair the vested right of anyone to any water; and Section 70, subdivision 1, is to the same effect. Any appropriation of water under the provisions of the act is thereby made subject to such condition. In the absence of such legislative announcement the lawmakers have no power to destroy such a right. The main purpose of the law is to protect water rights and to promote the utilization of the same. The right to the use of water is a valuable property right guaranteed to every citizen. It cannot be arbitrarily nor unreasonably interfered with by the legislative department of the state."

It is thus clear that the riparian rights of the Power Company could not be, and were not, extinguished or impaired by the statutes mentioned.

Finally, the Water Board and the lower court denied priority to the riparian rights of the Power Company, upon the ground that the form of claim filed by the Power Company in this proceeding presented for adjudication a claim for a definite and fixed amount of water and constituted it a claimant by appropriation and not as riparian owner. That determination was based upon decisions of this court holding that a riparian proprietor who claims an exclusive right to water as an appropriator from a stream flowing through his lands, and proposes to maintain his asserted claim against all comers, thereby waives his riparian rights; *In re Sucker Creek*, 83 Or. 228, 234 (163 Pac. 430), where all the earlier decisions are collected and cited.

The statement of claims of the Power Company in the instant case do not bring it within the rule established by the decisions above cited.

The statute providing for the adjudication of the relative rights of the various claimants to the waters of a stream requires that each claimant shall set forth and state his claim in writing under oath upon a blank form furnished by the Water Superintendent, which statement in writing shall contain all the particulars necessary for the determination of his rights to the waters of the stream to which he lays claim: Or. L., § 5734.

The statute also required the claimant to power rights to pay certain designated fees at the time of submitting proof based upon the theoretical horsepower which he claims the right to develop by the use of water from the stream: Or. L., § 5737.

The form supplied by the superintendent and which the claimant is required to use contains questions which the claimant must answer in writing under

oath upon submitting his claim. The statements of its claims herein were made by the Power Company on such forms; an examination of those statements shows the following questions and answers:

(Lower Development.)

"3. Q. What is the nature of the right or use on which this claim to the waters of said stream is based? A. Riparian ownership. See Exhibit 'A.'

"4. Q. How was such right initiated, or upon what is it based? A. Right is based upon ownership of riparian rights. See Exhibit 'A' attached hereto and made a part hereof.

"5. Q. State the date of the initiation of such water right? A. See Question 6.

"6. Q. What steps were taken by this claimant or his predecessor in interest to initiate said right? Answer fully, attaching separate sheet if necessary. A. The right to the waters was acquired with the lands, and passed by mesne conveyances from the United States to claimant. See Exhibit 'A' attached hereto and made a part hereof. * *

"23. Q. If water is used for power, state the total fall utilized and the theoretical (not actual) horse-power developed. A. Present development utilizes 140 second-feet at 46 feet head, giving 730 theoretical horse-power. Proposed and partly constructed extensions utilize 750 second-feet at 120 feet head, giving 10,227 theoretical horse-power."

(Upper Development.)

"3. Q. What is the nature of the right or use on which this claim to the waters of said stream is based? A. Riparian ownership. See Exhibit 'A.'

"4. Q. How was such right initiated, or upon what is it based? A. The right is based upon ownership of riparian rights. See said Exhibit 'A.'

"5. Q. State the date of the initiation of such water rights? A. See Question 6.

"6. Q. What steps were taken by this claimant or his predecessor in interest to initiate said right? Answer fully, attaching separate sheet if necessary. A. The right to the waters was acquired with the lands, and passed by mesne conveyance from the United States to claimant.  See Exhibit 'A' attached hereto and made a part hereof. * *

"23. Q. If water is used for power, state the total fall utilized and the theoretical (not actual) horse-power developed. A. The present development utilizes 640 second-feet at 28 feet head, giving 2,036 theoretical horse-power.  Proposed extensions utilize 750 second-feet at 252 feet head, giving 21,477 theoretical horse-power."

In Exhibit "A," referred to in the foregoing answers, the Power Company in each case reasserted its claim to waters as a riparian proprietor, and as the basis for such claim specifically described the lands through which the stream flows, and to which its riparian rights are incident, and set forth the dates of the several grants and conveyances whereby title thereto became vested in the Power Company.  Throughout the statements of claim the Power Company emphasized its reliance upon its riparian ownership of the lands, and only referred to or used definite quantities of water used by it, or which it proposed to use, in response to the requirements of the statute and the exaction of the Water Superintendent.

Under no rule of interpretation fairly applied can the statements of the Power Company be construed as claims to the use of water based upon appropriation.  It was compelled by the statute to designate the amount of water it proposed to use, in order to secure recognition and adjudication of its rights: *Pacific Livestock Co.* v. *Cochran,* 73 Or. 417 (144 Pac.

668). Under the facts of this case, its compliance with that requirement properly cannot be construed as a waiver or abandonment of its riparian rights.

The decree of the Circuit Court should be modified in accordance with the controlling principles above set forth, as they are further explained and applied to the facts of this case in the admirable opinion of Mr. Justice Burnett.

Mr. Justice Brown concurs in the dissent.

BURNETT, J., Specially Concurring With Mr. Justice McCOURT.—One who, prior to the passage of the Desert Land Act of March 3, 1877, acquired from the United States title to land through which flowed a stream to the waters of which no one except the government at the time had any right, took with the land as part thereof an estate in the water flowing in the stream. This right to the use of the water, by reason of the situation of the settler on the stream, was something not enjoyed by anyone subsequently entering upon lands not washed by the stream and was entitled to the protection of the law. It was the riparian right known to the common law. It was vested in the settler simultaneously with his acquisition of title to the land. By virtue of this right the bank owner supplied to his household water taken from the stream, let his domestic animals drink of its waters and made such use of the water flowing there as he could for power purposes on the condition that he took it out and returned it to the channel on his own land, allowing it to flow on down to lower riparian owners unimpaired in quality and undiminished in quantity except as consumed for the domestic purposes mentioned. That such riparian

rights have been recogniezd, maintained and protected in Oregon is thoroughly demonstrated by the precedents cited by Mr. Justice McCourt. Such rights are included in the clauses "subject to existing rights" and "vested right of any person, firm, corporation or association to any water" found in the Oregon Water Code: Or. L., §§ 5716, 5717.

Vested as they were at and prior to the passage of the Water Code in 1909, dating back to the first settlement upon government lands, it was not within the power of the legislative department to divest the owners of those rights except by the exercise of the right of eminent domain upon due compensation. The act protects the vested rights of both riparian owners and appropriators and it would be unconstitutional if it were properly construed as impairing those rights.

Appropriation of water had its origin in early mining days when no one cared for the title to land after the precious metals had been washed from the placers. Water was the prime essential for that process and the miners took it wherever they could obtain it. Naturally, he who was prior in time was held to be paramount in right. The general government, as owner, in almost every instance, of the lands upon which appropriations of water were made, tolerated them, then recognized the customs of miners and finally by such legislation as the Desert Land Act, gave statutory sanction to appropriation of water but always, as stated in that statute, "subject to existing rights." In time, as placer mines were exhausted and the people engaged more extensively in pastoral and agricultural pursuits in the western country, water came to be appropriated

for those purposes. So it resulted that while at common law the controlling idea about water was to allow it to flow on in the stream as nature placed it, public necessity in the arid west gave rise to the new theory that water should be taken out of the stream wherever possible and put to some beneficial use. Benefit, not ornament, is the ideal in the use of water in this state. Hence the rule has come into existence, applicable to all users of water, whether bank owners or appropriators, that when one has no present use for water, he must allow it to be employed by another who will then apply it to some beneficial purpose. Even a prior appropriator having no present use for the water he has appropriated, must for the time being yield to the junior appropriator who stands ready to use it. This does not necessarily mean the extinction of the estate of the senior appropriator. His right may be only temporarily in abeyance and will again come into operation when he has a present use for the water. The use of the water by the junior under such circumstances is not adverse to but in deference to the superior appropriation. So also as between a riparian owner and a subsequent appropriator, the latter may use the water to the extent that the former has no present employment for it and such use is not necessarily hostile nor adverse so as to result in title by prescription. It is only when the present beneficial use of water by one entitled to use it, whether he be an appropriator or a riparian owner, is invaded in a hostile manner that title by prescription will result if the invasion is maintained continually for ten years. If the rule were otherwise, rotation among water users could never be accomplished.

Being thus vested, no court or legislature can lawfully abridge those riparian rights nor take them from the owner unless by proper exercise of eminent domain. The most that can be done is to provide for the use by others of the water when and to the extent not employed by the riparian owner. This is a matter of administration applicable to all manner of water rights and does not give rise to a permanent estate in the water in derogation of the senior title. For illustration: to require one who uses water only in the wet season for mining whether as an appropriator or as a riparian owner, to allow it to flow to some junior appropriator during the season of, and for the purposes of irrigation does not lessen the estate of the miner. It only promotes the paramount purpose of applying the water to a beneficial use. So in the present instance, it would be competent as an administrative measure under proper legislative regulations to require the Pacific Power and Light Company to allow the surplus water, beyond what it is presently using, to go to those who, though junior in time and right, are ready at once to employ the water. As in the beginning, the riparian owner had the right to use all the water of the stream on condition that he both diverted and returned it to the channel on his own land, this right will continue unimpaired to be called into action and full enjoyment whenever he can beneficially use all the water. It would be an unlawful abridgment of the riparian owner's right to ascertain and determine finally and for all time that a fixed amount of water less than the full capacity of Hood River is all that he will ever have the right to use. To thus limit the exercise of riparian ownership is to turn the bank owner into

an appropriator against his will, and diminish his estate in the water.

There is no difficulty in law about the recognition and maintenance of riparian rights and appropriations. They are no more incompatible than titles to land by judgment and execution, or by prescription, or by deed, are inconsistent with each other. It is all a matter of the tenure by which the right to use the water is held. The whole argument about their incompatibility springs from the desire of those who have not, to possess without paying for it, the property of those who have. Priority in either case spells supremacy and this cannot be defeated except by abandonment, voluntary alienation or through the operation of eminent domain.

It has been said "that the rights of the Power Company could have been condemned by the appropriators of the water under the act of 1891." The company never had or claimed anything else than riparian rights which accompanied and were part of the land derived by an unbroken line of conveyances from the holder of the allodial tenure, the United States. If the company had something to condemn, it has something which, in the absence of condemnation, the courts are bound to protect, the same as any other property. On the other hand, if the rights of the appropriators who came upon the stream after the company and its grantors, are superior to those of the latter, there is no need of condemnation. Resort to eminent domain is had only for the extinguishment of what is otherwise a paramount title.

It has also been said *arguendo* "that the Power Company could have exercised its right to appropriate

all the water of Hood River for power purposes.''
So far as that is concerned, and so long as it both
diverted and returned the water on its own land
there was no occasion for appropriation, for the
use of the whole stream would not be in derogation
of the rights of other riparian owners. Appro-
priation in the true sense occurs only where water
is taken from a stream and never returned. It
happens also when a riparian owner takes out water
claiming a certain fixed quantity to the exclusion
in whole or in part of lower riparian owners and
does not return it to the channel for their use.
By such action he abandons his role of riparian
proprietor, severs his tenancy in common of the
water with other riparian owners, and becomes an
appropriator or tenant in severalty of the amount
he takes out. He cannot be an appropriator and
a riparian owner simultaneously because no one can
be at once a tenant in severalty and a tenant in
common of the same property: *Caviness* v. *La
Grande Irr. Co.*, 60 Or. 410 (119 Pac. 731). In that
case the following excerpt appears:

"Primarily, any use of the water of a natural
stream for a beneficial purpose is free to him who
has an opportunity to take it without infringing
upon the property rights of another. * * Con-
cerning the mere diversion and use of water there
is no difference between a nonriparian appropriator
and riparian user, provided the former has a lawful
right of access for that purpose to the stream from
which the diversion is made. The essential condi-
tion of appropriation in the first place on public
lands was the consent or acquiescence of the then
riparian owner, the general government. The
reason of the rule is not changed by the fact that
the riparian owner is a private person provided the

appropriator has his consent, or, what is equivalent, that the appropriator and the riparian owner are one and the same person. The deduction then is that if any one can lawfully gain access for that purpose to a non-navigable stream, and water is there not subject to use by another, such a one may appropriate it for his own use.''

Mr. Chief Justice EAKIN, while concurring in the result, withheld his assent to that portion of the opinion on the ground that its effect would be to abolish riparian rights. His dissent indicates his conviction of the existence and validity of those rights but his fears for them were groundless. The quoted language was illustrative of the difference between the prevailing ideas respecting the use of water in common-law times and in the modern days in the dry parts of this country. Then the controlling thought was to let the water flow in the stream according to nature's design. Now it is to divert it and use it elsewhere for beneficial purposes. The latest theory sprang from the necessities of the times and country, beginning with the early placer mines in California and extending gradually to agriculture and horticulture. If one desiring to appropriate water could lawfully gain access to a stream, that was but one step towards the fulfillment of his purpose. He might then find that the rights of lower riparian proprietors had attached before he got to the water. These he was bound to respect, the same as any other right appertaining to their lands and thus he would be prevented from appropriating water to their damage.

No one questions the right of the legislature in virgin territory, before riparian rights have attached, to abolish that feature of property in lands; but

after such rights have accrued to the owners of land
bordering on streams of water, no legislation is
valid which would destroy those rights to subserve
the interest of another class of people. The doctrine
of riparian rights, as known to the common law,
had been so often recognized and enforced in this
state prior to the enactment of the Water Code that
it was thoroughly established in the jurisprudence
of the commonwealth. It is believed that such a
measure could not have become a law without con-
taining the reservation it has in favor of ''vested
rights.'' That class of legislation came too late in
the history of Oregon to overturn riparian rights
so numerous and so long enjoyed. The legislature
could not constitutionally do so. It did not so
intend nor act. On the contrary, it expressly ex-
cepted vested rights from the operation of the
statute.

After riparian rights are lawfully acquired, they
continue and abide the same as any other part of
the land to which they belong. They may be regu-
lated so as to provide for the use temporarily by
others of the surplus water that is not employed at
the time by the riparian owner. The same principle
applies as between senior and junior appropriators,
the design being to effect the maximum beneficial
use of the water, having due regard to vested rights.
But as to the use by others of the surplus, it must
yield whenever the owner of the prior right, whether
riparian or that of an appropriator, has present
use for it. When that condition arises, the riparian
owner or the prior appropriator has the prerogative
of retaking the water to the full extent of his right
as against the junior user of the surplus. In the
case of the owner of riparian rights under such

circumstances he can retake the whole of the stream if his diversion and return are both on his own land provided he puts the water to a beneficial use. Use of the mere surplus under temporary regulation is not adverse to the paramount right in the water. It is only adverse when it interferes without their consent with the present beneficial use of the water by the prior appropriator or the prior riparian owner. The riparian right being part of the land, courts have no jurisdiction to limit the owner permanently to the amount of water he is now using for power purposes as such riparian owner nor restrict in that manner the future expansion of his plant.

As well as irrigation, the production of electric light and power is a useful purpose and, in this case, the Pacific Power & Light Co., being the riparian owner under title antedating all the appropriations mentioned in the record and engaged in that pursuit has the right to enlarge its plant in the future so as to use as such riparian owner all the water of Hood River, allowing the surplus in the meanwhile, beyond its present needs, to go to the benefit of junior water users as their interests may appear.

For the foregoing reasons as well as for those he has advanced, this is the plain deduction from the able opinion of Mr. Justice McCourt, with which, in that sense, I concur.


BROWN, J., Specially Concurring.—I concur in the dissenting opinion of Mr. Justice McCourt.

Our Water Code is copied largely from that of California. That state has been the pioneer in the

enactment of legislation pertaining to the use of water in the development of irrigation. In that state, as in this, the common-law doctrine in reference to riparian rights has prevailed, and that doctrine has never been questioned in California since the decision of the Supreme Court of that state in the case of *Lux* v. *Haggin,* rendered on April 26, 1886, reported in 69 Cal. 263 (4 Pac. 919, 10 Pac. 674). From legislation and the decisions of the Oregon. Supreme Court, the writer had become convinced that that question was *stare decisis* in this state.

Honorable LUCIEN SHAW, Chief Justice of the Supreme Court of California, in an instructive address on the subject of the development of law of waters in the west, appearing in the ''American Bar Association Journal'' of September, 1922, says, in reference to the case of *Lux* v. *Haggin, supra,* and the doctrine therein announced:

''Probably no case ever came before the Supreme Court of California that was more fully argued or in which counsel of greater ability were engaged on the respective sides. The opinion was exceedingly exhaustive, covering 176 pages of the printed report. It is the longest opinion to be found in the decisions of our Supreme Court, and it elaborately treated every phase of the subject. It declared that the rights of the riparian owners to the use of the waters of the abutting stream were paramount to the rights of any other persons thereto; that such rights were parcel of the land, and that any diminution of the stream against the will of the riparian owner by other persons was an actionable injury. The question was settled by that case, and the riparian right has never since been disputed.''

In speaking of the question that the policy might be injurious to nonriparian lands, the learned Chief Justice said:

"The opponents of the doctrine of riparian rights had pointed out these results with much emphasis. * * The obvious answer on the question of policy is, that the objection comes too late, that it should have been made to the Legislature in 1850, prior to the enactment of the statute adopting the common law. When that was done, the riparian rights became vested, and thereupon the much more important public policy of protecting the right of private property became paramount and controlling. This policy is declared in our constitutions, has been adhered to throughout our national history, and it is through it that the remarkable progress and development of the country has been made possible.

"Notwithstanding the existence of these vested rights, there has been a very general use of water on nonriparian land. This has been made possible by several causes. The most important and effective cause of a legal nature is the common-law rule, now expressed in Section 1007 of the Civil Code, that a title by prescription, good against all owners of private property, may be acquired by adverse occupancy."

In my opinion, the nonriparian owner of lands in nonarid districts would not suffer substantial injury by a full enforcement of what I conceive to be the law of the land. I am fully aware that on much of the nonriparian land along the Malheur, the Owyhee, and other streams in eastern Oregon, the sagebrush has been uprooted and water appropriated from the streams and conveyed to the soil, which now grows fields of grain, alfalfa, orchards and gardens. Further, it is my opinion that the common law, as now expressed by our statute, has,

by prescription and adjudication, given to many of these nonriparian users a valid right to the use of the water thus appropriated.

Finally, as to vested rights in land: In Oregon, as well as in the State of California, rights of property which have been created by the common law cannot be taken away without due process: *Munn* v. *Illinois*, 94 U. S. 113 (24 L. Ed. 77, see, also, Rose's U. S. Notes); *Second Employers' Liability Cases*, 223 U. S. 1, 50 (56 L. Ed. 327, 38 L. R. A. (N. S.) 44, 32 Sup. Ct. Rep. 169).